UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
BROWARD DIVISION

In re:

SEVEN STARS ON THE HUDSON
CORPORATION, d/b/a ROCKIN' JUMP

        Debtor,

_____/

Case No19-17544 - RBR
Chapter 11

SEVEN STARS ON THE HUDSON
CORPORATION, d/b/a ROCKIN' JUMP,

        Plaintiff

v.

MDG POWERLINE HOLDINGS, LLC
AND XBK MANAGEMENT LLC,
d/b/a XTREME ACTION PARK,

        Defendants.

_____

Adversary Proceeding
No.

## **COMPLAINT**

Plaintiff, Seven Stars on the Hudson Corporation, d/b/a Rockin' Jump, debtor
and debtor-in-possession ("Debtor"), sues the Defendants MDG Powerline
Holdings, LLC ("Landlord") and XBK Management, LLC, d/b/a Xtreme Action
Park ("Xtreme"), and alleges as follows:

1

1) This adversary proceeding is brought against: (a) the Landlord and Xtreme for (i) breach of the lease including the breach of the implied duty of good faith and fair dealing, (ii) breach of the covenant of quiet enjoyment, and, (iii) violation of the unfair and deceptive trade practice act under Fla. Stat. §§ 501.204, (iv) assumption of the Lease, and (b) against Xtreme for tortious interference with business relationships.

2) The Court has jurisdiction over this adversary proceeding under 28 US.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B) and (M).

3) Venue is proper before this Court under 28 U.S.C. § 1409.

4) On June 5, 2019, the Debtor commenced the above stated main bankruptcy case with the filing of a voluntary petition.

5) At all relevant times, the Debtor was a corporation, duly organized under the laws of the State of Florida with its principal place of business located in Ft. Lauderdale, Florida.

6) Upon information and belief, at all relevant times, Defendant, Landlord was a limited liability company, formed under the laws of the State of Florida, with its principal place of business located in Sunny Isles Beach, Florida.

7) Upon information and belief, at all relevant times, Xtreme, was a limited liability company, formed under the laws of the State of Florida, with its

principal place of business located in Ft. Lauderdale, Florida. Upon further information and belief, a principal of the Landlord has an ownership interest in Xtreme.

**THE LEASE**

8)  The Debtor is the tenant under the terms of a written commercial lease agreement between Debtor and Landlord (the "Lease" or the "Agreement").[1] Debtor paid three months' rent as a deposit totaling approximately $115,000.

9)  The initial term of the Lease is ten (10) years beginning on the commencement date, November 23, 2015. The Lease also provides for options to renew for three additional five (5) year terms. Since the inception of the Lease, Debtor has continuously occupied a portion of the commercial premises located at 5300 N. Powerline Road, Ft. Lauderdale, FL hereinafter referred to as the "Premises". True and correct copies of the Lease Agreement and the First Amendment are annexed collectively as Exhibit 1.

10) A Second Amendment to the Lease was made and entered into the Landlord and Debtor as of June 6, 2016 ("Second Amendment"). A true and correct copy of the Second Amendment to the Lease is annexed as Exhibit 2. A third amendment to the Lease was made and entered into November 2016. A true

---

[1]     The Debtor is also the franchisee under the terms of a franchise agreement dated December 5, 2014. Under the terms of the franchise agreement, the Debtor was obligated to pay six percent (6%) of gross revenues as royalty fees.

and correct copy of the Third Amendment to the Lease is annexed as Exhibit 3.

11)   Per the Second Amendment, the Premises consists of a portion of Bays 6 and 7 of the first floor of a subdivided commercial unit (approximating 18,200 square feet), and a portion of Bays 6, 7 and 8 of the second floor (approximating 2,900 square feet). The Premises is housed within a larger space occupied by co-defendant Xtreme.

12)   Under the terms of the Lease as amended by the Second Amendment, Debtor's gross rent obligation was to begin on the earlier of the issuance of a certificate of occupancy or September 1, 2016 with an agreed upon escalation every year. The initial monthly gross rent was $30,151.52.

13)   Jens Berding and Eddy Manzo-Berding, the owners of Debtor, each executed a limited guarantee not to exceed the amount of one year of the Gross Rent.

**CONSTRUCTION AND OPENING OF THE BUSINESS**

14)   As set forth in the Lease, the primary use of the Premises is as an indoor trampoline park and family fun center.

15)   Although the Premises is situated in a commercial area among a number of warehouses, the Landlord represented to the Debtor and its owners that the entire facility, comprised of over 200,000 sq. feet of warehouse space was in the process of being converted to an entertainment mall geared towards family

4

entertainment. The Landlord represented that there would be several vendors in the space catering to families, including restaurants.

16) The Debtor obtained financing totaling $1.4 million from Wells Fargo for the build-out of the Premises as a franchised trampoline facility, and construction began in or about mid of 2016.

17) In addition to the construction of the Premises, the Debtor also used working capital of approximately $200,000 to contribute ~43% to the buildout costs of bathrooms in Xtreme and reimburse landlord for the cost of HVAC equipment.

18) The Lease also anticipated that there would be an operating agreement which would govern the operation of the entertainment mall and delineate the rights and obligations of the tenants as to each other. To date, and despite multiple communications by Debtor to the Landlord, no such agreement has been executed.

19) The Lease obligates the Landlord to maintain the primary ingress and egress to the Premises the "Access Point" during Debtor's business hours. The Landlord was further obligated "not to inhibit passage of patrons through the Access Point during any hours of operation" that the parties had agreed upon.

20) The Lease also contained marketing requirements. Specifically, the Debtor was required to "spend no less than" $25,000 per year for marketing which

5

was required to reference the property location (5300 Powerline Road). The Debtor complied with this requirement and referenced Xtreme in its marketing materials.

21)    In addition to these marketing costs, Debtor is also required to contribute up to $25,000 for joint marketing campaigns. Debtor has sought multiple times to confer with Xtreme, but Xtreme has not agreed to any of Debtor's proposed joint marketing campaigns and has not invited Debtor to join in any of its marketing campaigns.

22)    Under the Second Amendment, Debtor and Landlord agreed that Tenant would be permitted to have interior signage. Specifically, Debtor is permitted to have interior signage "near the front of the building" and also to have "rights to the pro-rata portion of or dedicated panel on any existing or future pylon or monument". Although the signage required the Landlord's approval, such approval could not be unreasonably withheld.

23)    Finally and as relevant here, the Second Amendment provided that, in the event the front desk area outside of the Premises was reconstructed and/or expanded, the Debtor would be able to place its registration area and perform its registration activities within the expanded area.[2]

---

[2]    While there was a Fourth Amendment purportedly executed between the Landlord and the Debtor its validity is questionable, Xtreme was not a party to that Agreement and the allegations set forth in this Complaint arose after the date of this Amendment.

6

## DEFENDANTS' WRONGFUL ACTS

24) The Debtor opened for business on November 22, 2016.

25) In keeping with the Lease requirements, Debtor operated its business "during all business hours established by Landlord as the hours of operation for the Property" except for times when the lease allowed a later opening time or later or earlier close time.

26) Debtor's busy season begins in earnest on or about June 1st just as schools are ending their academic year. Because the Premises would be in a mall setting, the Debtor anticipated that customers visiting the mall, particularly ones with young children, would utilize the Premises. Debtor also targeted summer camps and other groups in its family friendly.

27) For a period beginning in mid-2016 prior to Debtor's opening and through early Fall 2017, Xtreme and the Debtor engaged in cross-promotion advertising which benefitted both parties. For example, Xtreme included Debtor on its weekly email blasts, on its website, in brochures and rack cards. Debtor reciprocated and referenced Xtreme on its website and in its print advertising. This was in keeping with the lease requirements and the fact that this warehouse space was created as a mall of family entertainment.

28) During the summer of 2017, the Debtor operated at a profit and saw its business steadily grow through its first full season.

29)   Beginning in late Fall 2017, the relationship between Xtreme and Debtor took a downward turn. Since that time and as described below, Xtreme, acting in concert with the Landlord, deliberately sabotaged Debtor's business activities.

*Absence of signage and information for Debtor's business*

30)   The Lease, as amended by the Second Amendment, provides that the Debtor has the right to maintain signage near the entrance to the property. This was particularly important to Debtor given that its location was towards the rear of the property and because it was surrounded by the Xtreme attractions.

31)   The only posters hanging directly outside the entrance to the facility advertise only the Xtreme attractions. Copies of photographs showing the exterior of the warehouse facility are annexed as Exhibit 4. Moreover the signage on the door leading into the facility references only Xtreme. A photograph of the front door or "Access Point" is annexed as Exhibit 5.

32)   Customers wishing to access the Premises are required to proceed through the space occupied by Xtreme. Prior to Spring 2018, Debtor maintained a satellite desk at the entrance to the entertainment facility alongside Xtreme by which it would check in customers and provide the necessary waiver forms. A copy of the front desk area showing the Debtor's satellite desk as it existed in May 2017 is annexed as Exhibit 6.

33) In or about May 2018, Xtreme undertook renovations at the front of the facility near the entrance, including the installation of kiosks to further its separate business interests. Debtor's satellite front desk which had been in place since June 2017, was dismantled and removed by Xtreme during this renovation. Copies of photographs showing the revamped space advertising Xtreme attractions and the kiosks which replaced the Debtor's satellite desk are annexed collectively as Exhibit 7.

34) Thereafter, Xtreme deliberately delayed the operation of installing the necessary cables or installed them improperly. Xtreme never approved the Debtor installing its own cables connecting its park with its satellite desk and again, the Debtor was forced to contract with an employee of Xtreme on a private basis for such services. This delayed a workable operation that Debtor needed in order to replace the satellite desk at the entrance. No reason was given for this action. Complaints to both the Landlord and Xtreme went unanswered for several months.

35) In addition, in or about April 2018 and during the renovation, Debtor discovered that its eight (8) foot long sign, which had previously hung in the lobby, had been removed with no prior notice. Neither the Landlord nor management of Xtreme contacted Debtor to advise of the sign's removal. Approximately six months after this removal, the sign was found by a

subcontractor working for Xtreme in a storage area, which upon information and belief, was and is exclusively used and controlled by Xtreme. A photograph of this sign is annexed as Exhibit 8.

36) Debtor requested that the sign be reinstalled at its original spot. Xtreme, through the Landlord communicated that the Landlord now did not approve of the old sign. Xtreme further stated that it would install a television screen and a separate "hanging sign" that Xtreme would pay for, asserting that this would be "more appropriate and quality signage that is in line with the facility".

37) The television screen installed by Xtreme was a poor substitute for the eight-foot sign previously in place, in that it advertises both its business as well as Debtor's business and gives a significantly less amount of screen time to Debtor. Specifically, the television monitor provides only a 3 to 4 inch banner that references the trampoline park without any mention of Debtor's name. This banner alternates every 6-8 seconds with an advertisement for Xtreme's Escape Room. No permanent signage has been re-installed on Debtor's behalf. In addition, Xtreme is now using the television monitor to further promote its separate business interest called "Evolution Room", thus further diluting the amount of screen time that customers will be able to view Debtor's business/entertainment offerings.

38) Nor are there any directional signs for customers once they enter the facility. In fact, upon entering through the Access Point, the only signage relates to the Xtreme attractions. The entrance is manned by an Xtreme employee who distributes activity maps. While the map references a trampoline park, Debtor's name is not mentioned. A copy of the map together with photographs showing the current directional signs are annexed collectively as Exhibit 9

39) Without the reference to Debtor's name, any reasonable person would likely assume that the "Trampoline" signage is just one more aspect of Xtreme's business and not part of a Debtor's business. Following the completion of Xtreme's renovation, Debtor was not permitted to place any signage near the front entrance or against the back wall of the newly renovated front desk/ticket center. In short, Debtor's name is not referenced anywhere inside the entertainment facility other than on the Debtor's Premises—which is located at the back of the facility.

*Intentionally blocking the view of Debtor's logo*

40) Xtreme also expanded its ropes course. The expansion of the ropes course was positioned directly in front of Debtor's space and blocked the view of its logo.

41) During the actual construction itself, large areas were unnecessarily blocked off limiting access to Debtor's logo as well as direct customer access to its park.

42) Xtreme also positioned its arcade games directly in front of Debtor's front entrance window which limited visibility to Debtor's park. After Debtor raised this as an issue, and only towards the end of the summer season, the Landlord or its agent finally directed the removal of these games.

*No advertising*

43) It was agreed between Xtreme and Debtor that the two businesses would cross-advertise and spend marketing monies on same. As noted above, Xtreme had a tab on its website dedicated to Debtor which would then link to Debtor's website. In addition, Xtreme would advertise at least one Debtor event per week on its calendar and would distribute an email with weekly activities to all its waiver holders. However, Xtreme stopped this agreed upon advertising on or around February of 2018.

44) Since early 2018, the Landlord and/or its agent, Xtreme, have requested additional payments from Debtor to provide it with the dedicated space on the outside marquee. The amount of the requested payment by far exceeds the cost of the signage and Debtor was not allowed to install their own graphic.

In addition, Xtreme wanted to allocate less space to Debtor than the lease would provide.

45) After much back and forth, Xtreme willfully refused to provide any space on the marquee outside the Building in which the Premises is located to advertise Debtor's business. No reason was given. Significantly, either the Landlord and/or Xtreme have allocated marquee space to an unrelated transportation company located in a neighboring warehouse space but which has nothing to do with Xtreme. Moreover, the marquee has empty space, and in addition, continues to advertise the presence of an auto museum (connected to the Landlord) even though this museum closed months ago. Photographs of the marquee are annexed as Exhibit 10.

46) Debtor sought to compensate for this loss in advertising by staffing employees to greet Debtor's customers as they arrived and to direct them to the Premises. Once Xtreme learned of this, it threatened these employees with immediate ejection from the property if they continued to direct Debtor's customers to the Premises.

*Lock-out Events*

47) Xtreme has held several lock-out events in the facility. A lock-out event is an event whereby a business purchases the right to use the amenities of the facility exclusively for its own employees or guests. Under an agreement

reached between Xtreme and the Debtor, the Debtor was supposed to be paid for each guest of the business hosting the event. In addition, Xtreme agreed that it would not block access for Debtor's customers.

48)    Nevertheless, at certain of the events held, Xtreme refused and/or deliberately delayed compensation to Debtor for the event(s).    Moreover, Xtreme's employees turned away Debtor's customers and/or otherwise blocked their access to Debtor's Premises.

49)    By way of example, during a corporate lockout event arranged for a certain local car dealership in late 2017, Xtreme positioned a staff member in front of Debtor's business advising the car dealership employees that Debtor was not part of the lockout event. At this same event, Xtreme also blocked the agreed upon access for Debtor's customers by telling arriving guests that Xtreme was closed for a private event.

50)    Xtreme willfully breached its agreement with Debtor to leave the facility open for Debtor guests during this lock-out event, as well as communicate to the employees/guests of the local car dealership that Debtor was open for them to enjoy the trampoline park. Debtor only found out about Xtreme's behavior because one of Xtreme's employees attempted to block one of Debtor's owners from accessing the Premises during the lock-out event.

51)    Xtreme continues to sell Debtor's business as part of lockouts even though it
has no right to do so without the explicit permission from Debtor.  This
happened on various occasions during the 2018 negotiations of the lockout
pricing and Xtreme only informed Debtor of its sales activity several weeks
before the actual occurrence of these events.  Upon information and belief,
industry experience as well as several events being arranged by Xtreme
indicate that lockouts are booked 6-9 months before the actual event rather
than several weeks in advance.

*Other wrongful acts*

52)    To accommodate Xtreme's customers and to avoid congestion, Debtor agreed
to temporarily use a side entrance (used as an emergency exit-evacuation
route) if there were large visiting groups.  This side door is located on the
Premises.  However, against Debtor's wishes, the Landlord repainted the side
entrance hallway which had the Debtor's green color and replaced it with
graphics unrelated to Debtor's brand.

53)    The Lease prohibits the sale of food by Debtor.  In fact, only Xtreme is
permitted to sell food within the facility. Debtor has abided by that restriction.
Because of this restriction, Debtor, on behalf of its customers would place
orders in advance.

54) Debtor has been targeted by Xtreme's significant delays in the delivery of food to Debtor's customers. Debtor's patrons are limited to 45 minutes to eat their food in the party rooms on the Premises and, often, receive their food deliveries more than 30 minutes after ordering. Oftentimes the hot food that is ordered is often delivered cold. This has negatively impacted Debtor's business and reputation.

55) The Lease requires the Debtor to "complete or cause to be completed all deliveries, loading, unloading, rubbish removal, and other services to the Premises prior to the hours reasonably established . . . by Landlord."

56) The Landlord often blocked Debtor's access to the loading dock on Monday evenings just as trash was about to be picked up.

57) To avoid a health hazard, Debtor had to make other costly arrangements to rid the Premises of the accumulated trash.

58) Xtreme, upon information and belief, with the assistance and implied consent of the Landlord, has installed cameras throughout the interior of Debtor's Premises, including the spaces where the Debtor's employees conduct business.

59) Nothing in the Lease mandates these interior cameras. Despite requests to remove them, the Landlord has refused.

16

60)   At all material times hereunder, Debtor fulfilled all its material obligations under the Lease.

61)   As a direct result of the actions of Landlord and Xtreme, the Debtor saw an approximately forty percent (40 %) drop in its revenue when comparing its busy season in 2017 to the same period in 2018.

62)   In accordance with the Lease, the Debtor contacted counsel for the Landlord in an effort to have the Landlord refrain from interference with Debtor's rights under the Lease. Specifically, by letter dated June 4, 2019, the Debtor notified Landlord that it should immediately cease and desist from interfering with and blocking access to Debtor's Premises and raised specifically ongoing problems with signage, front desk issues, non-delivery and/or late delivery of food and other misconduct. A copy of this letter is attached as Exhibit 11.

63)   The Debtor raised many of these same issues in an earlier letter addressed to the Landlord's counsel in response to contrived complaints by the Landlord and Xtreme. A copy of this letter is attached as Exhibit 12. Landlord and Xtreme ignored this letter and continued and even escalated their wrongful conduct.

## COUNT ONE

## (DECLARATORY JUDGMENT)
### against Defendant Landlord and Xtreme

64)   Debtor re-alleges paragraphs 1 - 63 of this Complaint and further alleges the following.

17

65) The Lease between Landlord and Debtor is a valid and enforceable contract and gives Debtor an enforceable long-term property interest in the Premises.

66) Pursuant to that Lease, Debtor is entitled to, *inter alia*, quiet enjoyment of the Premises.

67) In accordance with the Lease and Debtor's rights as lessee, Debtor is entitled to declaratory judgment as follows:

   a. Declaring and Adjudging that Debtor's exterior signage shall be restored to its original space near the front entrance.

   b. Declaring and Adjudging that Debtor shall design and cause to be installed, sufficient interior signage, that at a minimum fairly and clearly alerts the consuming Public as to its business/entertainment offerings;

   c. Declaring and Adjudging that its designated space (satellite front desk) near the Access Point will not be subject to interference so that Debtor can greet its customers and direct them to its entertainment area.

   d. Declaring and Adjudging that Debtor shall be permitted to install its signage at the entrance to the property and at a front desk (above the point of sale);

e.  Declaring and Adjudging that Debtor shall have a separate customer waiting line in front of its satellite front desk, so Debtor guests do not need to unnecessarily wait in the Xtreme front desk line

f.  Declaring and Adjudging that Debtor shall have space on a backwall where Xtreme displays its attractions;

g.  Declaring and Adjudging that Debtor shall be allowed to display its own brochures advertising birthday parties and jump time as well as other special events at all locations where Xtreme displays its own brochures.

h.  Declaring and Adjudging that Debtor shall have adequate representation in the Xtreme videos displayed on the kiosks and TVs around the entire Xtreme park as this cross advertising was envisioned under the lease.

WHEREFORE, the Debtor respectfully requests that the Court declare and adjudge as set forth above that the Debtor is entitled to have and Defendants are obligated to provide: (a) restoration of the original exterior signage; (b) sufficient interior signage; (c) restoration of its front satellite desk; (d) signage near the front desk area; (e) customer lines separated at the front of the facility near the entrance; (f) permitting advertising space on the backwall, same as Xtreme; (g) print and

distribute its own brochures, and (h) adequate representation be permitted on the video displays.

**COUNT TWO**

**BREACH OF COVENANT OF QUIET ENJOYMENT**
**against Defendant Landlord**

68) Debtor re-alleges paragraphs 1 - 63 of this Complaint and further alleges the following.

69) Section 20.21 of the Lease, captioned Quiet Enjoyment, provides in pertinent part as follows:

> Landlord represents and warrants that it has full right and authority to enter into this Lease. Landlord covenants that so long as Tenant pays the Rent and performs its other covenants and agreements herein set forth, Tenant shall peaceably and quietly have, hold and enjoy the Premises for the Term without hindrance or molestation from anyone claiming through Landlord, subject to the terms and provisions of this Lease.

70) Under Florida Law, if a landlord authorizes acts to be done which cause substantial injury to the tenant in the peaceful enjoyment of the demised premises and such a result is the natural and probable consequences of the acts so authorized, the Landlord is liable.

71) Defendant Landlord has materially breached its express and implied contractual duties to Debtor with respect to the other rights and privileges accorded to other commercial tenants renting from the Landlord--in this case, Xtreme. Landlord permitted Xtreme to act as its agent when dealing with the

20

Debtor. Xtreme's actions as described herein are therefore attributable to the Landlord.

72) As a direct and proximate result of Defendant's breaches of these contractual duties to Debtor, Debtor has been damaged.

73) Debtor's damages include lost revenue from its business and loss of the goodwill of its customers.

74) Debtor is entitled to attorney's fees pursuant to the Lease.

WHEREFORE the Debtor respectfully requests entry of judgment against Landlord for compensatory and any other damages suffered by Debtor as a result of the Landlord's breach of the lease, including reasonable attorneys' fees and costs incurred in bringing the instant action, together with interest and such other and further relief as this Court deems just and proper.

## COUNT THREE

### BREACH OF THE IMPLIED DUTY OF
### GOOD FAITH AND FAIR DEALING
### against Defendant Landlord

75) Debtor re-alleges paragraphs 1 - 63 of this Complaint and further alleges the following.

76) The Lease is a valid contract between the Debtor and the Landlord.

77) The Landlord had an implied contractual duty to deal with Debtor honestly, fairly, and in good faith, to not destroy the right of Debtor to receive the benefits of the Lease.

78) Debtor reasonably relied, and had a right to rely, on the following under the terms of the Lease:

a. that Debtor's exterior signage would not be tampered with and removed from its original space near the front entrance of the facility.

b. that Debtor could install and maintain sufficient interior signage, that at a minimum fairly and clearly alerted the consuming Public as to its business/entertainment offerings;

c. that its designated space (satellite front desk) near the Access Point would not be subject to interference so that Debtor could greet its customers and direct them to its entertainment area;

d. that it should have been permitted to install its signage at the entrance to the property and at a front desk (above the point of sale);

e. that Debtor should have had space on a backwall where Xtreme displays its attractions;

f. that Debtor should have been allowed to display its own brochures advertising birthday parties and jump time as well as other special events at all locations where Xtreme displays its own brochures;

g.  that the Landlord's actions unfairly interfered with Plaintiff's right to enjoy the Premises;

h.  that Debtor was in full compliance with the Lease or was excused from having to comply;

i.  that all conditions required for Landlord's performance had occurred.

j.  that the Landlord failed to act honestly, fairly, and in good faith, and by doing so destroyed the right of Debtor to receive the benefits under the Lease.

k.  that the Landlord's conduct did not comport with Debtor's reasonable contractual expectations as set forth above.

l.  that on numerous occasions, Debtor advised the Landlord (through its agent) of the numerous breaches committed by Landlord and its agent as stated herein, however, Landlord failed to cure the breaches or otherwise ignored Debtor's pleas.

m.  that the Debtor has been damaged as a result of Landlord's failure to act honestly, fairly, and in good faith of the Lease as Debtor did not get the benefit of its agreement, had to incur significant costs, including but not limited to lost revenue, and attorneys' fees and costs.

WHEREFORE, because of the foregoing, Debtor has suffered, and will continue to suffer, damages.

## COUNT FOUR

## <u>CONSTRUCTIVE EVICTION</u>
### <u>(Against Landlord)</u>

79) Debtor re-alleges paragraphs 1 - 63 of this Complaint and further alleges the following.

80) The Debtor and Landlord had a valid, enforceable Lease Agreement for the Premises.

81) The Landlord repeatedly violated the terms of the Lease by condoning and in fact permitting Xtreme, its agent, to (a) remove the Debtor's interior signage; (b) undertake construction in such a manner so as to deprive Debtor of the use and quiet enjoyment of its business, (c) prohibit Debtor from adding its name to the marquee located at the street entrance to the property, (d) authorize lock-out events solely for Xtreme's benefit which had the effect of driving Debtor's customer's away from the Premises or, alternatively, driving them to Xtreme's attractions, and (e) remove Debtor from all advertising brochures and marketing materials distributed by its agent Xtreme.

82) These actions were materially injurious to the Debtor's business and deprived the Debtor from substantial income from its business. It was also the overriding reason that the Debtor was compelled to seek protection by filing the petition.

WHEREFORE, as a direct and proximate result of Landlord's failure, deliberate actions in concert with Xtreme, the Debtor has incurred and continues

to incur expenses associated with this constructive eviction, including without limitation, attorneys' fees and associated expenses.

## COUNT FIVE

### (VIOLATION OF FDUPTA)
### against Landlord

83) Debtor re-alleges paragraphs 1 - 63 of this Complaint and further alleges the following.

84) The Landlord's actions as described above, which are incorporated by herein, are in and affecting commerce in Florida and are unfair and deceptive competitive practices and constitute violations of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. 501.201, et seq.

85) The Landlord has permitted its tenant, and agent, Xtreme to economically squeeze and deprive the Debtor of customers to its attractions by (a) removing the Debtor's interior signage; (b) undertaking construction in such a manner as to deprive Debtor of the use and quiet enjoyment of its Premises, (c) prohibiting Debtor from adding its name to the marquee located at the street entrance to the property and (d) authorizing lock-out events for Xtreme's benefit which had the effect of driving Debtor's customer's away from the Premises or, alternatively, driving them to Xtreme's attractions, and (e) removing Debtor from all advertising brochures and marketing materials distributed by its agent Xtreme.

WHEREFORE, as a direct and proximate cause of Landlord's conduct, Debtor has been and continues to be damaged in this State through the loss of business and damage to its competitive advantages it has earned in the marketplace. Moreover, Debtor will continue to incur attorneys' fees and costs in this action.

### COUNT SIX

### ASSUMPTION OF LEASE UNDER 11 U.S.C. § 365(a) and (b)

86) Debtor re-alleges paragraphs 1 - 63 of this Complaint and further alleges the following.

87) Section 365(a) provides that the Trustee, subject to the Court's approval, may assume or reject any executory contract or unexpired lease of the Debtor.

88) Before assumption is authorized, § 365(b)(1) requires the Trustee (A) to cure or provide adequate assurance that the Debtor will cure any existing default under the lease before assumption of the lease is authorized; (B) compensate the landlord of any actual pecuniary loss to such landlord resulting from any default; and (C) provide adequate assurance of future performance under such lease.

WHEREFORE, the Debtor respectfully requests that the Court enter judgment against the Landlord determining that the Debtor is not in default under the Lease either currently or as of the Petition Date and authorizing the Debtor to assume the

26

Lease under the terms and conditions as are provided for in the Lease or established by the parties' court of conduct and as are just and proper under the circumstances.

## COUNT SEVEN

## (TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIPS)
### against Xtreme

89) Debtor re-alleges paragraphs 1 - 63 of this Complaint and further alleges the following.

90) Debtor has certain rights vis-à-vis the Lease Agreement with the Landlord, including without limitation, interior signage and other promotional rights.

91) Up to the start of the 2018 season, Debtor had a good working relationship with the Landlord.

92) Xtreme, which at all relevant times, knew the terms of Debtor's agreement with the Landlord, began a campaign of harassment and interference aimed at damaging Debtor's relationship with the Landlord.

93) The Landlord has become hostile to Debtor's business and its plans and has accused Debtor of disrupting the tenancy of Xtreme. The Landlord has also threatened to terminate Debtor's tenancy based on these unfounded allegations.

94) Due to the actions and misrepresentations and tortious interference by Xtreme, Debtor has been denied certain rights guaranteed to it under its Lease Agreement, including valuable advertising rights.

95) Xtreme's actions constitute an intentional, unlawful and tortious interference with the existing and prospective business and/or contractual relationships of Debtor, including the continuation of a good working relationship with the Landlord.

96) As a direct and proximate consequence of Xtreme's tortious interference, Debtor has been damaged.

97) Debtor's damages include, but are not limited to loss of profits, income and business opportunities. Debtors reserve the right to claim punitive damages according to Fla. Stat. § 768.72.

WHEREFORE, the Debtor respectfully requests entry of judgment against Xtreme for compensatory and consequential damages suffered by Debtor as a result of its tortious interference, including reasonable attorneys' fees and costs incurred in bringing the instant action, together with interest and such other and further relief as this Court deems just and proper.

## COUNT EIGHT

### (CIVIL CONSPIRACY)
### against Landlord and Xtreme

98) Debtor re-alleges paragraphs 1 – 63 of this Complaint and further alleges the following.

99) The Landlord and Xtreme entered into a conspiracy to permit the Landlord to evade its obligations under the Lease and permit Xtreme to economically

deprive the Debtor of its business opportunities by eliminating the Debtor's signage (both exterior and interior), effectively blocking access and sight-line view to Debtor's business by the deliberate positioning of Xtreme's attractions, by mis-direction/re-direction of Debtor's customers to Xtreme's attractions, and by late delivery of food services. Said actions have played a major role in the decline in Debtor's revenues.

100)As a direct and proximate result of the conspiracy to deprive the Debtor of its rights under the Lease as well as interference with its business opportunities and customer base, the Debtor has sustained considerable damages, including but not limited to, lost business opportunities and consequential damages, and attorneys' fees.

WHEREFORE the Debtor respectfully requests entry of judgment against Landlord and Xtreme for compensatory and consequential damages suffered by Debtor as a result of their actions, including reasonable attorneys' fees and costs incurred in bringing the instant action, together with interest and such other and further relief as this Court deems just and proper.

29

Respectfully submitted July 12, 2019

LAW OFFICE OF KATHLEEN A. DALY, P.A.

*/s/ Kathleen A. Daly*

By:   Kathleen A. Daly

515 N. Flagler Dr., Ste. P300
West Palm Beach, FL 33401
(561) 293-8514
kdaly@kadalylaw.com

Attorney for the Debtor