**EXHIBIT 1**

**COMMERCIAL LEASE**
**ROCKIN' JUMP**
**BASIC LEASE PROVISIONS**

1.    **LANDLORD**: MDG Powerline Holdings, LLC

2.    **TENANT**: Seven Starts on the Hudson Corporation

3.    **TENANT'S TRADE NAME**: Rockin' Jump

4.    **PREMISES**: 5300 N. Powerline Road, Fort Lauderdale, FL 33309; A portion of Bays 7 and 8 as approximately depicted on Exhibit A (See Section 1.01)

5.    **FLOOR AREA OF PREMISES**:  Approximately Eighteen Thousand Five Hundred Ninety One (18,591) square feet of Floor Area

6.    **LANDLORD'S WORK:**

Landlord warrants the roof to be in good repair. As a part of Landlord's work and a condition to delivery of possession, Landlord will remove all asbestos and asbestos containing materials and remediate or abate all existing contaminants, pollutants, hazardous materials, and mold. Landlord shall deliver the Premises in broom clean condition and install demising partitions with dry wall sanded, taped and ready for paint.   Landlord shall also be responsible for the purchase and installation of HVAC for the Premises at a rate of 3 tons per 1,000 SF.  Tenant shall reimburse Landlord for the actual, reasonable, costs of the units.  Notwithstanding the foregoing, Tenant shall otherwise accept the Premises in As-Is condition.

7.    **TERM**: Ten (10) years, beginning on Commencement Date (Section 2.01)

8.    **RENEWAL OPTIONS**:  Tenant shall have options to renew the Lease for three additional five year terms (See Section 2.03).

9.    **COMMENCEMENT DATE:**      Lease Execution.

**RENT COMMENCEMENT DATE:**  One Hundred and Twenty (120) days after Commencement Date.

10.    **PERMITTED USE**: Subject to the terms of Section 6.02, for operation of a trampoline park and family fun center, along with ancillary uses, including the sale of retail products and other services related to Tenant's primary use as a trampoline park and family fun center. (Sections 6.01 and 6.02)

**RESTRICTIONS ON USE:**  Unless otherwise agreed to by Landlord and Tenant in writing, Tenant shall be prohibited from:

A.    Selling food and drink, subject to the terms of an operating agreement.
B.    Operating arcade games
C.    Installing ropes course or zip-line

11.    **GROSS RENT**: Gross Rent shall be paid in equal monthly payments. (Section 3.02).  Subject to the exercise of any Renewal Options, annual Gross Rent shall be as follows:

A.    Months 1 through 60 = $340,000 per year (Subject to the rent waiver during the first six months);
B.    Months 61 through 120 = $374,000

1

C.  During Renewal Periods Rent will increase by Ten Percent (10%) over the Gross Rent due during the then current Term.

12.  **ADDITIONAL RENT**:  Unless expressly stated to the contrary herein, Tenant's Gross Rent is inclusive of Tenant's share of Taxes (See Article 5), Utilities (See Article 13), Operating Expenses (See Article 14) shall be the gross amount set forth below:

13.  **SECURITY DEPOSIT**:  Four Months Gross Rent.

14.  **TOTAL AMOUNT DUE AT LEASE EXECUTION**:  1) First Month of Gross Rent [within two weeks of execution or upon SBA approval, whichever occurs earlier]; 2) Security Deposit; and, 3) Applicable Sales Tax.

15.  **SIGNAGE:**    Tenant will be permitted to install the maximum amount of signage allowable by local code on both the east and west façade of the building, subject to Landlord approval, which shall not be unreasonably withheld.   Tenant shall also have rights to a pro-rata portion of or dedicated panel on any existing or future pylon or monument, signage for the Project.

16.  **LIMITED GUARANTOR:**    Jens Berding and Eddy Manzo-Berding shall execute a Personal Guarantee which shall not exceed one year of Gross Rent, beginning on the date of Default.

17.  **BROKER**:  Landlord and Tenant represent to each other that Newmark Grubb Knight Frank ("Broker") is acting as the sole and exclusive broker for Landlord and Tenant. Landlord agrees to pay a commission to Broker of Eighty Thousand (80,000) payable as follows: Fifty Percent (50%) at Lease signing; Three additional equal payments following Tenant's payment of Gross Rent in months 4, 5, and 6.

18.  **ADDRESS FOR NOTICES**:

Landlord:                                                  Tenant:

18001 Collins Avenue, 31st Floor                2108 NE 63rd Street
Sunny Isles Beach, FL 33160                   Fort Lauderdale, FL 33308
Attention:  Legal Department                  Attention: Jens Berding

**ADDRESS FOR PAYMENT OF RENT**:

18001 Collins Avenue, 31st Floor
Sunny Isles Beach, FL 33160
Attention:  Accounting Department

19.  **LANDLORD ENTITIES** for insurance and indemnification (see Article 8):

Dezer Powerline, LLC
MDG Powerline Holdings, LLC
Xtreme Action Park Companies
Primetime Amusements

The trustees, boards of directors, officers, general partners, members, managers, affiliates, successors, assigns, lenders, beneficiaries, stockholders, employees and agents of each of the foregoing, and other parties as stipulated by Landlord.

The Basic Lease Provisions, including all terms defined herein, are incorporated as part of this Lease. References to specific sections are for convenience only and shall not be deemed all-inclusive.

# ARTICLE 1
## PREMISES

**SECTION 1.01          PREMISES DEFINED**

(a)          Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Premises for the Term, at the Rent, and upon the conditions and agreements set forth herein ("Lease").  The Premises are as identified on Exhibit A attached hereto.  Landlord reserves to itself the use of the roof, the exterior portions of the Premises including the demising walls, the outer walls of the building of which the Premises are a part, and any walls abutting said building other than the storefront, and the right to install, maintain, use, repair and replace pipes, ducts, conduits and wires through the Premises in locations which will not materially interfere with Tenant's use thereof.

# ARTICLE 2
## TERM

**SECTION 2.01 COMMENCEMENT DATE AND LEASE TERM**

(a)          The term of this Lease ("Term") shall commence on the date specified in the Basic Lease Provisions as the Commencement Date, and shall continue for the period specified in the Basic Lease Provisions.

(b)          No delay in Landlord's delivery of the Premises shall entitle Tenant to terminate this Lease or to any damages on account of such delay.  If Landlord has not tendered delivery of the Premises to Tenant within two (2) years after the Lease Reference Date, Landlord shall have the right to terminate this Lease upon prior notice to the other at any time thereafter.  If Landlord has not tendered delivery of the Premises within five (5) years after the Lease Reference Date, then this Lease shall become null and void and neither party shall have any liability or obligation to the other hereunder.

(c)          Tenant shall complete Tenant's Initial Work pursuant to Section 19.03 below and Exhibit B and open the entire Premises for business no later than 180 days after the Commencement Date.

(d)          In the event that during the sixty (60) day period following execution of the Lease, and after diligent efforts by Tenant to obtain all necessary governmental approvals, Tenant receives written notice from the City of Fort Lauderdale that it will be precluded from operating its intended business, Tenant may, at its option, terminate this Lease upon written notice to the Landlord no later than sixty five (65) days after execution of the Lease.

(e)          In the event that after diligent efforts by the Tenant, Tenant does not receive approval by the SBA for its loan, Tenant, may at its option, terminate the Lease upon written notice to the Landlord no later than sixteen (16) days after execution of the Lease.

**SECTION 2.02 LEASE YEAR**

A "Lease Year" is a period of twelve (12) full calendar months commencing with the Commencement Date and concluding on the date three hundred and sixty five days thereafter.

**SECTION 2.03 RENEWAL OPTION**

Notwithstanding anything contained in this Lease to the contrary, provided that the Lease is still in effect, Tenant shall have the right to extend the Lease Term for the number and terms of the Renewal Options specified in the Basic Lease Provisions.  ("Additional Terms")  upon and subject to the following terms and conditions:

(1)          Tenant must exercise such right of extension in writing to Landlord no later than six (6) months prior to the expiration of the then current Term, time being of the essence;

(2)      During the period from Tenant's date of election to exercise its option, through the expiration of the then current Term, Tenant shall not be in default beyond any grace period in the performance of any of its obligations under this Lease;

(3)      On the date that Tenant exercises its right of extension(s) hereunder, the Tenant must be a financially solvent entity;

(4)      From the date of its election through the first day of the Additional Term, either the Tenant named herein or a Landlord approved assignee or sublessee of Tenant shall be in sole occupancy of the entire Premises, it being understood and agreed that this option is personal only to the Tenant or approved assignee or sublessee, and is not assignable or transferable to any other person or entity;

(5)      Between the date of its election and the first day of the Additional Term, Tenant shall refurbish the Premises if it has not already done so within the one year period prior to the Expiration Data of the initial the then current Lease Term; such refurbishment shall be performed in accordance with plans and specifications pre-approved by the Landlord.

The Initial Term and the Additional Terms are collectively referred to herein as the "Term".

## ARTICLE 3
### RENT

**SECTION 3.01** RENT

The term "Rent" shall mean Minimum Rent and all other amounts payable by Tenant whether or not any such sums are specifically described as Rent in this Lease. Payments of Rent shall be without any deduction or offset, and without notice or demand, at Landlord's address for Rent payments as specified in the Basic Lease Provisions or to such other person or address as Landlord may designate in writing to Tenant.  Tenant shall pay to Landlord with each Rent payment all sales taxes and other taxes imposed on the Rent by taxing authorities.  Tenant shall commence paying Rent on the date specified in this Lease as the Rental Commencement Date.

**SECTION 3.02** GROSS RENT

Commencing on the Rental Commencement Date, Tenant shall pay to Landlord during the Term the Gross Rent specified in the Basic Lease Provisions, in advance upon the first day of each calendar month.

## ARTICLE 4
### ADDITIONAL RENT

**SECTION 4.01** ADDITIONAL RENT

Tenant shall pay to Landlord during the Term the Additional Rent specified in the Basic Lease Provisions, in advance upon the first day of each calendar month.

**SECTION 4.02** MATERIAL CHANGES

The calculation of Additional Rent is based on the current estimate of Tenant's Pro Rata Share of Taxes, Utilities and Operating Expenses to be incurred by Landlord.  Notwithstanding Section 4.01, in the event that Tenant's occupancy and use of the Premises causes a material increase in the Landlord's Taxes, Utilities and/or Operating Expenses, Landlord shall furnish to Tenant a statement showing in reasonable detail the increased costs incurred for each such item. Tenant agrees that it will pay an

4

amount equal to the material increase within thirty (30) days following the date of Landlord's statement. No delay in providing statements to Tenant shall be deemed a waiver of amounts due to Landlord. Tenant's failure to object to any statement, invoice or billing by Landlord within sixty (60) days after receipt thereof shall constitute Tenant's acquiescence with, and waiver of any objection to, such statement, invoice or billing and shall conclusively establish such statement, invoice or billing as being in accordance with this Lease. Following notice, the Tenant's Additional Rent for subsequent years shall increase by the same material increases in Taxes, Utilities and/or Operating Expenses. For purposes of this Section 4.02, a Material increase is an increase of 25% in any item over the Landlord's estimated expense for that item.

**ARTICLE 5**
**TAXES**

## SECTION 5.01 TAXES

Payment of Taxes is as set forth in Article 4. Notwithstanding the foregoing, Tenant is responsible for the payment of all sales, use or service tax imposed on the payment of Rent.

## SECTION 5.02 DEFINITIONS

(a)    The term "Taxes" shall include:

(i)    All taxes, assessments and governmental charges and surcharges levied upon or with respect to the real property and improvements within the Property, other than the portions thereof owned by separate parties and which are separately assessed;

(ii)    All other taxes, assessments and governmental charges and surcharges levied upon or with respect to the fixtures, equipment and other property of Landlord in or about the Property, whether real or personal;

(iii)    Fees and assessments for any governmental service(s) to the Property, including payments under any servicing agreement with respect to tax increment financing or other such charge which is in lieu of real property taxes;

(iv)    Dues and assessments payable to any property owner's association or condominium association due to Landlord's ownership or operation of the Property;

(v)    Any and all taxes: (A) upon, allocable to, or measured by or on the gross Rent payable hereunder, including without limitation any gross income tax, sales tax, excise tax levied by the State, any political subdivision thereof, or the Federal Government; (B) upon or with respect to the possession, leasing, operation, management, maintenance, alteration, repair, use or occupancy of the Premises or any portion thereof, including any sales, use or service tax imposed as a result thereof; (C) upon or measured by Tenant's gross receipts or payroll or the value of Tenant's equipment, furniture, fixtures, and other personal property of Tenant or leasehold improvements, alterations or additions located in the Premises; or (D) upon this transaction or any document to which Tenant is a party creating or transferring an interest or an estate in the Premises or an interest in this Lease;

(vi)    All expenses incurred (after deducting the amount of any reduction) in seeking reduction by the taxing or assessing authorities of the Taxes described in clauses (i) through (v) above; and

(vii)    Any payments to any ground lessor of the Property in reimbursement of payments by such ground lessor of any amounts specified in clauses (i) through (vi) above.

(b)    Taxes shall include all items identified or described above, whether or not such items are customary and whether or not such items are within the parties' contemplation at the Lease Reference

5

Date, and there shall be no deduction for any tax incentives or other tax benefits Landlord may receive from any governmental authority in connection with the development of the Property. Taxes shall not include any franchise, estate, inheritance, succession, capital levy, net income or excess profits taxes imposed upon Landlord, except that any tax, levy or other such charge which is in substitution for real property taxes shall in any event be included in Taxes hereunder regardless of how denominated or the source from which it is collected.

(c)     For the purpose of this Section, Taxes which are levied, assessed or charged on a fiscal year basis shall be deemed to apply one-twelfth to each calendar month in such fiscal year.

(d)     Notwithstanding anything to the contrary set forth in this Article 5, Tenant's obligation with respect to the payment of Taxes shall be based upon Taxes payable or paid during any calendar year, any portion of which occurs during the Term (without regard to whether such Taxes were levied and/or accrued during a different year).

## SECTION 5.03 OTHER TAXES

Tenant shall pay before delinquency all municipal, county or state taxes, levies and fees of every kind and nature, including but not limited to general or special assessments, assessed during the Term against the Rent hereunder, any leasehold interest, leasehold improvements or personal property of any kind, owned by or placed in, upon or about the Premises by Tenant.

## ARTICLE 6
## CONDUCT OF BUSINESS BY TENANT

## SECTION 6.01 USE OF PREMISES

(a)     Tenant shall use the Premises solely for the purposes and under the trade name(s) specified in the Basic Lease Provisions, and for no other purposes and under no other trade name whatsoever without the prior written consent of Landlord, which may be withheld in Landlord's sole discretion.     Commencing on the Rental Commencement Date, Tenant shall continuously and uninterruptedly during the Term operate its business in one hundred percent (100%) of the Premises during all business hours established by Landlord as the hours of operation for the Property, provided Landlord shall not require that Tenant open for business before 12:00 p.m. or remain open after 9:00 p.m., except: (i) for holiday, seasonal or other special sales or promotions, or (ii) when a majority of other tenants at the Property will be open. Failure of any other tenant, with or without the consent of Landlord, to observe the hours of operation established by Landlord. Commencing on the Rental Commencement Date, Tenant's failure to keep the Premises open for business during the required hours and days shall be conclusively deemed to be a violation or breach of this Lease which cannot afterward be cured, but which may be enforced by Landlord in an action for injunctive relief in addition to any other remedies available to Landlord.

## SECTION 6.02 RESTRICTIONS ON USE

(a)     Tenant shall comply promptly with all Laws regulating the use by Tenant of the Premises and all requirements of all insurance carriers or underwriters providing coverage on the building in which the Premises is located, the Premises or the contents thereof. Tenant shall not use or permit the use of the Premises in any manner that will create a nuisance or disturb to other tenants or occupants of the building, or which will invalidate, or increase Landlord's premiums for, any property damage or liability insurance maintained on the Premises or the building in which the Premises are located (or, at Landlord's option, Tenant shall pay Landlord the amount of the increase in such premiums). Tenant shall complete or cause to be completed all deliveries, loading, unloading, rubbish removal, and other services to the Premises prior to the hours reasonably established from time to time by Landlord, and shall not permit loading, unloading or parking of delivery vehicles in areas other than those designated by Landlord for such purpose.

(b)    Tenant shall comply at all times with the Rules and Regulations attached to this Lease as Exhibit C and such amendments, modifications and additions thereto as Landlord may from time to time reasonably adopt (and of which Tenant has notice) for the safety, care and cleanliness of the Property or the preservation of good order therein.

(c)    Tenant shall be precluded from any use stated as a Restriction on Use in the Basic Lease Provisions.

(d)    As used in this Lease, the term "Law" or "Laws" shall mean any federal, state, county, municipal or other local governmental or administrative law, statute, code, ordinance, rule or regulation, applicable equitable remedies and decisions by courts in cases where such decisions are binding precedents in the state in which the Property is located, and decisions of federal courts applying the Laws of such state, at the time in question.

(e)    Landlord agrees that during the Term of the Lease, unless otherwise terminated in accordance with the Lease, Landlord will not operate or allow to be operated a trampoline park that would directly compete with Tenant.

## ARTICLE 7
### MAINTENANCE, REPAIRS AND ALTERATIONS

**SECTION 7.01** LANDLORD'S OBLIGATIONS FOR MAINTENANCE

Subject to the provisions of Articles 9 and 11 hereof, Landlord shall during the Term keep in good order, condition and repair the foundations, exterior surfaces of exterior masonry walls and surfaces (excluding the storefront of the Premises and the storefront of other premises leased to tenants), downspouts, gutters and roof of the building in which the Premises are located, except for any damage thereto caused by any negligent act or omission of Tenant or its agents, employees or invitees. Landlord shall repair damage to the foregoing within a reasonable time after its receipt of notice of the need for repairs, which notice Tenant shall give Landlord promptly when Tenant determines any such repairs are required. Except to the extent (if any) prohibited by Law, Tenant waives the provisions of any Law permitting Tenant to make repairs at Landlord's expense. The costs and expenses incurred by Landlord for such maintenance and repair shall be included in the Operating Expenses reimbursed by Tenant pursuant to Section 14.05. Such costs shall exclude partial or complete restoration necessitated by casualty to the extent reimbursed by insurance proceeds, but shall include the cost of all insurance provided by Landlord pursuant to Section 8.04 hereof.

**SECTION 7.02** TENANT'S MAINTENANCE OBLIGATIONS

(a)    Except as provided in Section 7.01 of this Lease, Tenant, at Tenant's expense, shall keep and maintain in first class appearance, in a neat, clean, sanitary and safe condition at least equal to that which existed when Tenant initially opened the Premises for business, and in good order, condition and repair and adhering to Landlord's Design Criteria, as reasonably determined by Landlord (including replacement of parts and equipment, if necessary), the Premises and every part thereof and any and all appurtenances thereto wherever located, including, but without limitation, the interior surfaces of the exterior walls, the exterior and interior portion of all doors, door frames, door checks, other entrances, windows, window frames, plate glass, storefronts, all plumbing, sewage, sump pump, grease trap, and loading dock facilities exclusively serving the Premises (whether or not located in the Premises), including free flow up to the main sewer line, fixtures, ventilation, heating and air conditioning and electrical systems, sprinkler systems, walls, floors and ceilings, and all other repairs, replacements, renewals and restorations, interior and exterior, ordinary and extraordinary, foreseen and unforeseen, and all other work performed by or on behalf of Tenant pursuant to this Lease. Tenant shall neither commit nor permit waste or nuisance.

(b)    Tenant shall contract with a service company (which Landlord, at its option, may reasonably designate or approve) for the monthly maintenance of the heating, ventilating and air

conditioning equipment serving the Premises. Tenant shall furnish a copy of the service contract to Landlord within ten (10) days after opening for business, and a copy of any subsequent contracts from time to time during the Term.

(c)      Tenant shall, at its cost, retain a licensed, bonded professional pest and sanitation control service (which Landlord, at its option, may reasonably designate or approve) to perform inspections of the Premises at such intervals as shall be required by Landlord to keep the Premises free of infestation by insects, rodents and vermin, and shall promptly cause any corrective or extermination work recommended by such service to be performed.

(d)      Unless Landlord agrees to include the Premises in its own services contracts, Tenant shall contract in its own name and timely pay all charges for all services to the Premises including, but not limited to, security, janitorial, pest control, and alarm services, unless otherwise herein expressly provided.

(e)      Tenant shall store all trash and other waste within the Premises in odor and vermin proof containers, such containers to be kept in temperature controlled areas of the Premises not visible to members of the public. Tenant shall, at Tenant's expense, attend to the frequent disposal of such materials, as provided below. Tenant understands and agrees that trash removal must be done by Tenant using containers approved by Landlord at such times and in such manner as Landlord may direct and subject to such rules and regulations in respect thereto as Landlord may, from time to time, adopt.

(f)      Within ten (10) days after Tenant's execution of any maintenance or service contracts required under this Section 7.02, and after Landlord's request therefor at any time during the Term, Tenant shall furnish Landlord copies of all such contracts.

## SECTION 7.03 ALTERATIONS AND ADDITIONS

Tenant shall not, without the prior written consent of Landlord, which consent may be withheld in Landlord's reasonable discretion, except that Landlord may withhold in its sole and absolute discretion its consent for alterations involving the structural, mechanical, electrical and plumbing systems of the Premises, the building in which the Premises are located, or the Property, make any alterations, improvements, remodeling or additions to either the interior or exterior of the Premises or to fixtures installed therein, or paint, drill or in any way deface any portion of the Premises. Landlord may condition any approval upon such reasonable requirements as Landlord deems appropriate, including a requirement that all work be covered by payment and/or completion bonds and requirements as to the manner in which, the time at which, and the contractor(s) by whom, such work shall be done. All alterations, improvements, remodeling or additions shall be Tenant's Work and shall be subject to the provisions of Article 19, Exhibit B and the Design Criteria. Notwithstanding the foregoing, Tenant shall have the right, without Landlord's prior written consent, but upon prior notice to Landlord, to make non-structural, interior alterations to the Premises which require expenditures of less than $20,000.00 in any calendar year, provided, however, that any such alterations must be in compliance with all requirements of all applicable provisions of this Lease and all Laws; and further provided that the design concept of the Premises is not changed and such alterations do not involve any changes to the structural, plumbing, electrical and/or mechanical systems of the Property. Tenant agrees to indemnify and hold Landlord harmless from and against liability or expense (including reasonable attorneys' fees and costs of defense) for any damage or injury to person or property in or about the Property which may result, directly or indirectly, from the construction of any alterations, improvements, remodeling or additions by Tenant.

## SECTION 7.04 REFURBISH AND UPGRADE

Pursuant to Section 2.03, Tenant shall renovate and refurbish the Premises as necessary to maintain the Premises as a first-class manner. Such refurbishment or renovation may include new flooring, painting, new wall covering, new tenant fixtures, storefront and signage. All such work by Tenant pursuant to this Section shall be in accordance with Section 7.03 and Article 19 of this Lease, Exhibit B

(as reasonably applicable) and the Design Criteria and shall be completed within six (6) months after the date of Landlord's notice.

## ARTICLE 8
## INSURANCE AND INDEMNITY

### SECTION 8.01 TENANT'S INSURANCE

(a)    From the date of delivery of the Premises to Tenant through the later of the end of the Term or the date Tenant surrenders physical possession of the Premises to Landlord, Tenant shall keep in force: (i) commercial general/umbrella liability insurance naming the Landlord Entities (as identified in the  Basic Lease Provisions) ) and others designated by Landlord as additional insureds to protect against any liability to the public or to any invitee of Tenant or of Landlord incidental to the use of or resulting from any accident occurring in or upon the Premises, with a limit of not less than $2,000,000 per occurrence and not less than $5,000,000 in the annual aggregate, covering bodily injury and property damage, contractual liability coverage, insuring Tenant's indemnification obligations under this Lease, and $1,000,000 products/completed operations aggregate; (ii) business auto liability covering owned, non-owned and hired vehicles with a limit of not less than $1,000,000 per accident; (iii) insurance protecting against liability under workers' compensation Laws with limits at least as required by statute (and if Tenant uses borrowed employees (including employees from a temporary employment agency) to perform services, it shall require the primary employer to provide an alternate employer endorsement showing Tenant in the schedule as the alternate employer); (iv) employers' liability with limits of $1,000,000 each accident, $1,000,000 disease policy limit, $1,000,000 disease--each employee; (v) All Risk or Special Form coverage protecting Tenant against loss of or damage (including coverage against water damage, sprinkler flow and sprinkler leakage) to the alterations, additions, leasehold improvements, carpeting, floor coverings, paneling, decorations, fixtures, inventory, plate glass and other business personal property situated in or about the Premises  to the full replacement value of the property so insured, naming the Landlord Entities (as identified in the Basic Lease Provisions), and others designated by Landlord, as additional named insureds; (vi) business interruption insurance with limits of liability representing at least approximately twelve (12) months of gross income; and (vii) liquor Law liability insurance with a limit of not less than $5,000,000 per occurrence if Tenant is in the business of selling or distributing alcohol.

(b)    In no event shall there be any reduction in the amount of coverage provided by Tenant below the initial amount set forth herein.  If, in Landlord's reasonable judgment, good business practice or changes in conditions indicate a need for additional and/or different types of insurance, Landlord may required such changes be made by Tenant.

### SECTION 8.02 POLICIES

(a)    Each policy required under Section 8.01 shall (i) be provided at Tenant's expense; (ii) be issued by an insurance company with a minimum Best's rating of A-VIII during the Term; (iii) provide that said insurance shall not be cancelled unless thirty (30) days prior notice (ten (10) days for non-payment of premium) shall have been given to Landlord; and (iv) shall be primary, and any insurance maintained by Landlord or any other additional insureds shall be excess and non-contributory.  Policies or certificates evidencing such insurance coverage shall be delivered to Landlord by Tenant prior to Tenant's first entry upon the Premises and at least thirty (30) days prior to each renewal of said insurance.  If Tenant fails to provide such certificates or renewals thereof as required hereunder, and such failure continues for five (5) days after notice thereof from Landlord then Landlord may exercise Landlord's rights under Section 17.06 hereof.

(b)    Any insurance may be provided by means of a "blanket" policy, so long as the Premises are specifically covered (by rider, endorsement or otherwise) and the policy otherwise complies with the provisions of this Lease.

**SECTION 8.03** WORK BY TENANT

Whenever Tenant shall undertake any alterations, additions, improvements or other work in, to or about the Premises, including, without limitation, Tenant's Work, Tenant's insurance must extend to and include coverage for injuries to persons and damage to property arising in connection with such work, including without limitation liability under any applicable structural work act, and such other insurance as Landlord shall reasonably require.   In addition to Tenant's insurance, any general contractor or subcontractor performing work for Tenant or any other occupant of the Premises shall maintain during such work (a) commercial general and auto liability insurance naming the Landlord Entities as additional insureds, with limits of not less than $1,000,000 per occurrence and not less than $5,000,000 in the annual aggregate, covering bodily injury and property damage, and $1,000,000 products/completed operations aggregate; and (b) insurance protecting against liability under workers' compensation Laws with limits at least as required by statute.

**SECTION 8.04** LANDLORD'S INSURANCE

Landlord agrees, during the Term, to maintain or cause to be maintained (a) a commercial general liability insurance policy against any liability to the public incidental to the use of or resulting from any accident occurring in or upon the Common Areas owned by Landlord, and (b) insurance against fire and such other risks as may be included in extended coverage insurance from time to time available. Landlord may, but shall not be required to, maintain coverage against earthquake and flood and such other coverage as Landlord may deem appropriate from time to time.  The specific types and conditions of the foregoing insurance shall be as Landlord determines.  Any such insurance may be obtained as part of a blanket insurance policy or Landlord may self-insure for same.  If Landlord chooses to self-insure as provided herein, such self-insurance shall exist as though Landlord had obtained an insurance policy as set forth herein.

**SECTION 8.05** WAIVER OF SUBROGATION

So long as their respective insurers so permit, Landlord hereby waives any and all rights of recovery against Tenant, and Tenant hereby waives any and all rights of recovery against the Landlord Entities and against any other tenant or occupant of the Property and against the investment managers, trustees, directors, partners, members, beneficiaries, officers, employees, agents, management agents, representatives, customers and business visitors of such other party and of such other tenant or occupant of the Property, for any loss insured by All Risks or Special Form coverage or other property insurance now or hereafter existing for the benefit of the respective party (or which would have been payable if such insurance were maintained as required by this Lease). Each party shall obtain any special endorsements required by its insurer to evidence compliance with the foregoing waiver.  The foregoing waiver shall be effective whether or not a waiving party actually obtains and maintains the insurance required pursuant to this Lease.  Landlord and Tenant shall, upon obtaining the policies of insurance required hereunder, give notice to their respective insurance carriers of the foregoing mutual waiver of subrogation.  Landlord's notice hereunder may be a general notice with respect to all leases, including this Lease, then or thereafter in effect at the Property.

**SECTION 8.06** INDEMNITY

Except to the extent arising from the gross negligence or willful misconduct of Landlord, Tenant shall defend, indemnify and hold harmless the Landlord Entities from and against any and all claims, actions, lawsuits, damages, liability and expense (including, without limitation, reasonable attorneys' fees) arising from or in connection with: (i) any injury or damage to any person or property whatsoever occurring in, on or about the Premises; (ii) any injury or damage to any person or property whatsoever occurring in, on or about the Property (other than the Premises), if such injury or damage is caused in part or in whole by the act, neglect, fault, or omission to meet the standards imposed by any duty with respect to loss, damage or injury by Tenant, its agents, servants, employees, contractors, customers or invitees; (iii) the conduct or management of any work or thing whatsoever done by Tenant in or about the Premises or from transactions of Tenant concerning the Premises; (iv) Tenant's failure to comply with any and all Laws

applicable to the use of the Premises and its occupancy as required in this Lease; or (v) any breach or default by Tenant in the performance of any covenant or agreement pursuant to this Lease.

Except to the extent arising from the negligence or misconduct of Tenant, its employees, agents, contractors, customers or invitees, Landlord shall defend and hold harmless the Tenant from and against any and all claims, actions, lawsuits, damages, liability and expense (including, without limitation, reasonable attorneys' fees) arising from or in connection with: (i) any injury or damage to any person or property whatsoever occurring in, on or about the Property (other than the Premises), if such injury or damage is caused in part or in whole by the act, neglect, fault, or omission to meet the standards imposed by any duty with respect to loss, damage or injury by Tenant, its agents, servants, employees, or contractors; (ii) Landlord's failure to comply with any and all Laws applicable to the use of the Property and its occupancy as required in this Lease; or (iii) any breach or default by Landlord in the performance of any covenant or agreement pursuant to this Lease.

## SECTION 8.07 EXEMPTION OF LANDLORD

Except to the extent arising from the gross negligence or willful misconduct of Landlord, Landlord shall not be liable and Tenant hereby waives all claims against the Landlord Entities for any damage to any property, merchandise, trade fixtures or personal property of Tenant, and any injury to any person in or about the Premises or the Property, by or from any cause whatsoever, including, without limitation, rain or water leakage of any type from the roof, windows, water lines, sprinkler or heating and air conditioning equipment, walls, basement, pipes, plumbing works or appliances, gas, fire, oil, electricity, theft or the Property not being in good condition or repair. The Landlord Entities shall not be liable for any damages arising from any act or neglect of any other tenant or occupant of the Property, or any of their officers, employees, agents, representatives, customers, business visitors or invitees or by any other third person who was not acting under the direction and control of Landlord.

## SECTION 8.08 LANDLORD'S SECURITY

Landlord may, but shall have no obligation to, from time to time, employ one or more persons or entities to patrol or provide security services in the Common Areas. Notwithstanding any such activity, Tenant shall have the sole responsibility of providing security for the Premises and the persons therein. Under no circumstances shall Landlord be liable to Tenant or to any other person by reason of any theft, burglary, robbery, assault, trespass, unauthorized entry, vandalism, or any other act of any third person occurring in or about the Premises and Tenant covenants not to sue any Landlord Entity for any such claim.

**ARTICLE 9**
**REPAIRS AND RESTORATION**

## SECTION 9.01 MINOR DAMAGE

Subject to Section 9.04, if the Premises are damaged and such damage is not substantial and is caused by a casualty for which insurance is required under Section 8.04, then Landlord shall promptly repair such damage to those portions of the Premises required to be maintained by Landlord pursuant to Section 7.01 at Landlord's expense and Tenant shall at Tenant's expense promptly repair and restore the remainder of the Premises to the condition it was in immediately prior to the casualty but in no event less than the condition required under Section 7.02, and this Lease shall continue in full force and effect; provided, however, in no event shall Landlord be required to expend for such repair or rebuilding an amount in excess of the insurance proceeds received by Landlord (plus Landlord's deductible or self-insured retention), having first deducted any portion paid to Landlord's mortgagee as required under any mortgage or trust deed.

**SECTION 9.02 SUBSTANTIAL OR UNINSURED DAMAGE**

Subject to Section 9.04, if the Premises are destroyed or damaged and either (i) such damage is Substantial Damage (as hereinafter defined), or (ii) such damage is caused by a casualty for which insurance is not required under Article 8, then Landlord may at its option either (a) promptly repair such damage to those portions of the Premises required to be maintained by Landlord pursuant to Section 7.01 at Landlord's expense, in which event Tenant shall at Tenant's expense promptly repair and restore the remainder of the Premises to the condition it was in immediately prior to the casualty but in no event less than the condition required under Section 7.02, and this Lease shall continue in full force and effect, or (b) cancel and terminate this Lease as of the date of the occurrence of such damage, by giving Tenant notice of its election to do so within thirty (30) days after the date of the occurrence of such damage; provided, however, in no event shall Landlord be required to expend for such repair or rebuilding an amount in excess of the insurance proceeds received by Landlord (plus Landlord's deductible or self-insured retention), having first deducted any portion paid to Landlord's mortgagee as required under any mortgage or trust deed.

**SECTION 9.03 DAMAGE TO THE PROPERTY**

If premises aggregating twenty-five percent (25%) or more of the total leasable Floor Area within the Property, or within the building in which the Premises are located, shall be damaged or destroyed, whether or not the Premises are damaged or destroyed, Landlord may at its option cancel and terminate this Lease by giving notice to Tenant of Landlord's election to do so within sixty (60) days after the date of occurrence of such damage, in which event this Lease shall terminate on the date such notice is given. Notwithstanding anything to the contrary in this Section 9.03, Landlord shall only have the right to terminate this Lease in the event Landlord terminates the leases of all other retail tenants in the same building as the Premises similarly affected by such casualty.  In the event this Lease is terminated pursuant to this Section 9.03, both parties shall be relieved of all obligations under this Lease except for those obligations which are intended to survive the termination of this Lease and except those obligations accruing prior to such termination.

**SECTION 9.04 DAMAGE NEAR END OF TERM**

If the Premises are destroyed or damaged during the last twenty-four (24) months of the Term, and the estimated cost of repair exceeds ten percent (10%) of the Minimum Rent for the balance of the Term, then either Landlord or Tenant may at its option cancel and terminate this Lease as of the date of occurrence of such damage by giving notice to the other of its election to do so within thirty (30) days after the occurrence of such damage.  If neither party shall so elect to terminate this Lease, the repair of such damage shall be governed by Section 9.01, Section 9.02 or Section 9.03, as the case may be.

**SECTION 9.05 ABATEMENT OF RENT**

If the Premises are destroyed or damaged, and Landlord repairs or restores them pursuant to this Article, Tenant shall continue the operation of its business in the Premises to the extent reasonably practicable under prudent business management standards, and the Minimum Rent payable for the period of Landlord's repair or restoration of such damage shall be abated in proportion to the degree to which Tenant's use of the Premises is impaired.  Tenant shall have no claim against Landlord for any damage suffered by Tenant by reason of any such damage, destruction, repair or restoration.  Tenant hereby waives any statutory rights of termination which may arise by reason of any damage which Landlord is obligated to restore or may restore under any of the provisions of this Lease.  Upon completion of such repair or restoration, Tenant shall promptly refixture and restock the Premises substantially to the condition prior to the casualty and shall reopen for business if closed by the casualty.

**SECTION 9.06** OTHER

(a)    For the purpose of this Article, "Substantial Damage" to the Premises shall mean damage to the structural portions of or supporting the Premises, the estimated cost of repair which exceeds twenty percent (20%) of the then estimated replacement cost thereof.

(b)    The determination in good faith by Landlord of the estimated cost of repair of any damage and/or the estimated replacement costs of any building shall be conclusive for the purpose of this Article, absent manifest error.

### ARTICLE 10
### ASSIGNMENT AND SUBLETTING

**SECTION 10.01** LANDLORD'S RIGHTS

(a)    Landlord has entered into this Lease with Tenant in order to obtain for the benefit of the entire Property the unique attraction of Tenant's trade name as specified in the Basic Lease Provisions and the unique merchandising mix and product line associated with Tenant's business.  Landlord has specifically relied on the identity and special skill of Tenant in its ability to conduct the specific business identified in the Basic Lease Provisions.  Tenant hereby acknowledges that the provisions of this Article 10 have been freely negotiated and are expressly agreed to by Tenant as an inducement to Landlord to enter into this Lease.

(b)    Notwithstanding any provision in this Lease to the contrary or reference herein to concessionaires or subtenants or otherwise, without Landlord's prior written consent (which may be withheld, conditioned or delayed in Landlord's sole discretion), Tenant shall not assign nor in any manner transfer this Lease or any estate or interest therein, shall not hypothecate or mortgage this Lease or any estate or interest therein, and shall not lease nor sublet the Premises or any part or parts thereof or any right or privilege appurtenant thereto, and shall not allow anyone to conduct business at, upon or from the Premises (whether as concessionaire, franchisee, licensee, permittee, subtenant, department operator or otherwise), or to come in, by, through or under it, whether by voluntary or involuntary act or by operation of law or otherwise.  Each of the foregoing is herein deemed to be a "Transfer".

(c)    Each of the following is also deemed to be a Transfer: (i) the sale, issuance or transfer of a majority and controlling amount of the voting capital stock of Tenant or of any guarantor of this Lease or of a majority and controlling amount of the voting capital stock of any corporate entity which directly or indirectly controls Tenant (except for transfers of stock traded on the New York Stock Exchange, the American Stock Exchange or NASDAQ); (ii) the sale or transfer of any interests in any non-corporate entity which directly or indirectly controls Tenant or any guarantor of this Lease if such sale or transfer results in a change in the direct or indirect voting control (or a change in the identity of any person or entity with the power to vote or control at least fifty percent (50%) of the voting shares of any class of stock) of Tenant, any guarantor of this Lease, or any corporate or non-corporate entity which directly or indirectly controls Tenant or any guarantor of this Lease; (iii) if Tenant is a partnership, trust or unincorporated association, the sale, issuance or transfer of a controlling interest therein, or the transfer of a majority interest in, or a change in the voting control of, any partnership, trust, unincorporated association or corporation which directly or indirectly controls Tenant, or the transfer of any portion of any general partnership or managing interest in Tenant or in any such entity; or (iv) if Tenant is a limited liability company, the withdrawal or change, voluntary, involuntary or by operation of law, of a manager, or a transfer of a majority of the membership interests, in the aggregate or on a cumulative basis, or the dissolution of the limited liability company.  If Tenant is a sole proprietorship, the death or incapacity of Tenant shall be deemed a Transfer.

(d)    Any Transfer, either voluntarily or involuntarily or by operation of law or otherwise, not expressly consented to by Landlord, shall, at Landlord's option, terminate this Lease without relieving Tenant or any guarantor of this Lease of any of its obligations hereunder for the balance of the Term, and any such act shall be null and void.  The voluntary or other surrender of this Lease by Tenant, or a mutual

cancellation thereof, or the termination hereof by Landlord pursuant to any provision contained herein, shall not work a merger and shall, at the option of Landlord, terminate all or any existing franchises, concessions, licenses, permits, subleases, subtenancies, departmental operating arrangements or the like, or may, at the option of Landlord, operate as an assignment to Landlord of the same.

(e)    If Landlord consents to any Transfer (which consent may be withheld in Landlord's sole discretion), such consent shall not constitute a waiver of the need for Landlord's consent to any subsequent Transfer. Each Transfer to which Landlord consents shall be by written instrument, in form reasonably satisfactory to Landlord, executed by the transferor, assignor, sublessor, licensor, concessionaire, hypothecator or mortgagor, and the transferee, assignee, sublessee, licensee, concessionaire, or mortgagee shall agree therein for the benefit of Landlord to assume and perform the covenants and conditions of this Lease to be kept and performed by Tenant. A copy of such instrument shall be delivered to Landlord. At Landlord's option, failure to obtain Landlord's prior written consent or to otherwise comply with this Article 10 shall operate to prevent any such Transfer from being effective.

(f)    If the minimum rent or any other rent or consideration required to be paid arising from any Transfer exceeds the Rent reserved hereunder, then Tenant shall pay to Landlord, on demand, the entire amount of such excess, which shall be deemed Rent under this Lease.

(g)    Payment or performance of this Lease by any person or entity claiming an interest in this Lease or the Premises by, through or under Tenant without Landlord's consent in writing shall not constitute a Transfer or create any interest in this Lease or the Premises.

(h)    If Landlord consents to a Transfer or if Landlord does not terminate this Lease pursuant to this Article 10, the Minimum Rent payable following such Transfer shall be increased to an amount equal to the Minimum Rent then in effect multiplied by a fraction, the numerator of which is the Consumer Price Index then in effect and the denominator of which is the Consumer Price Index in effect on the Commencement Date. As use herein, the term "Consumer Price Index" shall mean "United States City Average All Items for All Urban Consumers (CPI-U, 1982-84=100)" published by the Bureau of Labor Statistics of the U.S. Department of Labor. If the publication of the Consumer Price Index of the U.S. Bureau of Labor Statistics is discontinued, comparable statistics on the purchasing power of the consumer dollar published by a responsible financial periodical selected by Landlord shall be used for making such computations. In no event shall Minimum Rent decrease below what is otherwise payable under this Lease.

All of the other terms, covenants and conditions of this Lease shall continue in full force and effect.

(i)    Notwithstanding anything to the contrary contained in this Article 10, Landlord shall have the option, by giving notice to Tenant within thirty (30) days after receipt of Tenant's notice of any proposed Transfer, to recapture the Premises. Such recapture notice shall cancel and terminate this Lease as of the date stated in Tenant's notice of proposed Transfer as the effective date of the proposed Transfer, unless Tenant revokes Tenant's notice of proposed Transfer by notice to Landlord within ten (10) days after Landlord's notice of recapture.

### SECTION 10.02 LANDLORD'S COSTS

Should Landlord consent to a Transfer, Tenant shall pay to Landlord on demand $1,500.00 to cover Landlord's costs, including attorneys' fees, incurred in connection with processing and documenting such Transfer.

### SECTION 10.03 NO RELEASE OF TENANT

Notwithstanding any Transfer, Tenant and Guarantor (if any) shall at all times remain directly and primarily responsible and liable for the payment of the Rent herein specified and for compliance with all other obligations under this Lease. Upon the occurrence of a default, if the Premises or any part thereof are then sublet, Landlord, in addition to any other remedies provided herein or by Law, may collect

14

directly from any subtenants all rents due and becoming due to Tenant under such sublease and apply such rent against any sums due to Landlord from Tenant hereunder. No such collection directly from an assignee or subtenant shall be construed to constitute a novation or a release of Tenant from the further performance of Tenant's obligations hereunder. The acceptance by Landlord of any payment due hereunder from any other person shall not be deemed to be a waiver by Landlord of any provision of this Lease or a consent to any Transfer. Any violation of this Lease by any assignee or subtenant shall be deemed to be a violation of this Lease by Tenant.

**ARTICLE 11**
**EMINENT DOMAIN**

## SECTION 11.01 ENTIRE OR SUBSTANTIAL TAKING OF PREMISES

If the entire Premises, or so much thereof as to make the balance not reasonably adequate for the conduct of Tenant's business notwithstanding restoration by Landlord as hereinafter provided, shall be taken under the power of eminent domain, this Lease shall automatically terminate on the earlier of the date the condemning authority grants the condemnation award or the date the condemning authority acquires possession.

## SECTION 11.02 PARTIAL TAKING OF PREMISES

In the event of any taking under the power of eminent domain which does not so result in a termination of this Lease, the Minimum Rent, Breakpoints and all other Rent payable hereunder based upon the square footage of the Premises shall be reduced, effective on the earlier of the date the condemning authority grants the condemnation award or the date the condemning authority acquires possession, in the same proportion which the Floor Area of the portion of the Premises taken bears to the Floor Area of the entire Premises prior to the taking. Landlord shall promptly at its expense restore the portion of the Premises not so taken to as near its former condition as is reasonably possible, and this Lease shall continue in full force and effect.

## SECTION 11.03 TAKING OF PROPERTY

If premises aggregating twenty-five percent (25%) or more of the total leasable Floor Area of the Property, or within the building in which the Premises are located, shall be taken by eminent domain, whether or not the Premises are so taken, Landlord may, at its option, terminate this Lease by notice to Tenant of its election to do so prior to the earlier of the date the condemning authority grants the condemnation award or the date on which the condemning authority acquires possession, and this Lease shall terminate on the earlier of the date of condemning authority grants the condemnation award or the date the condemning authority acquires possession.

## SECTION 11.04 AWARDS

All compensation awarded or paid upon a total or partial taking of the Premises shall belong to and be the property of Landlord without any participation by Tenant and Tenant hereby assigns to Landlord any such claim Tenant may have; provided, however, that nothing contained herein shall be construed to preclude Tenant, at its sole cost and expense, from independently prosecuting any claim directly against the condemning authority for loss of business, and/or depreciation to, damage to, and/or cost of removal of, and/or for the value of stock and/or trade fixtures, furniture and other personal property belonging to and paid for by Tenant; provided, however, that no such claim shall diminish or otherwise adversely affect Landlord's award or the awards of any and all ground and underlying lessors and/or mortgagees.

**SECTION 11.05** SALE UNDER THREAT OF CONDEMNATION

A sale by Landlord to any authority having the power of eminent domain, either under threat of condemnation or while condemnation proceedings are pending, shall be deemed a taking under the power of eminent domain for all purposes under this Article.

## ARTICLE 12
### INGRES AND EGREES

**SECTION 12.01** ACCESS POINT

Primary ingress and egress to the Premises shall be through the adjoining space, known as Unit 8 of the Building, as depicted in Exhibit A ("Access Point"). Landlord shall maintain the Access Point and agrees not to inhibit passage of patrons through the Access Point during any hours of operation agreed to by Landlord and Tenant. Notwithstanding the foregoing, Landlord shall provide any and all necessary emergency ingress and egress as required by Law.

**SECTION 12.02** MODIFICATION OF ACCESS POINT

In the event of a change in use or ownership of Unit 8 of the Building, such that use of the Access Point is no longer available, Landlord is obligated to provide a reasonable source of primary access for ingress and egress to and from the parking area in front of the Building.

## ARTICLE 13
### UTILITY SERVICES

**SECTION 13.01** UTILITY SERVICES AND CHARGES

Landlord shall have the right, at its option, to designate or approve the utility supplier for any utility services obtained by Tenant for the Premises, and to control access to and use of any common utility lines, systems or equipment at the Property. Landlord reserves the right from time to time to provide any or all utilities to the Premises. Tenant shall pay all charges for gas, water, sewer, rubbish removal, electricity, telephone, heating, ventilation, air conditioning and other utility services used in the Premises during the Term. If any such charges are not paid when due, Landlord may pay the same, and any amount so paid by Landlord shall thereupon become due to Landlord from Tenant as additional Rent. If any utility services are separately metered to the Premises, then Tenant shall cause the charges for such services to be billed directly to Tenant and shall pay such charges directly to the purveyor(s) of such services. As to any utility service not separately metered to the Premises at the Commencement Date of this Lease, Landlord reserves the right to require Tenant, as a part of Tenant's Work in the Premises and at Tenant's cost, to install a separate meter or submeter to monitor the usage of such utility service in the Premises. The foregoing provisions shall also apply to any utility service used by Tenant to operate the heating, ventilating and air conditioning unit serving the Premises.

**SECTION 13.02** INTERRUPTION OF SERVICE

Landlord shall not be liable and Tenant covenants not to sue Landlord for any failure or interruption of any utility service to the Premises and no such failure or interruption shall entitle Tenant to terminate this Lease or to an abatement of the Rent due hereunder.

**SECTION 13.03** NO OVERLOADING

If Tenant desires to connect or install any electric fixtures, equipment or appliances which require electricity exceeding the capacity of any utility facilities or which shall require additional utility facilities, Tenant must obtain Landlord's prior written approval of Tenant's plans and specifications therefor. If such installation is approved by Landlord, and if Landlord provides such additional facilities to accommodate Tenant's installation, Tenant agrees to pay Landlord, on demand, the cost of providing such additional

utility facilities or utility facilities of a greater capacity. Tenant shall in no event use any of the utility facilities in any way which shall overload or overburden the utility systems.

## ARTICLE 14
## COMMON AREAS

**SECTION 14.01** DEFINITION

"Common Areas" means all areas in the Property that are designated from time to time for the use and enjoyment of Landlord, tenants and occupants of the Property, and their respective employees, customers and other invitees (which use and enjoyment may be in common with others), in each case to the extent not now or hereafter held for exclusive use by Landlord or other persons. The Common Areas include, without limitation, the following: parking areas and structures; exterior walls and windows; the land and facilities utilized for or as parking lots and parking decks; open and/or enclosed malls; access and perimeter roads; truck passageways and loading platforms (to the extent not reserved for single tenant use); service corridors and loading platforms (to the extent not reserved for single tenant use); service corridors and stairways providing access for store premises to such platforms and truck passageways; landscaped areas; exterior walks, arcades, stairways and/or ramps, interior corridors, escalators, elevators, stairs, arcades and/or balconies (to the extent not reserved for single tenant use); public meeting rooms; ponds and basins; fountains; signage holders; directory equipment; storm and sanitary sewers, drainage facilities, utility lines and the like (whether or not within, the Property), washrooms, comfort rooms, drinking fountains, toilets and other public facilities; roofs; bus stations, taxi stands and the like.

**SECTION 14.02** USE

Tenant and its employees and invitees shall be entitled to the non-exclusive use of the Common Areas serving the Property during the Term in common with Landlord and with other persons authorized by Landlord, subject to such reasonable Rules and Regulations relating to such use as Landlord may from time to time establish, and subject to the other terms of this Lease.

**SECTION 14.03** CONTROL OF COMMON AREAS

(a)     Landlord shall operate, manage, equip, light, decorate, repair, replace, clean and maintain, or cause to be operated, managed, equipped, lighted, decorated, repaired, replaced, cleaned and maintained, the Common Areas to the extent and in such manner as Landlord may in its sole discretion determine to be appropriate. Landlord may temporarily close, or cause to be closed, any portion of the Common Areas for repairs or alterations, to prevent a dedication thereof or the accrual of prescriptive rights therein, or for any other reason deemed sufficient by Landlord. Landlord reserves the right from time to time to utilize portions of the Common Areas for advertising purposes, displays, entertainment and special events and placement of carts as Landlord deems appropriate. Landlord shall have the right to construct buildings, or temporary or permanent improvements, to control access to and use of any and all common utility lines, systems, and equipment, and to change the character of or make changes at any time in the size, shape, location, number and extent of the Common Areas, and no such change shall entitle Tenant to any abatement of Rent or other rights.

(b)     Landlord shall at all times during the Term have the sole and exclusive control of the Common Areas, and may at any time and from time to time restrain any use or occupancy thereof except as authorized by the Rules and Regulations for the use of such areas reasonably established by Landlord from time to time. The rights of Tenant in and to the Common Areas shall at all times be subject to the rights of Landlord, the other tenants of Landlord, the other occupants of stores in the Property, and others designated by Landlord, to use the same in common with Tenant, and Tenant shall keep said areas free and clear of any obstructions created or permitted by Tenant or resulting from Tenant's operation. If in the sole opinion of Landlord unauthorized persons are using any of said areas by reason of the presence of Tenant in the Property, Tenant, upon demand of Landlord, shall restrain such unauthorized use by

appropriate proceedings. Nothing herein shall affect the right of Landlord at any time to remove any such unauthorized persons.

## SECTION 14.04 PARKING AREAS

(a)     Tenant and its employees shall park their vehicles only in such parking areas in the Property, if any, as are from time to time designated for that purpose by Landlord, and Landlord may change such designated areas at any time upon notice to Tenant.

(b)     Without limiting the generality of the foregoing, Landlord shall have the right to designate off-site parking within one (1) mile of the Property as parking for Tenant's employees. If Landlord elects to use such off-site employee parking, the costs incurred in using such off-site areas and providing shuttle bus service to and from the Property shall be included in Operating Expenses pursuant to this Article. Notwithstanding the foregoing, Landlord agrees that any policy it imposes requiring the Tenant's employees to use off-site parking will be applied to all Tenant's

(c)     If Landlord elects or is required to limit or control parking by customers or invitees of the Property, whether by validation or parking tickets or any method of assessment, or any program for free or reduced cost transportation, Tenant agrees to participate in such validation, assessment or transportation program under such reasonable rules and regulations as are from time to time established by Landlord with respect thereto.

(d)     Tenant shall furnish Landlord with a list containing the description and automobile license numbers (and state of issuance) of the cars of Tenant and its employees within fifteen (15) days of any request by Landlord, and shall thereafter advise Landlord upon request of any changes, additions or deletions to such list. Landlord may:  (a) refuse to permit any person violating the provisions of this Section 14.04 to park, and remove the vehicle owned or driven by the violator from the Property without liability whatsoever, at such violator's risk and expense, and/or (b) charge Tenant such reasonable rates as Landlord may from time to time establish for such violations. These provisions shall be in addition to any other remedies available to Landlord under this Lease or otherwise.

## SECTION 14.05 OPERATING EXPENSES

(a)     Operating Expenses are all costs incurred to operate, manage, equip, police, light, insure, decorate, repair, replace, clean and maintain the Property.  Such costs and expenses shall include, without limiting the generality of the foregoing:  utility costs; costs of public liability, property damage, vandalism, malicious mischief and other insurance (including appropriate reserves for deductible amounts and uninsured events relating to the Property); costs of lighting, ventilating, air conditioning, and providing music for the Property; costs for marketing and promotion of the Property; charges for water, electricity, sanitary control, gas, steam, sewage disposal and other services for the Property (but not any service provided directly for the sole benefit of a specific tenant); wages, salaries and benefits for all on-site personnel; pest control and extermination; costs of installation, repair, replacement, inspection, testing, painting, decorating or cleaning of parking areas, curbs, walkways, landscaping, drainage facilities, facilities for lighting, heating, ventilating and cooling, pylon signs, other signs, markers or bumpers, utility lines, systems, equipment, roofs, gutters, downspouts, roof flashings, interior and exterior walls, foundations, windows, glass and glazing, planters, gardens, and all other installations in the Property; depreciation of equipment; cost of security and fire protection; cost of obtaining certified audits of Operating Expenses and similar items; Operating Expenses shall not include an allowance for depreciation of buildings and other improvements, but shall include all charges, surcharges and other levies of whatsoever nature imposed by, and all costs (whether or not capital in nature) of compliance with orders or requirements of, any federal, state or local governmental authority regulating environmental, health, safety and other aspects of the Property including (without limitation) the Americans With Disabilities Act (42 USC Sec. 12101 et seq.) and regulations and guidelines thereunder, and all amendments thereto ("ADA"), and all costs, as reasonably amortized, with interest, on any capital improvement which is (a) reasonably calculated to help reduce Operating Expenses, or (b) made to

comply with Laws, or (c) made for repairs or replacements (other than new buildings or new additions to buildings).

(b)     In addition to the operating expenses stated in this Article 14, Tenant shall be responsible for its reasonable share of additional operating expenses ("Additional Operating Expenses") attributable to use of any part of the premises located in the adjacent tenant space as well as the information desk and common area located at or near the Access Point.  The Additional Operating Expenses will be allocated, in the reasonable discretion of the Landlord, based on the pro rata for the total square footage of the adjacent premises using shared Access Point.  Payment of Additional Operating Expenses shall be in the same manner as Operating Expenses.

(c)     In addition to the other expenses set forth in this Article 14, Tenant agrees to the following requirements:

(i)     Tenant agrees to reimburse Xtreme Action Park and its Affiliates fifty percent (50%) of Xtreme's costs for joint marketing which identifies both Xtreme Action Park or its Affiliates' venues and Tenant's business.  Notwithstanding the foregoing, Tenant will not be required to reimburse Xtreme more than twenty five thousand dollars ($25,000) per year.

(ii)     In addition to the marketing referenced in Section 15.05(c)(i) above, Tenant will spend no less than twenty five thousand dollars ($25,000) per year for marketing which includes a specific reference to Tenant's location at 5300 Powerline Road.  Landlord may request reasonable evidence of Tenant's annual expenditures on marketing that complied with this Section.

(d)     The following shall also not be included in Operating Expenses:

(i)     Leasing commissions, attorneys' fees, advertising costs, and other expenses incurred in connection with the negotiations or disputes with tenants, or the leasing, renovating or improving space for prospective tenants of the Property;

(ii)     Costs incurred due to a violation by Landlord of any of the terms and conditions of this Lease or any other lease relating to retail space for other tenants in the Property if such costs were not due to acts or omissions of Tenant, its employees, agents or contractors;

(iii)     Interest on mortgages or other debt or amortization payments and rental under any ground or underlying lease;

(iv)     Repairs and other work occasioned by fire, windstorm or other casualty or loss for which Landlord has received reimbursement from insurance (excluding deductibles) or condemnation proceedings;

(v)     Any costs, fines, penalties or expenses incurred due to violations by Landlord of Laws not due to acts or omissions of Tenant, its employees, agents or contractors;

(vi)     The cost of the land or the buildings of the Property or the depreciation thereof;

(vii)     The initial cost of the installation of the parking areas or the depreciation thereof;

(viii)     Any reserves for future expenditures not yet incurred; and

(ix)     Salaries and other compensation payable to officers, directors, shareholders and partners of Landlord for services not in connection with the management, operation, repair or maintenance of the Property.

**SECTION 14.06** ADDITIONAL CONSTRUCTION

Landlord reserves the right at any time to make alterations, modifications, reductions, expansions or additions to and to build additional stories on any building or portion of any building in the Property and to build adjoining the same. Landlord reserves the right at any time to do, or permit to be done, any or all of the following with respect to the Property: add or remove buildings, structures, parking or Common Areas; change the number and location of buildings and structures; change building dimensions; change the number of floors in any buildings or structures; add to, alter or remove partially or wholly any structure or structures or enclose any mall area; change the identity and type of stores and tenancies and the dimensions thereof, including the alteration of lease lines as they adjoin Common Areas; change the name of the Property, change the address or designation of the Premises or the building in which the Premises are located; provide subterranean and multiple level parking decks; convert Common Areas into leasable areas and vice versa (including installation or removal of kiosks, planters, pools and sculptures) or construct temporary or permanent buildings or improvements in the Common Areas; change the location or character of or make alterations in or additions to the Common Areas and otherwise alter, repair, reconstruct the Common Areas or change the use thereof; and expand the size of the Property by acquiring or making available additional land; provided, however, that no such changes shall materially alter the size of the Premises or deny reasonable ingress to or egress from the Premises.

**SECTION 14.07** PROPERTY

The term "Property" shall mean the building or structure in which the Premises are located and any other buildings or structures owned or controlled by Landlord or its affiliates and operated in conjunction with the Property, whether or not shown on Exhibit A hereto, together with the Common Areas, and all parcels or tracts of land owned or ground leased by Landlord from time to time on which all or any portion of the foregoing items are located and any fixtures, systems and equipment, furniture and other personal property owned or leased by Landlord located thereon or therein and used in connection therewith, including, other buildings, structures and parcels or tracts of land owned by other parties which adjoin the other areas of the Property or the Common Areas.

**ARTICLE 15**
**SIGNS**

Landlord reserves the exclusive right in its sole discretion to develop, modify and control internal and external signage, advertising and display devices at the Property. All signs are subject to the prior written approval of Landlord, including, without limitation, materials, content, size, construction, color, face type and location. Any sign installed, placed or erected on the Premises must be approved in writing by Landlord. Tenant covenants not to begin installation of any sign until Landlord has given its approval. Landlord reserves the right to inspect all signs at the proposed site of installation, placement or erection, and to remove or cause to be removed all unapproved signs, such removal to be at the sole cost and expense of the person or persons responsible for the installation, placement or erection of each unapproved sign. Tenant shall immediately remove any signs or advertising or display devices erected or maintained in violation of this Lease or such criteria, and if Tenant fails to do so after notice from Landlord, Landlord may enter the Premises and cause such item to be removed, and the cost of such removal and restoring any damaged property shall be paid by Tenant upon demand.

**ARTICLE 16**
**ESTOPPEL STATEMENT, ATTORNMENT AND SUBORDINATION**

**SECTION 16.01** ESTOPPEL STATEMENT

Tenant shall, without charge, at any time and from time to time, within ten (10) days after receipt by Tenant of written request therefor from Landlord or from any mortgagee or other person or entity designated by Landlord, deliver a duly executed and acknowledged certificate or statement to the requesting party certifying: (i) that this Lease is unmodified and in full force and effect, or, if there has been any modification, that this Lease is in full force and effect as modified, and stating any such

modification; (ii) the date of commencement of the Term; (iii) that Rent is paid currently without any offset or deduction thereto; (iv) the dates to which the Rent and other charges payable hereunder by Tenant have been paid, and the amount of Rent and other charges, if any, paid in advance; (v) that Tenant has accepted the Premises and all of Landlord's Work has been completed; (vi) whether or not there is then existing any claim of Landlord's default hereunder and, if so, specifying the nature thereof; and (vii) any other ascertainable matters relating to the status of this Lease as shall be requested by Landlord or other designated party, with any changes required for accuracy.  Any such certificate or statement may, at the election of the requesting party, include Tenant's undertaking not to pay Rent for more than a specified period in advance of the due dates set forth herein.  If Tenant fails to execute and deliver any such certificate or statement within ten (10) days after receipt by Tenant of a written request therefor, such failure shall be conclusive and binding upon Tenant that all information set forth above (or in the form of certificate or statement provided to Tenant) is true and accurate.  Additionally, Tenant hereby irrevocably appoints Landlord as its attorney-in-fact to execute and deliver such certificate or statement to any third party in the name and on behalf of Tenant if Tenant fails to execute and deliver any such certificate or statement within ten (10) days after receipt by Tenant of a written request therefor.

## SECTION 16.02 ATTORNMENT

If, under any mortgage or deed of trust or condominium declaration encumbering the land on which the Premises is located, any foreclosure or power of sale proceedings are brought or a conveyance by deed in lieu of foreclosure occurs, or if Landlord sells, conveys or otherwise transfers its interest in the Property or any portion thereof containing the Premises, or if any underlying lease is terminated, then, in each case, at the option of the mortgagee, beneficiary, lessor or other such successor in interest taking title to the Premises (as the case may be), this Lease shall remain in full force and effect, subject to the provisions of any underlying lease, and Tenant shall attorn to and recognize such successor in interest as Landlord under this Lease, and Tenant covenants to execute, within ten (10) days after receipt by Tenant of written request therefor from such successor in interest, an instrument in writing reasonably satisfactory to the new owner evidencing such attornment.  In the event of attornment to a successor of the Landlord's interest under this Lease as a result of any foreclosure or power of sale proceeding, a conveyance by deed in lieu of foreclosure, or termination of any underlying lease, the successor in interest shall not be (i) liable for any security deposit or bound by any prepayment of Rent paid more than one (1) month in advance, or (ii) bound by any modification of this Lease not consented to in writing by such successor in interest.

## SECTION 16.03 SUBORDINATION

Tenant agrees that this Lease is subject and subordinate to any mortgages or deeds of trust and all other encumbrances and matters of public record applicable to the Property, including, without limitation, any ground lease, covenants, conditions, and restrictions that are now, or may hereafter be placed, upon the Premises and to any and all advances to be made thereunder, and to the interest thereon, and all renewals, replacements and extensions thereof.  Tenant also agrees that any mortgagee or beneficiary, ground lessor or condominium or other association may elect to have this Lease constitute a prior lien to its mortgage or deed of trust or ground lease or condominium or similar declaration (as the case may be), and in the event of such election and upon notification by such mortgagee or beneficiary or ground lessor or condominium or other association (as the case may be) to Tenant to that effect, this Lease shall be deemed prior in lien to such mortgage or deed of trust or ground lease or condominium or other declaration (as the case may be), whether this Lease is dated prior to or subsequent to said mortgage or deed of trust or ground lease or condominium or other declaration (as the case may be).  Tenant agrees that upon the request of Landlord, or any mortgagee or beneficiary or ground lessor or condominium or other association, Tenant shall execute, within ten (10) days after receipt by Tenant of such written request therefor from Landlord or such mortgagee, beneficiary, ground lessor, condominium or other association, whatever instruments may be reasonably required to carry out the intent of this Section.

**SECTION 16.04** REMEDIES

If Tenant shall fail to execute any statements or instruments necessary or desirable to effectuate the provisions of this Article, within five (5) days after a second written request by Landlord, Tenant shall be deemed to have agreed with the matters set forth therein, and Landlord acting in good faith shall be authorized as Tenant's attorney-in-fact to execute such statement on behalf of Tenant (which shall not be in limitation of Landlord's other remedies therefor).

## ARTICLE 17
## DEFAULTS AND REMEDIES

**SECTION 17.01** DEFAULTS

(a)      The occurrence of any one or more of the following events shall constitute a "Default" hereunder by Tenant:

(i)      The abandonment of the Premises by Tenant.  Abandonment is herein defined to include, but is not limited to, any absence by Tenant from the Premises for two (2) days or longer, unless specifically permitted by this Lease.

(ii)      Tenant's failure to make any payment of Rent within three (3) days after notice from Landlord. Notwithstanding the foregoing, an immediate Default, without the necessity of notice and opportunity to cure, shall occur if during the twelve months preceding the non-payment, Landlord previously delivered two notices of non-payment.

(iii)      Tenant's failure to observe the minimum hours of operation established by Landlord, where such failure shall continue for a period of three (3) days after notice thereof from Landlord to Tenant.  For purposes of this subsection (iii), Tenant shall not be deemed to have cured a default resulting from Tenant's failure to observe the minimum hours of operation established by Landlord if Tenant shall, within thirty (30) days after any purported cure, again fail to observe such minimum hours of operation.

(iv)      Tenant's failure to obtain and keep in force at all times any insurance Tenant is required to obtain and keep in force under Article 8 where such failure is not cured within five (5) days after notice of such failure from Landlord.

(v)      A Transfer in violation of Article 10.

(vi)      Tenant's failure to timely provide the estoppel certificate required under Section 16.01 and/or a subordination as required under Section 16.03, within five (5) days after notice from Landlord of such failure.

(vii)      If any proceeding shall be commenced to declare Tenant or any guarantor of this Lease bankrupt or insolvent or to obtain relief from any debts or obligations or to delay or extend the payment thereof, or if either Tenant or any guarantor of this Lease generally fails to pay, or admits its inability to pay, debts as they become due, or otherwise becomes insolvent, or if any assignment of Tenant's or any guarantor's property be made for benefit of creditors, or if a receiver or trustee be appointed for Tenant or any guarantor or for Tenant's or any guarantor's property or business (unless in the case of a petition filed against Tenant or any guarantor, the same is dismissed within sixty (60) days).

(viii)      Tenant's failure to observe or perform any of the express or implied covenants or provisions of this Lease to be observed or performed by Tenant, other than as specified in (i)-(vii) above, where such failure shall continue for a period of thirty (30) days after notice thereof from Landlord to Tenant.  If the nature of Tenant's default is such that more than thirty (30) days are reasonably required for its cure, then Tenant shall not be deemed to be in default if Tenant shall commence such cure within

said thirty (30) day period and thereafter diligently prosecute such cure to completion within a reasonable time, not to exceed ninety (90) days after the notice of default.

(ix)     A default under any , contract or agreement between Landlord and Tenant, or agreement between Tenant and any affiliate of Landlord ("Associated Contract"), shall be considered a Default under this Lease.  For purposes of this section, a default shall be defined the same as a default under the Associated Contract.

(b)     Any notice of default sent by Landlord to Tenant shall be in lieu of, and not in addition to, any termination notice required under applicable statutory or regulatory provisions (and no further notice shall be required should Landlord elect to terminate this Lease as set forth below).

## SECTION 17.02 REMEDIES

(a)     Upon any Default by Tenant, Landlord may exercise any of the following remedies:

(i)     With or without terminating this Lease, terminate Tenant's right to possession of the Premises by any lawful means, in which case Tenant shall immediately surrender possession of the Premises to Landlord.  In such event Landlord shall be entitled to recover from Tenant:

(1)     The worth at the time of award of the unpaid Rent which had been earned at the time of termination; and

(2)     The worth at the time of award of the amount by which the unpaid Rent which would have been earned after termination until the time of award exceeds the amount of such loss that Tenant proves could have been reasonably avoided; and

(3)     The worth at the time of award of the amount by which the unpaid Rent for the balance of the Term after the time of award exceeds the amount of such loss that Tenant proves could be reasonably avoided; and

(4)     Any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including, but not limited to, the cost of recovering possession of the Premises, expenses of reletting, including necessary repair, renovation and alteration of the Premises, brokers' commissions, reasonable attorneys' fees, and any other costs.

In clauses (1) and (2) above, "worth at the time of award" shall be computed by allowing interest at the rate per annum determined pursuant to Section 20.05 from the date such amounts accrue to Landlord.  In clause (3) above, "worth at the time of award" shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of Chicago at the time of the award plus one percent (1%).

(ii)     Without terminating or effecting a forfeiture of this Lease or otherwise relieving Tenant of any obligation hereunder, Landlord may, but need not, relet the Premises or any portion thereof at any time or from time to time and for such terms and upon such conditions and rental as Landlord in its sole discretion may deem proper.  If Landlord relets the Premises or any portion thereof, such reletting shall not relieve Tenant of any obligation hereunder, except that Landlord shall apply the rent or other proceeds actually collected by it for such reletting against amounts due from Tenant hereunder to the extent such proceeds compensate Landlord for nonperformance of any obligation of Tenant hereunder. Landlord may execute any lease made pursuant hereto in its own name, and the lessee thereunder shall be under no obligation to see to the application by Landlord of any proceeds to Landlord, nor shall Tenant have any right to collect any such proceeds.  Landlord shall not by any re-entry or other act be deemed to have accepted any surrender by Tenant of the Premises or Tenant's interest therein, or be deemed to have terminated this Lease, or to have relieved Tenant of any obligation hereunder, unless Landlord shall have given Tenant express notice of Landlord's elections to do so as set forth herein.

(iii)    Landlord may terminate this Lease by express notice to Tenant of its election to do so.  Such termination shall not relieve Tenant of any obligation hereunder which has accrued prior to the date of such termination.  In the event of such termination, Landlord shall be entitled to recover from Tenant the amounts determined pursuant to paragraph (i) above.

(b)    Landlord shall be under no obligation to observe or perform any covenant of this Lease on its part to be observed or performed after the date of any default by Tenant hereunder.

(c)    In any action for unlawful detainer, the reasonable rental value of the Premises for the period of the unlawful detainer shall be deemed to be the amount of Rent reserved in this Lease for such period, unless Landlord or Tenant shall prove to the contrary by competent evidence.

(d)    The rights and remedies reserved to Landlord herein, including those not specifically described, shall be cumulative, and, except as provided by applicable Law in effect at the time, Landlord may pursue any or all of such rights and remedies, at the same time or otherwise.

(e)    No delay or omission of Landlord to exercise any right or remedy shall be construed as a waiver of any such right or remedy or of any default by Tenant hereunder.  The acceptance by Landlord of any Rent hereunder shall not be a waiver of any breach or default by Tenant, other than the failure of Tenant to pay the particular Rent accepted, regardless of Landlord's knowledge of such breach or at the time of acceptance of such Rent, or a waiver of Landlord's right to exercise any remedy available to Landlord by virtue of such breach or default.  Acceptance of a partial payment of any amount of Rent owed shall not be a waiver of Landlord's right to recover the remaining amounts of Rent still owing.

(f)    Tenant hereby waives any right of redemption or relief from forfeiture after this Lease or Tenant's right to possession is terminated based on a Default by Tenant.

## SECTION 17.03 LANDLORD'S FAILURE TO PERFORM

Landlord shall not be deemed to be in default in the performance of any obligation hereunder unless and until it has failed to perform such obligation within thirty (30) days after notice by Tenant to Landlord specifying wherein Landlord has failed to perform such obligation; provided, however, that if the nature of Landlord's obligation is such that more than thirty (30) days are required for its performance, then Landlord shall not be deemed to be in default if it shall commence such performance within such thirty (30) day period and thereafter diligently prosecute the same to completion.  The obligations of Landlord and Tenant, respectively, under this Lease are expressly agreed by the parties to be independent covenants, and Tenant's remedies for Landlord's failure to perform any covenant as required under this Lease shall be limited to suit or action at law or in equity, and shall not extend to self-help, withholding or offsetting Rent or terminating this Lease.  Tenant shall give Landlord's lender(s) a copy of any default notice given by Tenant to Landlord if Tenant has been notified of the name and address of such lender(s).  If Landlord fails to cure such default in the time provided in this Lease for cure, any such lender shall have an additional thirty (30) days to cure such default (or if more than thirty (30) days is required, such lender must commence such cure within said thirty (30) days and thereafter diligently prosecute such cure to completion).

## SECTION 17.04 EXPENSE OF LITIGATION

If either party brings any action or proceeding by reason of any default or alleged default of the other party hereunder, the party prevailing in such action or proceeding shall be entitled to recover its reasonable expenses in connection therewith (including without limitation reasonable attorneys' fees) from the other party.  For purposes of this provision, in any unlawful detainer or other action or proceeding instituted by Landlord based upon any default or alleged default by Tenant hereunder, Landlord shall be deemed the prevailing party if (a) judgment is entered in favor of Landlord or (b) prior to trial or judgment Tenant shall eliminate the condition(s), cease the act(s) or otherwise cure the omission(s) claimed by Landlord to constitute a default by Tenant hereunder.

## SECTION 17.05 HOLDING OVER

If Tenant or anyone claiming under Tenant shall remain in possession of the Premises or any part thereof after expiration of the Term or earlier termination thereof without Landlord's written consent (which may be withheld in Landlord's sole discretion), Tenant shall (a) occupy upon all of the terms and conditions of this Lease except that Tenant shall pay one hundred fifty percent (150%) of the Rent in effect at the end of the Term, (b) pay all damages sustained by Landlord by reason of such retention, and (c) indemnify, defend, and hold Landlord harmless from and against any loss or liability resulting from such holding over. Landlord's acceptance of Rent shall create only a tenancy at sufferance, upon the terms set forth in this Section. Any such tenancy shall be terminable at any time by either party by notice to the other party given not less than ten (10) days prior to such termination. Nothing contained in this Section shall be deemed or construed to waive Landlord's right of reentry or any other right of Landlord hereunder or at law, or as permission for Tenant to hold over.

## SECTION 17.06 LANDLORD'S RIGHTS

All covenants and agreements to be performed by Tenant under this Lease shall be performed by Tenant at Tenant's sole cost and expense and without any abatement of Rent. If Tenant fails to pay any sum of money, other than Rent, required to be paid by it or fails to perform any other act on its part to be performed and such failure continues for five (5) days or more, then, in addition to any other remedies, Landlord may, but shall not be obligated to, make any such payment or perform any such other act, without waiving or releasing Tenant from any obligations of Tenant. Landlord's election shall not give rise to any responsibility of Landlord to continue making the same or similar payments or performing the same or similar acts. Immediately upon receipt of written demand therefor by Landlord, Tenant shall reimburse Landlord for all sums so paid by Landlord and all necessary incidental costs, together with an administrative fee of fifteen percent (15%) of such costs, and interest thereon at the rate determined under Section 20.05, accruing from the date of such payment by Landlord. All such sums shall be additional Rent.

## SECTION 17.07 WAIVER OF COUNTERCLAIMS; TRIAL BY JURY; VENUE

**LANDLORD AND TENANT EACH WAIVES ITS RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER AGAINST THE OTHER (OR BY TENANT AGAINST THE LANDLORD ENTITIES) ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PREMISES, AND ANY STATUTORY REMEDY. IF LANDLORD COMMENCES ANY ACTION OR PROCEEDING IN WHICH LANDLORD SEEKS REPOSSESSION OF THE PREMISES FROM TENANT, TENANT SHALL NOT INTERPOSE ANY COUNTERCLAIM OF ANY NATURE EXCEPT A MANDATORY OR COMPULSORY COUNTERCLAIM UNDER THE PROCEDURAL LAWS OF THE STATE IN WHICH THE PROPERTY IS LOCATED. ANY ACTION OR PROCEEDING BROUGHT BY EITHER PARTY AGAINST THE OTHER FOR ANY MATTER ARISING OUT OF OR IN ANY WAY RELATING TO THIS LEASE, THE PREMISES, OR THE PROPERTY SHALL BE HEARD IN THE COUNTY IN WHICH THE PROPERTY IS LOCATED.**

### ARTICLE 18
### COMPLIANCE

## SECTION 18.01 SAFETY AND HEALTH

Tenant shall maintain all working areas, machinery, structures and electrical facilities in accordance with the Laws of the State in which the Property is located and in accordance with all directions, rules and regulations of the health officer, fire marshal, building inspector, or other proper officials of the governmental agencies having jurisdiction, and Tenant shall comply with all requirements of Law affecting the Premises, including such requirements as would be applicable with respect to agents, employees or contractors of Landlord who may from time to time be present upon the Premises, all at the sole cost and expense of Tenant.

## SECTION 18.02 HAZARDOUS MATERIALS

Tenant shall not, and shall not direct, suffer or permit any of its agents, contractors, employees, licensees or invitees to, at any time handle, use, manufacture, store or dispose of in or about the Premises or the Property any of the following (collectively, "Hazardous Materials" any flammables, explosives, radioactive materials, hazardous wastes or materials, toxic wastes or materials or other similar substances, petroleum products or derivatives or any substance subject to regulation by or under any federal, state or local Laws relating to the protection of the environment or the keeping, use or disposition of environmentally hazardous materials, substances, or wastes, presently in effect or hereafter adopted, all amendments to any of them, and all rules and regulations issued pursuant to any of such Laws (collectively, "Environmental Laws", nor shall Tenant suffer or permit any Hazardous Materials to be used in any manner not fully in compliance with all Environmental Laws, in the Premises or the Property and appurtenant land, or allow the environment to become contaminated with any Hazardous Materials. Notwithstanding the foregoing, and subject to Landlord's prior consent, Tenant may handle, store, use or dispose of products containing small quantities of Hazardous Materials (such as aerosol cans containing insecticides, toner for copiers, paints, paint remover, and the like) to the extent customary and necessary for the use of the Premises for general retail sales purposes; provided that Tenant shall always handle, store, use, and dispose of any such Hazardous Materials in a safe and lawful manner and never allow such Hazardous Materials to contaminate the Premises, the Property and appurtenant land or the environment. Tenant shall protect, defend, indemnify and hold each and all of the Landlord Entities harmless from and against any and all loss, claims, liability or costs (including court costs and reasonable attorneys' fees) incurred by reason of any actual or asserted failure of Tenant to fully comply with all applicable Environmental Laws, or the presence, handling, use or disposition in or from the Premises of any Hazardous Materials (even though permissible under all applicable Environmental Laws or the provisions of this Lease), or by reason of any actual or asserted failure of Tenant to keep, observe, or perform any provision of this Section.

## SECTION 18.03 AMERICANS WITH DISABILITIES ACT

Landlord shall be responsible for compliance with Title III of the ADA in the Common Areas located in the Property. Notwithstanding the foregoing, Landlord may perform, or require that Tenant perform, at Tenant's cost in either case, work required by ADA "path of travel" provisions due to alterations in the Premises. Tenant shall be responsible for compliance with ADA Title III in the Premises, including any leasehold improvements.

## ARTICLE 19
## CONSTRUCTION OF PREMISES

## SECTION 19.01 CONDITION OF PREMISES

Tenant acknowledges by execution of this Lease that Tenant has inspected the Premises and except as may be otherwise specifically set forth in this Lease, including, without limitation, the performance by Landlord of the Landlord's Work, accepts the Premises "AS IS." Tenant acknowledges that neither Landlord nor any agent of Landlord has made any representations or warranty, express or implied, with respect to the Premises or the Property or the suitability of either for the conduct of Tenant's business, except as expressly provided in this Lease. In the event the heating, ventilation and air conditioning system within and exclusively serving the Premises is not in good working order as of the Delivery Date, Tenant gives Landlord notice thereof within thirty (30) days after the Delivery Date, and such failure was not caused, in whole or in part, by any act or omission of Tenant, its agents, employees, or contractors, then Landlord shall promptly repair such system to return it to good working order.

## SECTION 19.02 LANDLORD'S WORK

Unless expressly identified in this Lease, Landlord shall not be required to undertake or perform any work in the Premises prior to the Delivery Date. Landlord shall install, at Tenant's expense, the Air Conditioning as set forth in Paragraph 6 of the Basic Lease provisions.

**SECTION 19.03 TENANT'S WORK**

(a)     As a material consideration to Landlord for its execution of this Lease, Tenant agrees to construct tenant improvements in the Premises with high quality work using first class materials, all as provided in Exhibit B and elsewhere in this Lease.

(b)     Tenant's Initial Work shall be at Tenant's sole cost and expense, and unless expressly set forth in this Lease, there shall be no allowance or abatement of any kind by Landlord to or for Tenant on account of Tenant's Initial Work, or the cost thereof. The provisions of Article 18 and Section 19.08 shall be specifically applicable to Tenant's Initial Work.

(c)     Any additional work or remodeling during the Term shall be subject to all of the provisions of this Lease, including (without limitation) Exhibit B, Section 7.03, Article 18, this Article and the Design Criteria, subject in each case to such time period(s) and date(s) therefor as shall be agreed upon by Landlord and Tenant.

(d)     Failure of Tenant to perform its obligations pursuant to this Article in a timely fashion shall be deemed a Default by Tenant pursuant to this Lease entitling Landlord to exercise all remedies available to a landlord against a defaulting tenant, including but not limited to those provided in Article 17.

**SECTION 19.04 COMMENCEMENT OF TENANT'S WORK**

Subject to the provisions of Section 20.14 hereof, if Tenant fails to commence Tenant's Initial Work within the later of: (a) thirty (30) days after the Delivery Date, and (b) Landlord's approval of the Working Drawings for Tenant's Initial Work, then Landlord shall have the right at any time thereafter to cancel this Lease upon twenty (20) days' notice to Tenant unless at the time of such notice, Tenant has commenced Tenant's Initial Work and Tenant is diligently and continuously prosecuting the performance of Tenant's Initial Work. The term "Delivery Date" shall mean the date Landlord tenders delivery of the Premises to Tenant for Tenant's possession. Notwithstanding the foregoing, The foregoing time frames shall be extended by any necessary time to obtain permits for work, so long as Tenant is diligently proceeding to obtain the permits, and any delay is beyond tenant's control. Notwithstanding the foreoing, in the event that Landlord is unable to deliver the Premises with the fire doors installed within 30 days of the execution of the Lease, then Tenant's time pursuant to this Paragraph shall be extended until the Premises are delivered with the fire doors.

**SECTION 19.05 PRIOR ACCESS**

Any access or possession by Tenant prior to the Commencement Date shall be on and subject to all the other terms, covenants and conditions of this Lease, except for the payment of Rent (other than payments with regard to utilities pursuant to Section 13.01 above, for which Tenant shall be responsible during any such early access or possession).

**SECTION 19.06 LABOR RELATIONS**

Tenant agrees to conduct its labor relations and its relations with its employees so as to avoid all strikes, picketing and boycotts of, on or about the Premises and the Property. If any of its employees strike, or if picket lines or boycotts or other visible activities objectionable to Landlord are established or conducted or carried out against Tenant or its employees, or any of them on or about the Premises or the Property, Tenant shall immediately close the Premises to the public and remove all employees, agents, contractors or subcontractors therefrom until the dispute giving rise to such strike, picket line, boycott or objectionable activity has been settled to Landlord's satisfaction.

**SECTION 19.07 FACILITIES**

Tenant shall have no right to cancel this Lease, seek a diminution of Rent, sue for damages, or assert any other contractual, legal or equitable remedy based on a claim that the size, location, layout,

dimension or construction of the Property in which the Premises are located or service areas (if any), sidewalks, parking areas or other Common Areas, or any other facilities to be furnished by Landlord, were not completed or furnished in accordance with the provisions of this Lease.

## SECTION 19.08 LIENS

(a)    Tenant shall do all things reasonably necessary to prevent the filing of any mechanics' or other liens against the Property or any part thereof by reason of work, labor, services or materials supplied or claimed to have been supplied to Tenant, or anyone holding the Premises, or any part thereof, through or under Tenant.  If any such lien shall at any time be filed against the Property, (i) Tenant shall defend, indemnify and hold harmless the Landlord Entities from and against any such liens, and (ii) Tenant shall cause the same to be discharged of record by bond or otherwise within twenty (20) days after the filing thereof.  Nothing contained herein shall imply any consent or agreement on the part of Landlord to subject Landlord's estate in the Property to liability under any mechanics' or other lien Law. Tenant shall give Landlord adequate prior notice of any proposed work in the Premises, and Landlord shall have the right to post such notices of non-responsibility as are provided for in the lien Laws of the state in which the Property is located.

(b)    If Tenant shall fail to cause such lien to be so discharged or bonded after being notified of the filing thereof, then in addition to any other right or remedy of Landlord, Landlord may discharge the same by paying the amount claimed to be due and the amount so paid by Landlord together with interest thereon at the rate set forth in Section 20.05, and all costs and expenses, including reasonable attorneys' fees incurred by Landlord in procuring the discharge of such lien, shall be due and payable by Tenant to Landlord as additional Rent on demand.

(c)    Landlord understands and acknowledges that Tenant is obtaining a Small Business Administration loan in order to open and operate the Tenant's business.  Landlord agrees to allow the SBA's Uniform Commercial Code lien on the contents of the Premises.  To the extent Landlord maintains its own lien under this Lease or Law, Landlord agrees to subordinate its lien to the lien of the SBA.

## ARTICLE 20
## MISCELLANEOUS

## SECTION 20.01 LANDLORD'S RIGHT OF ACCESS

Landlord and its agents, employees and any person authorized by Landlord shall have the right to enter the Premises (a) at all reasonable times, upon reasonable prior notice (except in an emergency), for the purpose of examining or inspecting the same to ascertain if they are in good repair, making such alterations, repairs, improvements or additions to the Premises or the Property as Landlord may be required or permitted to make hereunder, exhibiting the Premises to prospective purchasers and lenders and posting notices which Landlord may deem necessary for its protection, and (b) at any time in an emergency.  During the six (6) months prior to the end of the Term, Tenant shall cooperate with Landlord in exhibiting the Premises to prospective tenants. Access by Landlord hereunder shall not, under the circumstances, unreasonably interfere with Tenant's use and enjoyment of the Premises. Tenant waives any claim, and covenants not to sue Landlord, for damages for any injury or inconvenience to or interference with Tenant's business, occupancy or quiet enjoyment arising out of any permitted entry by Landlord.  Tenant acknowledges that Landlord might not retain a key to the Premises and therefore may, in any emergency, enter the Premises in any manner which Landlord determines to be necessary, without liability therefor to Tenant.  No entry pursuant to this Section shall be deemed to constitute an eviction of Tenant or a forcible detainer of the Premises.

## SECTION 20.02 FLOOR AREA

"Floor Area" as used in this Lease means, with respect to the Premises and with respect to any leasable area of the Property, the aggregate of (a) the number of square feet of floor space on all floor levels, measured from the center line of party walls between tenant areas and the exterior face of all other

walls, and (b) all outside areas used for the sale of merchandise by tenants. No deduction or exclusion from Floor Area shall be made by reason of columns, stairs, elevators, escalators, or other interior construction or equipment. Landlord may, at any time and from time to time, make changes or additions to the Property which result in an increase or decrease in the aggregate Floor Area occupied or designed for occupancy by tenants of the Property, provided that, except as stated herein, no such change or addition shall increase or decrease the Floor Area of the Premises without Tenant's prior consent.

**SECTION 20.03** TRANSFER OF LANDLORD'S INTEREST; LIABILITY

(a)     If any conveyance or transfer of Landlord's interest in the Property shall occur, the transferor shall be automatically relieved of any and all obligations and liabilities on the part of Landlord accruing from and after the date of such transfer, provided that the transferee shall assume the same.

(b)     **THE LIABILITY OF LANDLORD TO TENANT FOR ANY DEFAULT BY LANDLORD IN CONNECTION WITH THIS LEASE OR ANY MATTER RELATING TO THE PROPERTY OR THE PREMISES SHALL BE LIMITED TO LANDLORD'S INTEREST IN THE PROPERTY, AND TENANT AGREES TO LOOK SOLELY TO LANDLORD'S INTEREST IN THE PROPERTY FOR THE RECOVERY OF ANY JUDGMENT AGAINST LANDLORD, AND LANDLORD SHALL NOT BE PERSONALLY LIABLE FOR ANY SUCH JUDGMENT AFTER EXECUTION THEREON. THE OBLIGATIONS OF LANDLORD UNDER THIS LEASE SHALL NOT BE PERSONALLY BINDING ON, NOR SHALL ANY RESORT BE HAD TO THE ASSETS OF, ANY OF ITS PRESENT OR FUTURE TRUSTEES, BOARD OF DIRECTORS, OFFICERS, PARTNERS (WHETHER GENERAL OR LIMITED), MANAGERS OR MEMBERS (IF LANDLORD IS A LIMITED LIABILITY COMPANY), BENEFICIARIES, STOCKHOLDERS, EMPLOYEES, AGENTS OR INVESTMENT MANAGERS OF LANDLORD. THE FOREGOING SHALL NOT RELIEVE LANDLORD FROM THE PERFORMANCE OF ITS OBLIGATIONS UNDER THIS LEASE, BUT SHALL SERVE ONLY TO LIMIT THE PERSONAL LIABILITY IN CASE OF A JUDGMENT AGAINST LANDLORD. WITHOUT LIMITING THE FOREGOING, UNDER NO CIRCUMSTANCES SHALL LANDLORD BE LIABLE TO TENANT OR ANY OTHER PERSON OR ENTITY FOR ANY SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES (INCLUDING, BUT NOT LIMITED TO, LOST PROFITS OF TENANT OR LOSS OF OR INTERFERENCE WITH TENANT'S BUSINESS).**

**SECTION 20.04** SECURITY DEPOSIT

Tenant shall upon execution of this Lease deposit with Landlord the sum specified in the Basic Lease Provisions, to be held as security for the full and faithful performance of every provision of this Lease to be performed by Tenant. If Tenant defaults with respect to any provision of this Lease, including but not limited to the provisions relating to the payment of Rent, Landlord may use, apply or retain all or any part of the security deposit for the payment of any Rent or other sum in default, or for the payment of any other amount which Landlord may spend or become obligated to spend by reason of Tenant's default, or to compensate Landlord for any other loss or damage which Landlord may suffer by reason of Tenant's default. If any portion of the security deposit is so used or applied, Tenant shall within five (5) days after written demand therefor deposit cash with Landlord in an amount sufficient to restore the security deposit to its original amount, and Tenant's failure to do so shall be a material breach of this Lease. Landlord shall not be required to keep the security deposit separate from its general funds, and Tenant shall not be entitled to interest on the security deposit. If Tenant shall fully and faithfully perform every provision of this Lease to be performed by it, the security deposit shall be applied against any amounts owed by Tenant to Landlord at the expiration or termination of this Lease, and any balance thereof shall be returned to Tenant (or at Landlord's option, to the last assignee of Tenant's interest hereunder) within the time period specified by Law in the state in which the Property is located. In no event shall the security deposit be returned until Tenant has vacated the Premises and delivered possession thereof to Landlord as required by this Lease.

**SECTION 20.05 LATE PAYMENTS**

Any amount due from Tenant to Landlord hereunder which is not paid to Landlord within five (5) days after it is due shall bear interest at the lesser of twelve percent (12%) per annum or the maximum rate of interest then permitted by the applicable usury Law for the state in which the Property is located, accruing from the date due until such amount is fully paid. Payment of such interest shall not excuse or cure any default by Tenant. In addition to such interest, Tenant acknowledges that the late payment by Tenant of any Rent required to be paid by Tenant under this Lease, will cause Landlord to incur certain costs and expenses not contemplated under this Lease, the exact amount of such costs being extremely difficult and impractical to fix. Such costs and expenses will include, without limitation, attorneys' fees, administrative and collection costs, and processing and accounting expenses and other costs and expenses necessary and incidental thereto. Therefore, if any such installment is not received by Landlord within five (5) days after the date due, Tenant shall pay to Landlord as a late charge, in addition to the interest provided above, four percent (4%) of such payment, or, at Landlord's option, at least One Hundred Fifty and no/100 Dollars ($150.00). Such late charge shall be re-assessed for each month the payment is not made. Landlord and Tenant agree that this late charge is a reasonable estimate of such costs and expenses and is fair compensation to Landlord for its loss suffered by such nonpayment. The interest and late charges set forth herein are in addition to, and acceptance of such late charge shall not constitute a waiver of Tenant's default with respect to, such overdue amount, nor prevent Landlord from exercising any other rights and remedies granted hereunder or by Law to Landlord.

**SECTION 20.06 TIME OF ESSENCE**

Time is of the essence with respect to the performance of every provision of this Lease in which time of performance is a factor.

**SECTION 20.07 HEADINGS**

The captions, section numbers, article numbers and index contained in this Lease are for convenience only and shall not be considered in the construction or interpretation of any provision hereof.

**SECTION 20.08 PRIOR AGREEMENTS AND AMENDMENTS**

This Lease and the Exhibits hereto cover in full every agreement of every kind or nature whatsoever between the parties concerning the Premises and the Property, and all preliminary negotiations and agreements of whatever kind with respect to the Premises or the Property, except those expressly contained herein, are superseded and of no further force or effect. No provision of this Lease may be amended except by an agreement in writing signed by the parties hereto or their respective successors in interest.

**SECTION 20.09 NOTICES**

Any notice, consent or approval required or permitted to be given hereunder shall be in writing, shall be served personally, by U.S. registered or certified mail, or via any nationally recognized overnight courier service which provides receipt of delivery, and shall be addressed as specified in the Basic Lease Provisions. Any notice which is served personally or via courier shall be effective upon service; any notice given by mail shall be deemed effectively given three (3) days after deposit in the United States mail, registered or certified, postage prepaid. Either party may by notice to the other from time to time in accordance with this Section specify a different address for notice purposes. All notices from Landlord to Tenant, including, without limitation, notice of default and/or termination of Tenant's interests under this Lease, may be given by Landlord's attorney acting as agent on behalf of Landlord.

**SECTION 20.10 BROKERS**

Tenant warrants that it has had no dealings with any real estate broker or agent in connection with the negotiation of this Lease, except as specifically stated to the contrary in the Basic Lease

Provisions, and expressly agrees and covenants to hold the Landlord Entities harmless and to defend the Landlord Entities from any claims, threatened or asserted, by any broker, finder or agent claiming under or through Tenant in connection with the negotiation and execution of this Lease.

## SECTION 20.11 NO WAIVERS

The failure of Landlord to insist in any one or more cases upon the performance of any of the covenants, agreements or conditions of this Lease or to exercise any option herein contained shall not be construed as a waiver or a relinquishment for the future of such covenant, agreement, condition or option. Receipt by Landlord of Rent or of any other payment or the acceptance by Landlord of performance of anything required by this Lease to be performed by Tenant with or without knowledge of the breach of a covenant shall not be deemed a waiver of such breach, and acceptance of a partial payment of any amount of Rent owed shall not be a waiver of Landlord's right to recover the remaining amounts of Rent still owing.  No waiver of any covenant, agreement or condition of this Lease shall be deemed to have been made unless expressed in writing and signed by the party against whom such waiver is charged; and no waiver by Landlord in respect to one tenant shall constitute a waiver in favor of any other tenant in the Property.

## SECTION 20.12 RECORDING

To the extent permitted by Law, Tenant shall not record this Lease or any notice of lease or short form lease.

## SECTION 20.13 RELATIONSHIP OF PARTIES

The parties agree that it is their intention hereby to create only the relationship of landlord and tenant, and no provision hereof, or act of either party, shall be construed as creating the relationship of principal and agent, or a partnership, or a joint venture or enterprise between the parties.

## SECTION 20.14 FORCE MAJEURE

(a)    If either Landlord or Tenant is delayed in performing any obligation hereunder by any cause beyond the reasonable control of the party required to perform such obligation, the time period for performing such obligation shall be extended by a period of time equal to the period of the delay.  For the purpose of this Section, a cause shall be beyond the reasonable control of a party when such cause would affect any person similarly situated (such as a power outage, labor strike or truckers' strike) but shall not be beyond the reasonable control of such party when peculiar to such party (such as financial inability or ordering materials requiring a long lead time).

(b)    This Section shall not excuse any rental obligations, nor delay the Rental Commencement Date for any time period in excess of thirty (30) days.

(c)    In the event of any occurrence which a party believes constitutes a cause beyond the reasonable control of such party pursuant to this Section, such party shall promptly in writing notify the other party of the occurrence and nature of such cause, the anticipated period of delay and the steps being taken by such party to mitigate the effects of such delay.

## SECTION 20.15 PURCHASE DISCOUNTS

(a)    So long as Tenant is not in breach of this Lease, when Tenant purchases food or beverages from the Xtreme Action Park for events taking place at the Premises, Tenant will receive a discount of fifteen percent (15%) off Xtreme's published prices.

(b)    In the event that Xtreme Action Park purchases blocks of twenty or more entrance tickets to Tenant's business, in order to offer those tickets to Xtreme's patrons booking events at Xtreme's venues, Xtreme will receive a discount of fifteen percent (15%) off of Tenant's published prices.

(c)       In the event that Tenant purchases blocks of twenty or more entrance tickets to Xtreme Action Park's venues,  in order to offer those tickets to Tenant's patrons booking events at Tenant's business, Tenant will receive a discount of fifteen percent (15%) off of Xtreme's published prices.

## SECTION 20.17 TENANT'S AUTHORITY

Each individual executing this Lease on behalf of Tenant represents and warrants that the execution and delivery of this Lease on behalf of Tenant is duly authorized and that he or she is authorized to execute and deliver this Lease on behalf of Tenant.  If Tenant is a corporation, Tenant shall concurrently with the execution of this Lease deliver to Landlord a certified copy of a resolution of Tenant's board of directors or the executive committee thereof authorizing or ratifying the execution of this Lease.

## SECTION 20.18 LIEN FOR RENT

To secure the payment of Rent and the performance of Tenant's other obligations hereunder, Tenant hereby grants to Landlord an express contractual lien on and security interest in all equipment, inventory, fixtures, consumer goods, goods and any and all personal property of any kind or character of Tenant which may be placed in or on the Premises and also upon all proceeds thereof (including the proceeds of any insurance which may accrue to Tenant by reason of damage to or destruction of any such property).  This lien and security interest are given in addition to, and not in lieu of, Landlord's statutory lien and shall be cumulative thereto.  To the extent permitted by Law, this lien and security interest may be foreclosed with or without court proceedings, by public or private sale, with or without notice, and Landlord shall have the right to become purchaser at any such sale upon being the highest bidder.  Upon request of Landlord, Tenant shall execute Uniform Commercial Code financing statements relating to the aforesaid security interest.  Prior to the installation of fixtures, equipment or improvements permanently affixed to the Premises or which would otherwise become the property of Landlord under the terms of this Lease, Tenant shall notify the holder of any security interest in the same of Landlord's rights to such property under the terms of this Lease, and at the request of Landlord, Tenant shall furnish Landlord with evidence of such notification.

## SECTION 20.19 NON-DISCLOSURE

Landlord and Tenant agree that the terms of this Lease are confidential and constitute proprietary information of the parties hereto.  Disclosure of the terms hereof could adversely affect the ability of Landlord to negotiate with other tenants of the Property.  Each of the parties hereto agrees that such party, and its respective partners, officers, members, managers, directors, employees, agents and attorneys, shall not disclose the terms and conditions of this Lease to any other person without the prior written consent of the other party hereto except pursuant to an order of a court of competent jurisdiction; provided, however, that each party may disclose the terms hereof to its lenders or prospective lenders, to accountants who audit its financial statements or prepare its tax returns, to any prospective transferee of all or any portions of its interests hereunder, to any of the Landlord Entities, to any governmental entity agency or person to whom disclosure is required by applicable Law, in connection with any action brought to enforce the terms of this Lease on account of the breach or alleged breach hereof, or to seek a judicial determination of the rights or obligations of the parties hereunder.

## SECTION 20.20 GENDER; TENANTS

The use of the masculine pronoun includes the feminine and neuter genders; the use of the singular form of a pronoun includes the plural and vice versa.  If there be more than one person or entity indicated as tenant herein, each person or entity subscribing as tenant shall be jointly and severally liable for all obligations of Tenant hereunder.

**SECTION 20.21** QUIET ENJOYMENT

Landlord represents and warrants that it has full right and authority to enter into this Lease. Landlord covenants that so long as Tenant pays the Rent and performs its other covenants and agreements herein set forth, Tenant shall peaceably and quietly have, hold and enjoy the Premises for the Term without hindrance or molestation from anyone claiming through Landlord, subject to the terms and provisions of this Lease. Landlord shall not be liable for any interference or disturbance by other tenants or third persons, nor shall Tenant be released from any of its obligations under this Lease because of such interference or disturbance.

**SECTION 20.22** ASSIGNS

Subject to the provisions of Article 10, the terms, covenants and conditions contained herein shall be binding upon and inure to the benefit of the heirs, successors, executors, administrators, marital communities, if any, and assigns of the parties hereto.

**SECTION 20.23** NO OPTION

Submission of this Lease shall not be deemed to be a reservation of the Premises. Landlord shall not be bound hereby until its delivery to Tenant of an executed original hereof signed by Landlord, already having been signed by Tenant, and until such delivery Landlord reserves the right to exhibit and lease the Premises to other prospective tenants.

**SECTION 20.24** CONSTRUCTION OF LEASE; SEVERABILITY

Tenant declares that Tenant has read and understands all parts of this Lease. In the construction and interpretation of the terms of this Lease, the principle that a document is to be construed most strictly against the party who prepared the same shall not be applied, it being agreed that both parties hereto have participated in the preparation of the final form of this Lease. In interpreting this Lease, the printed provisions and any additions written or typed therein shall be given equal weight. Any printed provisions which have been deleted shall not be used to interpret the remaining provisions. If any provision of this Lease or any term, paragraph, sentence, clause, phrase or word herein shall be held invalid or unenforceable for any reason, such holding shall not be deemed to affect, alter, modify or impair in any manner any other provision, term, paragraph, sentence, clause, phrase or word appearing herein. Landlord and Tenant acknowledge that certain charges, fees and other payments are deemed additional Rent herein for the purpose of enforcing Landlord's remedies, but shall not be construed as rent in the event of imposition of rent controls.

**SECTION 20.25** OTHER TENANTS; EXHIBITS

Tenant acknowledges that Landlord has made no representations regarding the presence of a certain tenant or store or the number, types or hours of operation of tenants or stores at the Property. An abandonment or cessation of business by any other occupant shall not release Tenant from its obligations under this Lease. Tenant acknowledges that any site or lease plan attached hereto as an exhibit is intended only to show the general layout of the Property or a part thereof, and shall not be deemed a warranty or agreement by Landlord as to the Property, the Premises, the existence of any particular Majors or other stores or occupants, or any matter shown thereon. All measurements and distances are approximate and are not to be scaled.

**SECTION 20.26** FINANCIAL STATEMENTS

Within fifteen (15) days after Landlord's request made from time to time during the Term, Tenant shall provide Landlord with Tenant's most recent annual report which is filed or otherwise regularly published and made available to the public, or, if Tenant is not a public company, or if Tenant is a partnership or sole proprietor, Tenant's financial statement in form and substance reasonably satisfactory to Landlord, certified to be true and correct by Tenant or Tenant's chief financial officer.

**SECTION 20.27 TERMINATION AND SURRENDER OF PREMISES**

If this Lease is terminated under any provision hereof, or upon the expiration of the Term, Tenant shall peaceably yield up the Premises and all additions made upon the same to Landlord, in good condition, except for ordinary wear not caused by Tenant's failure to maintain the Premises as required under this Lease and casualty damage not required to be restored by Tenant.   All alterations, improvements, remodeling, additions, fixtures or trade fixtures which are installed in the Premises and attached to the floor, walls or ceiling of the Premises, and any floor covering which is cemented or otherwise affixed to the Premises, shall be the property of Landlord and shall remain upon and be surrendered with the Premises, unless Landlord shall direct Tenant to remove such items (or some of them), by notice given not less than thirty (30) days prior to the expiration of this Lease, or within ten (10) days after the earlier termination hereof.  Tenant shall remove any such items and repair any damage caused by such removal at Tenant's sole cost, prior to the expiration of this Lease, or in the event of an early termination, within ten (10) days after Landlord's notice.  Tenant shall remove from the Premises all merchandise, furniture, furnishings, equipment, vaults and movable trade fixtures and shall surrender the Premises to Landlord in the condition required by Section 7.02.  Tenant shall, at Tenant's cost, repair any damage to the Premises or the Property caused by such removal.  Any items which Tenant is permitted to remove but fails to remove prior to the surrender of the Premises to Landlord shall be deemed abandoned by Tenant and shall become the sole property of Landlord, and Landlord may retain or dispose of the same as Landlord sees fit without claim by Tenant thereto or to any proceeds thereof, and the cost incurred by Landlord for the same shall be paid to Landlord upon demand.  Tenant shall pay all amounts payable by it through the expiration date or earlier termination date of this Lease .

**SECTION 20.28 NO THIRD-PARTY RIGHTS**

Except as specifically set forth in this Lease as Exhibit F, this Lease shall not confer, or be construed as conferring (directly, indirectly, contingently or otherwise), any rights or benefits on any Person that is not a named party to this Lease, including any third party beneficiary rights.  "Person" shall mean an individual, corporation, partnership, trust, unincorporated organization or governmental organization or agency or political subdivision thereof.   Notwithstanding the foregoing, it is understood that Xtreme Action Park is a third party beneficiary of this Lease.

**SECTION 20.29 SURVIVAL**

All obligations (including without limitation indemnity obligations) or rights of either party arising during or attributable to the period prior to the expiration or termination of this Lease shall survive such expiration or termination, except as specifically provided to the contrary in this Lease.

**SECTION 20.30 INTENTIONALLY OMITTED.**

**SECTION 20.31 INTENTIONALLY OMITTED.**

**SECTION 20.32 MISCELLANEOUS FLORIDA PROVISIONS.**

(a)      Notwithstanding anything to the contrary set forth in Article 5, Tenant, and not Landlord, shall pay when due and payable the Florida State Sales Tax and any other sales tax or excise tax assessment now or later levied or assessed upon or against Tenant's or Landlord's interest in the Rental to be paid under this Lease, or any portion of it, or Landlord's interest in this Lease or its income from this Lease.  Should the appropriate taxing authority require that any sales or excise tax and/or assessment be collected by Landlord for or on behalf of the taxing authority, then the sales or excise tax and/or assessment shall be paid by Tenant to Landlord as additional Rent in accordance with the terms of any written notice from Landlord to Tenant.

(b)      Before making any improvements to the Premises, Tenant shall notify any contractor making such improvements that Landlord's interest shall not be subject to liens for improvements made

by Tenant, and Tenant shall comply in all respects with Chapter 713 of the Florida Statutes, as amended from time to time.

(c)      The following disclosure is required by Section 404.056(7) of the Florida Statutes: "Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county health department." Landlord disclaims any and all representations and warranties regarding the absence or presence of radon gas or radon gas-producing conditions in connection with the Premises.

(d)      In any distress for Rent action filed by Landlord against Tenant, Tenant waives the requirement under Section 83.12 of the Florida Statutes that Landlord file a bond payable to Tenant in at least double the sum demanded by Landlord, and Tenant agrees that no bond shall be required in any such action. Tenant also waives the right under Section 83.14 of the Florida Statutes to replevy distrained property.

**[Remainder of page intentionally left blank; signatures begin on following page.]**

**EXHIBIT D**

**LEASE GUARANTY**

This Guaranty is made as of this 23 day of *November*, 2015 by Jens Berding (hereafter "Guarantor") with an address of _____, to and in favor of Dezer Powerline, LLC and MDG Powerline Holdings, LLC ("Landlord") with an address of 18001 Collins Ave, 31st Floor, Sunny Isles Beach, FL 33160.

WITNESSETH:

WHEREAS, by Lease Agreement dated *Nov 23*, 2015. Landlord has leased to Seven Stars on the Hudson Corporation ("Tenant") certain premises, as hereafter modified, amended, extended or renewed, (collectively, the "Lease"); and

WHEREAS, Landlord has required the Guarantor to execute this Guaranty of Lease ("Guaranty") as a condition to the Landlord entering into the Lease with the Tenant; and

WHEREAS, Guarantor will receive direct or indirect benefit from the Landlord entering into the Lease with the Tenant.

NOW, THEREFORE, in order to induce Landlord to enter into the Lease and for other good and valuable consideration, the undersigned Guarantor hereby agrees as follows:

1.  Guarantor hereby absolutely, unconditionally, and irrevocably guarantees to Landlord the full and prompt payment of all rent and any and all other sums and charges payable by Tenant under the Lease (collectively, the "Payment Obligations") and hereby further guarantees the full and timely performance and observance of all of the covenants, terms conditions and agreements therein provided to be performed and observed by Tenant (the "Performance Obligations" and together with the Payment Obligations collectively, the "Obligations"). In the event of a default under the Lease, Guarantor hereby covenants and agrees with Landlord: (i) to make the due and full punctual payment of all Payment Obligations payable by Tenant under the Lease; (ii) to effect prompt and complete performance of all and each of the Performance Obligations, contained in the Lease on the part of Tenant to be kept, observed and performed; and (iii) to indemnify and save harmless Landlord from any loss, costs or damages arising out of any failure by Tenant to pay or perform any Obligation including, without limitation, attorneys' fees and costs of collection. This Guaranty is a continuing guaranty of payment and performance and is not conditional or contingent upon any attempt to collect from Tenant or upon any other condition or contingency. Notwithstanding the foregoing, the total Obligation pursuant to this Guaranty shall be the Gross Rent, plus sales tax, for up to one year following a Default. The foregoing limitation shall be in effect so long as Tenant returns the Premises to the Landlord and surrenders possession of the Premises in the condition required by the Lease, free of all tenancies or rights or claims of occupancy by Tenant or any party claiming through Tenant ("Release Date"). Otherwise, the total Obligation pursuant to this Guaranty shall continue until the Release Date.

2.  In the event of a default under the Lease, Guarantor waives any right to require Landlord to first (i) proceed against Tenant or pursue any rights or remedies with respect to the Lease; (ii) proceed against or exhaust any security that Landlord holds from Tenant; or (iii) pursue any other remedy whatsoever. Landlord shall have the right to enforce this Guaranty regardless of the acceptance of additional security from Tenant and regardless of the release or discharge of Tenant or any guarantor by Landlord or by others, or by operation of law.

3.  Guarantor hereby expressly waives: (a) any right of setoff, counterclaim or deduction against amounts due under this Guaranty; (b) notice of the acceptance of this Guaranty and notice of default of Tenant under the Lease;

and (c) the right to interpose all substantive and procedural defenses of the law of guaranty, indemnification and suretyship, except the defenses of prior payment or prior performance.

4.  Without limiting the generality of the foregoing, the liability of Guarantor under this Guaranty shall not be deemed to have been waived, released, discharged, impaired or affected by (a) reason of any waiver or failure to enforce or delay in enforcing any of the Obligations, or (b) the granting of any indulgence or extension of time to Tenant, or (c) the assignment of the Lease, or the subletting of the premises by Tenant, with or without Landlord's consent, or (d) the expiration of the term, or (e) if Tenant holds over beyond the term of the Lease, or (f) any merger or reorganization or the release or discharge of Tenant or any other guarantor in any voluntary or involuntary receivership, bankruptcy winding-up or other creditors' proceedings, or (g) the rejection, disaffirmance or disclaimer of the Lease by any party in any action or proceeding, or (h) the release of any collateral held for the Obligations or any other guarantor, or (i) any defect or invalidity of the Lease or (j) the transfer by Guarantor of any or all of the capital stock of Tenant, and shall continue with respect to the periods prior thereto and thereafter. The liability of the Guarantor shall not be affected by any repossession, re-entry or re-letting of the premises by Landlord, provided, however, that the net payments received by Landlord after deducting all costs and expenses of repossession and/or reletting the same (including, without limitation, any attorney fees, brokerage fees and any reasonable costs or expenses incurred in redecorating, remodeling, or altering the premises for reletting), shall be credited from time to time by Landlord to the account of Tenant and Guarantor and Guarantor shall pay any balance owing to Landlord from time to time, immediately upon being given written notice of demand by Landlord in the manner for providing notice set forth in the Lease.

5. The liability of Guarantor under this Guaranty shall not be released by any modification or amendment to the Lease (including any extension or renewal of the term of the Lease), and in the case of any such modification, the liability of Guarantor shall be modified in accordance with the term of any such modification of the Lease. Guarantor waives any notice of the modification or amendment of the Lease.

6.  Guarantor shall pay Landlord's reasonable attorneys' fees and all costs and other expenses incurred in any collection or attempted collection of this Guaranty or in any negotiations relative to the Obligations guaranteed under this Guaranty whether or not a lawsuit is commenced. All rights and remedies of Landlord under this Guaranty shall be cumulative and may be exercised singly or concurrently.

7. This Guaranty shall remain in full force and effect until the payment or performance of all Obligations and the other amounts payable under this Guaranty (whether or not the Lease shall have been terminated). Until the payment and performance of all Obligations and the amounts payable under this Guaranty, Guarantor:

a.  Shall have no right of subrogation against Tenant by reason of any payments or acts of performance by the Guarantor in compliance with the obligations of the Guarantor under this Guaranty;

b.  Waives any right to enforce any remedy which Guarantor now or hereafter shall have against Tenant by reason of any one or more payments or acts of performance in compliance with the obligations of Guarantor under this Guaranty; and

c.  Subordinates any liability or indebtedness of Tenant now or hereafter held by Guarantor to the obligations of Tenant to the Landlord under the Lease.

8. This instrument may not be changed, modified, discharged or terminated orally or in any manner other than by an agreement in writing signed by Guarantor and the Landlord.

9.  All of the terms, agreements and conditions of this Guaranty shall extend to and be binding upon Guarantor, and the heirs, executors, personal administrators, and/or successors and assigns of Guarantor shall inure to the benefit of and may be enforced by Landlord, its successors and assigns, and the holder of any mortgage or deed of trust to which the premises may be subject at any time or from time to time.

10.  The use of the singular herein shall include the plural and the use of any gender shall include all genders or neuter as the case may be. This Guaranty is entered into in the State of Florida and shall be governed by and construed in accordance with the laws of the State of Florida.

11.  If Guarantor consists of more than one person or entity, the liability of each such person or entity under this Guaranty shall be joint and several.

12.  The undersigned individual acknowledges that he/she is a duly authorized agent of the Guarantor with full power and authority to execute and deliver this Guaranty. This Guaranty has been executed and delivered by Guarantor and constitutes the valid, binding and legal obligation of the Guarantor. Guarantor agrees that it will, from time to time, within ten (10) days of Landlord's request, executed and deliver a statement certifying that this Guaranty is unmodified and in full force and effect.

13.  All notices under this Guaranty shall be delivered by certified mail, return receipt requested, to the address of the parties first set forth above. All notices shall be effective as of depositing the same in mail.

14.  If any provision of this Guaranty or the application thereof to any person or circumstances shall, for any reason and to any extent, be invalid or unenforceable, the remainder of this Guaranty and the application of that provision to other persons or circumstances shall not be affected but rather shall be enforced to the extent permitted by law. This Guaranty shall be construed without regard to any presumption or other rule requiring construction against the party causing this Guaranty to be drafted.

15.  As a further inducement to Landlord to enter into the Lease and to accept this Guaranty, Guarantor hereby intentionally, knowingly and voluntarily waives any right to a trial by jury in any lawsuit, proceeding, counterclaim, or any other litigation procedure based upon, or arising out of this Guaranty. In extension of the foregoing, the Guarantor specifically consents to trial before a court respecting any such matter. Guarantor will not seek to consolidate any such action in which a jury trial has been waived with any other action in which a jury trial cannot be or has not been waived.

  IN WITNESS WHEREOF, the undersigned has set hand and Seal this 23 day of *November* 2015.

_____

STATE OF FLORIDA          )
COUNTY OF MIAMI-DADE  )

On this ____ day of _____ in the year 2015, before me, the undersigned, personally appeared Jens Berding, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

Exhibit  D - 3

**EXHIBIT E**

**LEASE GUARANTY**

This Guaranty is made as of this 23 day of _Nov_, 2015 by Eddy Manzo-Berding (hereafter "Guarantor") with an address of _____, to and in favor of Dezer Powerline, LLC and MDG Powerline Holdings, LLC ("Landlord") with an address of 18001 Collins Ave, 31st Floor, Sunny Isles Beach, FL 33160.

WITNESSETH:

WHEREAS, by Lease Agreement dated _Nov 23_, 2015. Landlord has leased to Seven Stars on the Hudson Corporation ("Tenant") certain premises, as hereafter modified, amended, extended or renewed, (collectively, the "Lease"); and

WHEREAS, Landlord has required the Guarantor to execute this Guaranty of Lease ("Guaranty") as a condition to the Landlord entering into the Lease with the Tenant; and

WHEREAS, Guarantor will receive direct or indirect benefit from the Landlord entering into the Lease with the Tenant.

NOW, THEREFORE, in order to induce Landlord to enter into the Lease and for other good and valuable consideration, the undersigned Guarantor hereby agrees as follows:

1. Unless otherwise stated herein, Guarantor hereby absolutely and irrevocably guarantees to Landlord the full and prompt payment of all rent and any and all other sums and charges payable by Tenant under the Lease (collectively, the "Payment Obligations") and hereby further guarantees the full and timely performance and observance of all of the covenants, terms conditions and agreements therein provided to be performed and observed by Tenant (the "Performance Obligations" and together with the Payment Obligations collectively, the "Obligations"). At the end of the second Lease Year any and all obligations of Guarantor under this Guaranty shall cease. In the event of a default under the Lease, Guarantor hereby covenants and agrees with Landlord: (i) to make the due and full punctual payment of all Payment Obligations payable by Tenant under the Lease; (ii) to effect prompt and complete performance of all and each of the Performance Obligations, contained in the Lease on the part of Tenant to be kept, observed and performed; and (iii) to indemnify and save harmless Landlord from any loss, costs or damages arising out of any failure by Tenant to pay or perform any Obligation including, without limitation, attorneys' fees and costs of collection. This Guaranty is a continuing guaranty of payment and performance and is not conditional or contingent upon any attempt to collect from Tenant or upon any other condition or contingency. Notwithstanding the foregoing, the total Obligation pursuant to this Guaranty shall be the Gross Rent, plus sales tax, for up to one year following a Default. The foregoing limitation shall be in effect so long as Tenant returns the Premises to the Landlord and surrenders possession of the Premises in the condition required by the Lease, free of all tenancies or rights or claims of occupancy by Tenant or any party claiming through Tenant ("Release Date"). Otherwise, the total Obligation pursuant to this Guaranty shall continue until the Release Date.

2. In the event of a default under the Lease, Guarantor waives any right to require Landlord to first (i) proceed against Tenant or pursue any rights or remedies with respect to the Lease; (ii) proceed against or exhaust any security that Landlord holds from Tenant; or (iii) pursue any other remedy whatsoever. Landlord shall have the right to enforce this Guaranty regardless of the acceptance of additional security from Tenant and regardless of the release or discharge of Tenant or any guarantor by Landlord or by others, or by operation of law.

3.  Guarantor hereby expressly waives: (a) any right of setoff, counterclaim or deduction against amounts due under this Guaranty; (b) notice of the acceptance of this Guaranty and notice of default of Tenant under the Lease; and (c) the right to interpose all substantive and procedural defenses of the law of guaranty, indemnification and suretyship, except the defenses of prior payment or prior performance.

4.  Without limiting the generality of the foregoing, the liability of Guarantor under this Guaranty shall not be deemed to have been waived, released, discharged, impaired or affected by (a) reason of any waiver or failure to enforce or delay in enforcing any of the Obligations, or (b) the granting of any indulgence or extension of time to Tenant, or (c) the assignment of the Lease, or the subletting of the premises by Tenant, with or without Landlord's consent, or (d) the expiration of the term, or (e) if Tenant holds over beyond the term of the Lease, or (f) any merger or reorganization or the release or discharge of Tenant or any other guarantor in any voluntary or involuntary receivership, bankruptcy winding-up or other creditors' proceedings, or (g) the rejection, disaffirmance or disclaimer of the Lease by any party in any action or proceeding, or (h) the release of any collateral held for the Obligations or any other guarantor, or (i) any defect or invalidity of the Lease or (j) the transfer by Guarantor of any or all of the capital stock of Tenant, and shall continue with respect to the periods prior thereto and thereafter. The liability of the Guarantor shall not be affected by any repossession, re-entry or re-letting of the premises by Landlord, provided, however, that the net payments received by Landlord after deducting all costs and expenses of repossession and/or reletting the same (including, without limitation, any attorney fees, brokerage fees and any reasonable costs or expenses incurred in redecorating, remodeling, or altering the premises for reletting), shall be credited from time to time by Landlord to the account of Tenant and Guarantor and Guarantor shall pay any balance owing to Landlord from time to time, immediately upon being given written notice of demand by Landlord in the manner for providing notice set forth in the Lease.

5.  The liability of Guarantor under this Guaranty shall not be released by any modification or amendment to the Lease (including any extension or renewal of the term of the Lease), and in the case of any such modification, the liability of Guarantor shall be modified in accordance with the term of any such modification of the Lease. Guarantor waives any notice of the modification or amendment of the Lease.

6.  Guarantor shall pay Landlord's reasonable attorneys' fees and all costs and other expenses incurred in any collection or attempted collection of this Guaranty or in any negotiations relative to the Obligations guaranteed under this Guaranty whether or not a lawsuit is commenced. All rights and remedies of Landlord under this Guaranty shall be cumulative and may be exercised singly or concurrently.

7. This Guaranty shall remain in full force and effect until the payment or performance of all Obligations and the other amounts payable under this Guaranty (whether or not the Lease shall have been terminated). Until the payment and performance of all Obligations and the amounts payable under this Guaranty, Guarantor:

a.  Shall have no right of subrogation against Tenant by reason of any payments or acts of performance by the Guarantor in compliance with the obligations of the Guarantor under this Guaranty;

b.  Waives any right to enforce any remedy which Guarantor now or hereafter shall have against Tenant by reason of any one or more payments or acts of performance in compliance with the obligations of Guarantor under this Guaranty; and

c.  Subordinates any liability or indebtedness of Tenant now or hereafter held by Guarantor to the obligations of Tenant to the Landlord under the Lease.

8. This instrument may not be changed, modified, discharged or terminated orally or in any manner other than by an agreement in writing signed by Guarantor and the Landlord.

9.  All of the terms, agreements and conditions of this Guaranty shall extend to and be binding upon Guarantor, and the heirs, executors, personal administrators, and/or successors and assigns of Guarantor and shall inure to

the benefit of and may be enforced by Landlord, its successors and assigns, and the holder of any mortgage or deed of trust to which the premises may be subject at any time or from time to time.

10.  The use of the singular herein shall include the plural and the use of any gender shall include all genders or neuter as the case may be. This Guaranty is entered into in the State of Florida and shall be governed by and construed in accordance with the laws of the State of Florida.

11.  If Guarantor consists of more than one person or entity, the liability of each such person or entity under this Guaranty shall be joint and several.

12.  The undersigned individual acknowledges that he/she is a duly authorized agent of the Guarantor with full power and authority to execute and deliver this Guaranty. This Guaranty has been executed and delivered by Guarantor and constitutes the valid, binding and legal obligation of the Guarantor. Guarantor agrees that it will, from time to time, within ten (10) days of Landlord's request, executed and deliver a statement certifying that this Guaranty is unmodified and in full force and effect.

13.  All notices under this Guaranty shall be delivered by certified mail, return receipt requested, to the address of the parties first set forth above. All notices shall be effective as of depositing the same in mail.

14.  If any provision of this Guaranty or the application thereof to any person or circumstances shall, for any reason and to any extent, be invalid or unenforceable, the remainder of this Guaranty and the application of that provision to other persons or circumstances shall not be affected but rather shall be enforced to the extent permitted by law. This Guaranty shall be construed without regard to any presumption or other rule requiring construction against the party causing this Guaranty to be drafted.

15.  As a further inducement to Landlord to enter into the Lease and to accept this Guaranty, Guarantor hereby intentionally, knowingly and voluntarily waives any right to a trial by jury in any lawsuit, proceeding, counterclaim, or any other litigation procedure based upon, or arising out of this Guaranty. In extension of the foregoing, the Guarantor specifically consents to trial before a court respecting any such matter. Guarantor will not seek to consolidate any such action in which a jury trial has been waived with any other action in which a jury trial cannot be or has not been waived.

IN WITNESS WHEREOF, the undersigned has set hand and Seal this 23 day of _Nve_ , 2015.

_____

STATE OF FLORIDA          )
COUNTY OF MIAMI-DADE )

On this 23 day of _Nve_ ___ in the year 2015, before me, the undersigned, personally appeared Eddy Manzo-Berding, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

Exhibit E - 3

**IN WITNESS WHEREOF** the parties hereto have signed this Lease.

Witnesses:                                                    LANDLORD:

_____            _____

(Printed Name)

_____
Mary Bertoni
(Printed Name)

Witnesses:                                                    TENANT: Seven Stars on the Hudson Corp

_____            By: Jens Berding, President

(Printed Name)                                               _____

_____
Mary Bertoni
(Printed Name)

## EXHIBIT A

**PREMISES**

THIS EXHIBIT IS DIAGRAMMATIC ONLY AND IS INTENDED ONLY TO SHOW THE GENERAL LOCATION AND CONFIGURATION OF THE PREMISES AS THEY ARE CURRENTLY EXPECTED TO EXIST AS OF THE DATE THE PREMISES ARE DELIVERED TO TENANT.

## EXHIBIT B

### LANDLORD'S AND TENANT'S WORK

All terms in this Exhibit B that are defined in the body of the Lease to which this Exhibit is attached shall have the meanings provided for them in the body of the Lease. As used herein, "Tenant's Work" shall mean any work performed by Tenant, whether it is work performed prior to the Rental Commencement Date pursuant to the Working Drawings approved by Landlord ("Tenant's Initial Work") or work subsequent thereto.

**SECTION I.    LANDLORD'S WORK**

1.    Except as may be otherwise specifically set forth in this Lease, Tenant shall take the Premises in an "as is" condition and all work to be performed at the Premises shall be performed by Tenant at Tenant's expense. Pursuant to Section 19.02 of the Lease, there is no Landlord's Work.

2.    Landlord does not warrant any information Landlord may have furnished or will furnish Tenant regarding the Premises. It shall be Tenant's responsibility to verify existing field conditions and measurements of the Premises. Tenant's failure to verify the existing conditions and measurements of the Premises shall not relieve Tenant of any expenses or responsibilities resulting from such failure, nor shall Landlord have any liability or obligations to Tenant arising from such failure.

**SECTION II.    TENANT'S WORK**

1.    Subject to the provisions of this Lease, including this Exhibit, Tenant shall construct the Premises as provided in Article 19 of the Lease.

2.    Tenant shall perform Tenant's Work in accordance with all Laws including, without limitation, the building code of the jurisdiction in which the Property is located and all requirements of the Americans with Disabilities Act.

3.    Tenant shall prepare its plans and specifications for Tenant's Work in accordance with this Exhibit, Landlord's design criteria for the Property, as the same may be revised or supplemented from time to time, and such other criteria as Landlord may furnish Tenant (such criteria herein referred to as the "Design Criteria"). The Design Criteria contains specific criteria for the design and performance of Tenant's Work, including the mechanical and electrical work.

4.    Tenant's Initial Work and, except to the extent as may be specifically otherwise provided in the Lease, all subsequent work in the Premises which Tenant may wish to perform, shall be subject to the advance written approval by Landlord, not to be unreasonably withheld or delayed.

5.    Tenant shall, prior to commencement of Tenant's Work, obtain all required building and other permits at Tenant's expense and post said permits at the Premises as required.

6.    The loads imposed by Tenant's Work at the Premises (including dead and live loads) shall not exceed the allowable load capacity of the existing structural systems and components thereof.

7.    Tenant shall use only new, high quality materials for Tenant's Work, including all improvements, equipment, trade fixtures and all other fixtures.

8.    Tenant shall make no marks or penetrations into the roof, upper floor decks, exterior walls, or floors, unless approved by Landlord in writing in advance. All penetrations shall be made by Landlord's contractor.

9.    If any of Tenant's Work being performed by Tenant to connect to Landlord's utilities requires access through the premises of any other tenant or otherwise will affect any other tenant and Landlord has approved such Tenant's Work, Tenant shall be responsible for coordinating such Tenant's Work with such other tenant, restoring said tenant's premises to its original condition following Tenant's Work, and compensating said other tenant for any costs incurred by it on account of such Tenant's Work.

10.    If any of Tenant's Work necessitates any special work outside the Premises, such as, but not

limited to, structural modification, increasing the size of electric conduit or adding or relocating water service or sanitary service, Landlord, at Landlord's election, may perform such work and Tenant shall reimburse Landlord the cost thereof plus 15% thereof for administration, or require Tenant perform the work at Tenant's cost.

       11.     Tenant shall retain Landlord's identification signs, if any, or, at Tenant's cost, provide new signs for Landlord's utilities, valves, and other such devices in the Premises.

       12.     Landlord may at its election require any aspect of Tenant's Work to be tested, and Tenant shall cooperate with any such testing procedure.

       13.     No approval from Landlord with respect to any aspect of Tenant's Work shall be valid unless in writing.


**SECTION III.**     **CONSTRUCTION**

       1.     Tenant may not commence any Tenant's Work until Landlord has approved Tenant's Working Drawings, all required insurance certificates have been furnished Landlord, all building permits have been obtained, and Tenant has complied with all other requirements herein and elsewhere in this Lease.

       2.     A representative of Tenant shall meet with Landlord or its agent prior to start of construction to discuss construction-related items. Tenant's representative shall contact Landlord in advance to schedule said meeting at a mutually satisfactory time and place.

       3.     Without limitation to any provision of this Lease, prior to commencement of any Tenant's Work at the Premises Tenant shall furnish Landlord the following:

          a.     The names, addresses, representatives and telephone numbers of the general contractor and all subcontractors ("Tenant's Contractors").

          b.     Amounts of the general contract and each subcontract.

          c.     Certificates of Insurance evidencing the insurance required of Tenant and Tenant's general contractors as provided in this Lease, including this Exhibit B.

          d.     A copy of the building permit(s).

          e.     A detailed construction schedule.

          f.     If required by Landlord, a deposit (the "Construction Deposit") to cover damage to Landlord's property during Tenant's construction and payment of any charges due from Tenant. The amount of the Construction Deposit shall be as specified in the Basic Lease Provisions. The Construction Deposit shall be returned to Tenant upon completion of all Tenant's Work in accordance with the approved Working Drawings, provided Tenant owes no amounts to Landlord in connection with the construction.

          g.     Prior to commencement of Tenant's Work, Tenant shall furnish to Landlord, a copy of the executed contract between Tenant and Tenant's general contractor covering all of Tenant's obligations under this Exhibit B. Such contract shall be subject to Landlord's written approval for form and substance.

       4.     All Tenant's Contractors shall be bondable, licensed contractors, having good labor relations, capable of working in harmony with Landlord's general contractor and other contractors in the Property. Tenant shall coordinate Tenant's Work with other construction work at the Property, if any. Landlord specifically reserves the right to approve Tenant's Contractors. If Landlord does not give Tenant such approval with respect to any contractor(s) Tenant shall contract with another general contractor and/or subcontractors(s), as the case may be, for the completion of Tenant's Work.

       5.     In addition to the items in paragraph 3 of this Section IV above, Landlord may require either or both of the following:

   a.  Proof in form satisfactory to Landlord of Tenant's financial ability to cause Tenant's Work to be completed and fully paid for prior to opening for business.

   b.  A completion bond or an irrevocable letter of credit in Landlord's favor in the amount of the cost of Tenant's Work which Landlord may draw upon in order to pay the Tenant's Contractors if Tenant fails to pay for any of its Work.

  6.  Tenant's Work shall be subject to the inspection of Landlord's representative from time to time during the period in which the Work is being performed.

  7.  Tenant's general contractor shall maintain at the Premises during construction a complete set of approved Working Drawings bearing Landlord's approval stamp.

  8.  Temporary Facilities.

   a.  If not already available in the Premises, Tenant shall provide temporary heat, air-conditioning and ventilation for the Premises during construction if Tenant desires the same.

   b.  Tenant shall make the necessary temporary electrical connections at a source designated by Landlord prior to beginning Tenant's Work at the Premises for electricity during Tenant's construction. Tenant shall pay for said electricity as billed by the electrical company or by Landlord (at Landlord's actual costs therefor), as is applicable.

   c.  If Tenant requires water service during construction and Landlord is able to provide it, Landlord do so and bill Tenant as Landlord reasonably determines.

   d.  Tenant shall place all trash in trash containers at a pick-up area or areas designated by Landlord. Tenant shall be responsible for breaking down boxes. Tenant shall furnish its own trash containers at its cost unless Landlord elects to furnish the containers. If Landlord furnishes the trash containers, Tenant shall reimburse Landlord's actual costs therefor. Tenant shall provide trash removal service at Tenant's own cost from the pick-up areas unless Landlord elects to provide the trash removal service. Tenant shall not permit trash to accumulate within the Premises, in the corridor adjacent to the Premises, in the loading docks, or in any areas exterior to the Premises. Should Landlord elect to remove Tenant's trash from the designated pick-up areas for any reason, the charge to Tenant shall be equal to Landlord's actual costs for such removal, plus 15% thereof for administrative costs.

   e.  Tenant shall provide temporary sanitary facilities for its construction personnel at a location designated by Landlord. Landlord reserves the right to provide temporary sanitary facilities for Tenant's use and charge Tenant Landlord's actual cost for such service.

   f.  Tenant shall take all necessary precautions to contain construction "wash-up" liquids (such as grout wash, paint wash, etc.) and prevent entry of such liquids into Landlord's sanitary or storm waste system. All construction wash-up shall be conducted at a location designated by Landlord.

   g.  In the event Tenant is performing Tenant's Work concurrent with the construction of the building shell, Tenant may schedule usage of the material hoist or service elevator for conveyance of Tenant's materials. Hours of usage shall be solely at the discretion of Landlord's general contractor and all scheduling shall be conducted directly with Landlord's general contractor. Tenant shall reimburse Landlord's actual cost therefor.

  9.  During the performance of Tenant's Initial Work, a temporary barricade shall be required in front of the entire Premises. Landlord will provide a temporary flush mounted storefront barricade in front of the Premises. Tenant shall reimburse Landlord for such barricade upon demand at a rate of $75.00 per lineal foot. In addition, Tenant shall be responsible for all modifications to the barricade that may be required to perform Tenant's storefront construction. Any pop-out of the barricade must be pre-approved by Landlord in writing and must be performed during non-operating hours. Upon completion of Tenant's storefront construction, the barricade must be removed and disposed of by Tenant at Tenant's expense. Landlord may at its election require that the barricade include a graphic design which shall be furnished and installed by Tenant at Tenant's expense and shall be subject to Landlord's prior written approval. Landlord shall have the right to remove any non-permitted signs without liability or

prior notice.

10.     The cost of any work permitted or required to be performed by Landlord on behalf of Tenant under this Exhibit shall become due and payable in full within thirty (30) days after Tenant has been invoiced for same by Landlord and said charges shall be deemed Rent under the Lease.

11.     Upon completion of Tenant's Initial Work, Tenant shall notify Landlord.  Upon said notification, Landlord's designated representative shall inspect the Premises and, if the Premises are constructed in accordance with the approved Drawings, said representative shall issue a Letter of Acceptance for the Premises.  If Landlord believes the Premises have not been constructed in accordance with the approved Drawings, Landlord shall so notify Tenant or Tenant's Contractor.  Tenant shall furnish Landlord a copy of a certificate of occupancy for the Premises before Tenant opens for business.

12.     Upon completion of Tenant's Initial Work, Tenant shall promptly furnish to Landlord lien waivers and sworn statements from all contractors who performed labor or supplied materials in connection with Tenant's Initial Work showing that they have been paid in full.

13.     All work performed by Tenant during its construction period, or otherwise during the Term, shall be performed so as to cause the least possible interference with other tenants and the operation of the Property, and Landlord shall have the right to impose reasonable requirements with respect to timing and performance of the Work in order to minimize such interference.  Work causing noise, odor or vibration outside the Premises shall be performed during hours that comply with local ordinances and do not adversely impact tenants within the Property. Tenant shall take all precautionary steps to protect its facilities and the facilities of others affected by the Work (including Common Area flooring in the vicinity of the Premises) and shall police same properly.  Construction equipment and materials are to be located in confined areas and truck traffic is to be routed to and from the site as directed by Landlord so as not to burden the construction or operation of the Property.  All Work shall be confined to the Premises. Tenant's Contractor shall coordinate with Landlord for the delivery and removal of its equipment and materials. Landlord shall have the right to order Tenant or any Tenant's Contractor who willfully violates the above requirements to cease work and to remove its equipment and employees from the building.  Tenant and/or Tenant's Contractor shall take precautions to protect adjacent premises and premises on common air distribution systems from airborne dust, dirt and contaminants, and volatile organic compounds, such as paint thinner or varnish vapors.

14.     Tenant's Contractor shall perform all Work in a manner and at times that do not impede or delay the performance of Landlord's Work.  Tenant and Tenant's Contractor shall not do anything that jeopardizes the labor relations of others in the Property.  Tenant shall be responsible for any costs and expenses arising from any delays in the completion of any work in the Premises, and any damage to such work caused by Tenant's Contractor.

15.     Tenant shall cause all Tenant's Contractors to maintain during the construction period the following insurance: (i) commercial general liability insurance, with minimum coverage of $1,000,000 for bodily injury and property damage combined single limit per occurrence and $2,000,000 in the aggregate on an annual basis, and shall include the following coverages:  premises/operations; independent contractors for contractor's and the subcontractor's liability arising out of the work and operations of subcontractors; aggregate limits of insurance per project; broad form contractual liability specifically in support of, but not limited to, the indemnity provisions of the Lease; personal injury liability with employment and contractual exclusions removed; broad form property damage, including completed operations (this coverage is to be maintained for four (4) years after completion of the Work); explosion, collapse and underground coverage; products/completed operations (this coverage is to be maintained for four (4) years after the final payment agreement with any Contractor is executed); a separation of insureds or severability of interests provision with regard to the general liability policies applicable to the named insured(s) and all additional insureds; (ii) workers' compensation insurance with respect to each Contractor's workers at the site or involved in Tenant's Work, in the amounts required by statutes of the States in which Tenant's Work is performed and the Contractor's employees reside, with coverage for all of Contractor's workers at the Property and anyone directly employed by the Contractor and anyone for whom the Contractor may be liable for workers' compensation claims that may arise out of or result from operations under the contract; (iii) employer's liability insurance in the amount of at least $500,000 per accident, and at least $500,000 per each employee for disease; (iv) comprehensive automobile liability insurance with minimum coverage of $1,000,000 per occurrence combined single limit for bodily injury (including wrongful death) and property damage liability covering all owned, leased, hired or non-owned vehicles, including the loading and unloading thereof; (v) builder's risk property insurance upon the entire Work to the full replacement cost value thereof; and (vi) umbrella liability coverage with a minimum coverage limit of $5,000,000 per occurrence and in the aggregate. No portion of the policies described above shall consist of self-insurance or contain a self-insured retention.  Contractors may have a deductible on these policies of no more than $5,000. Landlord, Landlord's managing agent, and such other parties as are designated by Landlord, shall be

additional insureds under (i), (iv), (v) and (vi) above. All policies will be endorsed to be primary to, and shall receive no contribution from, the additional insureds or any insurance carried by the additional insureds. All insurance required hereunder shall be provided by responsible insurers rated at least A and XIII in the then current edition of Best's Key Rating Insurance Guide and shall be licensed in the State in which the Property is located. All such insurance shall provide for a waiver of subrogation by the insurance carriers. Tenant shall provide, or cause its Contractors to provide, such certificates prior to any Work being performed at the Premises. Such certificates shall state that the coverage may not be changed or cancelled without at least sixty (60) days' prior written notice to Landlord. The certificate of insurance shall contain the following information:

Name and Address of Property:  5300 N. Powerline Road, Fort Lauderdale, FL 33309

Name of Owner:  Dezer Powerline, LLC and MDG Powerline Holdings, LLC

Name and address of Certificate Holder:          Dezer Powerline, LLC and MDG Powerline Holdings, LLC
                                                 18001 Collins Avenue, 31st Floor
                                                 Sunny Isles Beach, Florida 33160

Additional Insureds:  As listed in the Basic Lease Provisions of the Lease.

## EXHIBIT C

## RULES AND REGULATIONS

A.       Tenant covenants and agrees that Tenant will comply with (and require all of Tenant's employees, agents and contractors to comply with, such that the use of "Tenant" hereunder is deemed to refer to Tenant and all such parties) all reasonable rules and regulations set by Landlord from time to time for the operation of the Property or the Premises, including but not limited to the following:

1.       All deliveries to or from the Premises shall occur only at such times, in the areas and through the entrances designated for such purpose by Landlord.

2.       Tenant shall keep and maintain the Premises in a clean and sanitary condition satisfactory to Landlord.  Tenant shall also remove any garbage and refuse generated by Tenant or by the use of the Premises from all areas outside of the Premises, including any common areas and loading areas.  All garbage and refuse shall be kept inside the Premises in the type of container specified by Landlord, and shall be placed outside of the Premises prepared for collection in the manner and at the times and places specified by Landlord. Tenant shall pay the cost of removal of any of Tenant's refuse, including the cost of any garbage removal service provided or designated by Landlord.  Tenant shall use any trash compactor that Landlord may elect to provide for the general use of Tenant or other tenants in a designated area of the Property.  If any part of Tenant's business shall consist of the preparation and/or sale of food, including without limitation the operation of a restaurant, snack shop or food market, Tenant shall provide refrigerated garbage containers at Tenant's expenses for the disposal of food scraps and refuse.

3.       No radio or television aerials or other devices shall be erected on the roof or exterior walls of the Premises or the Property without first obtaining Landlord's written consent (which may be withheld in Landlord's sole and absolute discretion), in each and every instance.  Any aerial or device installed without such written consent shall be subject to removal at any time without notice by Landlord at Tenant's expense.

4.       No loudspeakers, televisions, phonographs, radios, tape players or other devices shall be used in a manner so as to be heard or seen outside of the Premises without the prior written consent of Landlord.

5.       The plumbing facilities shall not be used for any purpose other than the purpose for which they were constructed and no foreign objects or substances of any kind shall be disposed of therein.  All grease traps, if any, shall be installed and maintained in accordance with applicable law and in accordance with Landlord's requirements.  The expense of any breakage, stoppage or damage resulting from a violation of this regulation shall be borne by Tenant.

6.       Tenant shall keep the Premises free of rodents, insects and other pests and contract, at its expense, for termite and pest extermination services covering the Premises, which shall be performed not less than semimonthly.

7.       Tenant shall not burn any trash or garbage of any kind in the Premises or the Property.

8.       Tenant shall periodically clean all glass surfaces of the Premises, including, without limitation, the exterior and interior partitions of all windows, doors and all other glass.  At Tenant's expense, Tenant shall participate in any reasonable window cleaning program that may be established by Landlord for all or substantially all other stores in the Property.

9.       Tenant shall not solicit business or distribute advertising or promotional material in the common areas of the Property.

Exhibit C - 1

10.    Tenant shall not take any action which would violate Landlord's labor contracts, if any, affecting the Property, nor create any work stoppage, picketing, labor disruptions or dispute, or any interference with the business of Landlord or any other tenant or occupant of the Property or with the rights and privileges of any customer or either person(s) lawfully in and upon the Property, nor shall Tenant cause any impairment or reduction of the good will of the Property.

11.    Tenant shall pay before delinquency all license fees, permit fees and any other charges of a similar nature required in order to lawfully conduct business in the Premises.

12.    Tenant shall use the Property name and logo, as either may be changed from time to time, in referring to the location of the Premises in all newspaper, radio and television or other advertising.

13.    Tenant shall store and/or stock in the Premises only such merchandise as Tenant is permitted to offer for sale in the Premises pursuant to the Lease.

14.    Tenant shall not conduct or permit any fire, bankruptcy, auction or "going out of business" sale (whether real or fictitious) in the Premises, or utilize any unethical business practices or methods of operation.

15.    Tenant shall not perform any act or carry on any practice which may damage, mark or deface the Premises or any other part of the Property.

16.    Tenant shall not use any forklift truck, tow truck or any other powered machine for handling freight in the Property, except in such manner and in those areas in the Property as may be approved by Landlord in writing.  All such equipment shall have rubber wheels only.

17.    Tenant shall not place a load on any floor in the interior delivery system, if any, or in the Premises, or in any area of the Property, exceeding the floor load that such floor was designed to carry, nor shall Tenant install, operate or maintain therein any heavy item or equipment except in such manner as to achieve a proper distribution of weight.

18.    Tenant shall not install, operate or maintain in the Premises or in any other area of the Property any electrical equipment which does not bear underwriter's approval, or which would overload the electrical system or any part thereof beyond its capacity for proper and safe operation as determined by Landlord.

19.    Tenant shall not suffer, allow or permit any vibration, noise, light, odor or other effect to emanate from the Premises, or from any machine or other installation therein, or otherwise suffer, allow or permit the same to constitute a nuisance or otherwise interfere with the safety, comfort and convenience of Landlord or any of the other occupants of the Property or their customers, agents or invitees or any others lawfully in or upon the Property.  Upon notice by Landlord to Tenant that any of the aforesaid is occurring, Tenant agrees to forthwith remove or control the same.

20.    Tenant shall not use or occupy the Premises in any manner or for any purpose which would injure the reputation or impair the present or future value of the Premises, the Property and/or the neighborhood in which the Property is located.

21.    Tenant shall not store, display, sell or distribute any alcoholic beverage or any dangerous materials (including without limitation fireworks) unless specifically permitted in the Lease.

22.    Tenant shall not use or occupy the Premises or do or permit anything to be done thereon in any manner which shall prevent Landlord and/or Tenant from obtaining at standard rates any insurance required or desired, invalidate or increase the cost to Landlord of any existing insurance, or which may cause structural injury to any building, constitute a public or private nuisance or violate any present or future laws,

Exhibit C - 2

regulations, ordinances or requirements (ordinary or extraordinary foreseen or unforeseen) of any governmental public or quasi-public authorities now existing or hereafter created having jurisdiction in the Premises or the Property. Any increase in the cost of Landlord's insurance resulting from the type of merchandise sold by Tenant in the Premises or resulting from Tenant's use of the Premises (notwithstanding that such use may be a Permitted Use or that such use may have been consented to by Landlord) shall be paid by Tenant.

23.     Tenant shall not operate any coin or token operated vending machine or similar device (including, without limitation, pay telephone, pay toilets, scales, amusement devices, and machines for the sale of beverages, foods, candy, cigarettes or other merchandise and/or commodities) within the Premises or in any part of the Property, except in those areas of the Premises designated for the sole and exclusive use of Tenant's employees. Notwithstanding the foregoing, Tenant shall be allowed to operate coin operated massage chairs.

24.     Tenant shall not conduct business or any business related activity in the common areas of the Property.

25.     Tenant and its employees shall park in the employee parking areas as designated by Landlord.

26.     Tenant shall keep its loading facilities, if any, and the sidewalks immediately adjoining the Premises free from trash, litter and obstructions.

27.     Tenant shall not permit any hazardous wastes or materials to be brought into the Premises at any time or permit the release, disposal, dumping or storage of hazardous wastes or materials into the septic tanks, sewers or other waste disposal systems of the Property or anywhere in the Property.

28.     If Tenant engages in the preparation of food or packaged foods or engages in the use, sale or storage of inflammable or combustible material, Tenant shall install chemical extinguishing devices (such as Ansil) and shall regularly service such devices (except if otherwise provided by the Lease). If gas is used in the Premises, Tenant shall install at its expense gas cutoff devices (manual and automatic).

29.     No credit card signs, advertisements or hand lettered signs shall be placed outside of the Premises. All interior signs visible from the common areas of the Property and all service door signs shall be professionally prepared and conform to standards of design established by Landlord from time to time for the Property.

B.     Landlord may waive any one or more of these rules for the benefit of any particular tenant or tenants, but no such waiver shall be construed as a waiver by Landlord of such rules in favor of any other tenant or tenants, nor prevent Landlord from thereafter enforcing any such rules against any or all of the tenants of the Property. No waiver by Landlord of any rule or regulation shall be effective unless expressed in a writing signed by Landlord.

C.     Landlord reserves the right, at any time, to change or rescind any one or more of these rules and regulations or to make such other and further reasonable rules and regulations as in Landlord's judgment may from time to time be necessary for the management, safety, care and cleanliness of the Property, for the preservation of good order therein and for the convenience of tenants of and visitors to the Property. Any such amendments, deletions or additions to these rules and regulations shall be effective immediately upon delivery of notice thereof to tenants.

D.     Tenant shall abide by any additional rules or regulations which are ordered or requested by any governmental or military authority. Tenant shall be responsible for the observance of these rules and any such rules by its employees, agents, clients, customers, invitees and guests.

Exhibit C - 3

E.    Landlord shall not be responsible to Tenant or to any other person for the non-observance or violation of these rules and regulations by any other tenant or other person.

F.    Landlord shall, for the enforcement of the covenants, conditions and agreements now or hereafter made a part of this Exhibit C referred to as "Rules and Regulations", have all remedies in this Lease provided for breach of the provisions hereof.

Exhibit C - 4

**APPENDIX F**
**ADDENDUM TO LEASE**

This Addendum to Lease ("Addendum") is executed as of this 23 day of, Novate , 2015 by and between Seven Starts on the Hudson Corporation ("**Franchisee**") and MDG Powerline Holdings, LLC ("**Landlord**") as an addendum to the Commercial Lease (as amended, renewed, and/or extended from time to time, "the **Lease**") for the Premises located at 5300 N Powerline Road, Fort Lauderdale Florida, (the "**Location**"), dated as of November 23 , 2015.

WHEREAS, Franchisee has executed or intends to execute a Franchise Agreement with Rockin' Jump Franchise, LLC ("**Franchisor**") for the operation of a **ROCKIN' JUMP®** business ("**Business**") at the Location, and as a requirement thereof, the Lease for the Location must contain the provisions contained in this Addendum; and

WHEREAS, Landlord and Franchisee agree that the terms contained herein shall supersede any terms to the contrary set forth in the Lease;

NOW THEREFORE, in consideration of mutual covenants set forth herein, the execution and delivery of the Lease, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord and Franchisee hereby agree as follows:

1.    Landlord shall deliver to Franchisor a copy of any notice of default or termination of the Lease at the same time such notice is delivered to Franchisee.

2.    Franchisee hereby assigns to Franchisor, with Landlord's consent, all of Franchisee's rights, title and interest to and under the Lease upon any Termination or non-renewal of the Franchise Agreement, but no such assignment shall be effective unless: (a) the Franchise Agreement is Terminated or expires without renewal; and (b) Franchisor notifies the Franchisee and Landlord in writing that Franchisor assumes Franchisee's obligations under the Lease.

3.    Franchisor shall have the right, but not the obligation, upon giving written notice of its election to Franchisee and Landlord, to cure any breach of the Lease and, if so stated in the notice, to also succeed to Franchisee's rights, title and interests thereunder. Notwithstanding the foregoing, Franchisor's right to cure a default of the Lease shall be subject to, and with the time frame for, any cure provisions stated in the Lease. Franchisor's written notice of an election pursuant to this Addendum must occur within thirty days of its right to assume the Lease occuring or within the time frame to cure any Default under the Lease, whichever occurs first.

4.    The Lease may not be modified, amended, renewed, extended or assigned by Franchisee without Franchisor's prior written consent.

5.     Franchisee and Landlord acknowledge and agree that Franchisor shall have no liability or obligation whatsoever under the Lease unless and until Franchisor assumes the Lease in writing pursuant to Article 2 or 3 above.

6.     If Franchisor assumes the lease as provided for in Articles 2 or 3 above, Landlord and Franchisee agree that (i) Franchisee will remain liable for the responsibilities and obligations, including amounts owed to Landlord, prior to the date of assignment and assumption, and (ii) Franchisor will have the right to sublease the Premises to another franchisee, provided the franchisee agrees to operate the Location as a ROCKIN' JUMP business pursuant to a Franchise Agreement with Franchisor.  Franchisor will be responsible for the lease obligations incurred after the effective date of the assignment.

7.     In the event Franchisor exercises its right assume the Lease, Landlord will be given the right of first refusal to enter into a franchise agreement, in accordance with the same terms and conditions of Franchisee's agreement with Franchisor.

8.     Landlord and Franchisee hereby acknowledge that Franchisee has agreed under the Franchise Agreement that Franchisor and its employees or agents shall have the right to enter the Location for certain purposes. Subject to the rights of entry included in the Lease, Landlord hereby agrees not to interfere with or prevent such entry by Franchisor, its employees or agents. Landlord and Franchisee hereby further acknowledge that in the event the Franchise Agreement expires (without renewal) or is terminated, Franchisee is obligated to take certain steps under the Franchise Agreement to de-identify the location as a ROCKIN' JUMP business. Landlord agrees to permit Franchisor, its employees or agents, to enter the Location and remove signs, decor and materials displaying any marks, designs or logos owned by Franchisor, provided Franchisor shall bear the expense of repairing any damage to the Location as a result thereof.

9.     Subject to the requirements contained in Exhibit B of the Lease, Landlord agrees to allow Franchisee to remodel, equip, paint and decorate the interior and exterior of the Location pursuant to the terms of the Franchise Agreement and any successor Franchise Agreement under which Franchisee may operate the Business at the Location.

10.    Copies of any and all notices required or permitted hereby or by the Lease shall also be sent to Franchisor at 7901 Stoneridge Dr., Suite 503, Pleasanton, CA 94588, or such other address as Franchisor shall specify by written notice to Landlord.

11.    Franchisor is a third party beneficiary under this Addendum.

12.    References to the Landlord, Franchisee and Franchisor include the successors and assigns of each of the parties.

WITNESS the execution hereof under seal.

LANDLORD:

DATE: Nov. 23, 2015

FRANCHISEE:

Seven Stars on Hudson Corp., BY: Jens Berding, Pres.

DATE: Nov 23, 2015

FRANCHISOR:

DATE: _____, _____

## FIRST AMENDMENT TO LEASE AGREEMENT

THIS FIRST AMENDMENT TO LEASE AGREEMENT ("First Amendment") made and entered into this _03_ day of March, 2016 by and between **MDG POWERLINE HOLDINGS, LLC.** a Florida limited liability company having an office at 18001 Collins Ave, 31st Floor, Sunny Isles Beach, FL 33160 and/or its assigns ("Landlord") and **Seven Stars on the Hudson Corporation,** a Florida corporation, having an office at 2108 NE 63rd Street, Fort Lauderdale, Florida 33308 ("Tenant"), collectively referred to as "Parties".

### WITNESSETH:

WHEREAS, Landlord and Tenant entered into a Lease Agreement executed on November 23, 2015 (the "Lease"), pursuant to which the Tenant agreed to lease the Premises described in the Lease; and

WHEREAS, Landlord and Tenant have agreed to amend certain provisions to the Lease;

NOW, THEREFORE, in consideration of the mutual covenants, promises and agreements herein contained, and for other good and valuable consideration exchanged between the Parties, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed as follows:

1.    All capitalized terms used but not otherwise defined herein shall have the identical, respective meanings ascribed to them in the Lease.

2.    Where any provision of this First Amendment shall conflict with, or be inconsistent with, any provisions of the Lease, then such provisions of this First Amendment shall control.

3.    Notwithstanding anything to the contrary contained in the Lease, it is hereby agreed as follows:

a.  The Lease Execution Date shall be November 23, 2015

b.  Section 4 (Premises) of the Basic Lease Provisions of the Lease is deleted in its entirety and replaced with the following: **PREMISES:** 5300 N. Powerline Road, Fort Lauderdale, FL 333309; A portion of Bays 6 and 7 as approximately depicted with cross hatching on Exhibit A (See Section 1.01)

c.  Exhibit A (Premises) of the Lease is deleted in its entirety and replaced with Exhibit A attached hereto and incorporated herein.

4.    All other terms and provisions of the Lease not in conflict with the terms and provisions contained herein, shall remain in full force and effect and are hereby deemed ratified by each of the parties thereto.

- 1 -    Landlord's Initials: _____    Tenants Initials: _____

5.    Miscellaneous.  This First Amendment may be signed in more than one counterpart and/or by facsimile or electronic mail, in which case each counterpart shall constitute an original. Paragraph headings are for convenience only and are not intended to expand or restrict the scope or substance of the provisions of this First Amendment.  Wherever used herein, the singular shall include the plural, the plural shall include the singular, and pronouns shall be read as masculine, feminine or neutral as the context requires.

**IN WITNESS WHEREOF**, the Parties have duly executed this First Amendment the day and year first above written.  Individuals signing on behalf of a principal warrant that they have the authority to bind their principals.  Signed, sealed and delivered in the presence of:

**WITNESSES:**

**LANDLORD:**
**MDG POWERLINE HOLDINGS, LLC.**

Print Name:

_____
Michael Dezer
Manager

Print Name:

**TENANT:**
**Seven Stars on the Hudson Corporation**

Print Name:

_____
Jens Berding
President

Print Name:

- 2 -    Landlord's Initials: _____    Tenants Initials: _____

## EXHIBIT A

### PREMISES



THIS EXHIBIT IS DIAGRAMMATIC ONLY AND IS INTENDED ONLY TO SHOW THE GENERAL LOCATION AND CONFIGURATION OF THE PREMISES AS THEY ARE CURRENTLY EXPECTED TO EXIST AS OF THE DATE THE PREMISES ARE DELIVERED TO TENANT.

i        Landlord's Initials: _____    Tenants Initials: _____