# EXHIBIT 11



**THINKEEN LEGAL, P.A.**
1951 NW 7TH AVE #600,
MIAMI, FL 33136
WWW.THINKEENLEGAL.COM

Christian Pérez Font
T +1 954 873 0923
CPerezFont@thinkeenlegal.com

August 20th, 2018

Kristina E. Wilson, Esq.
Simply Legal
1395 Brickell Avenue, Suite 900
Miami, FL  33131

Re:     *Your letter of July 31, 2018 in connection with the Lease Agreement between MDG Powerline Holdings, LLC and Seven Stars on the Hudson Corp dated November 23, 2015.*

Dear Ms. Wilson:

This firm represents Seven Stars on the Hudson Corp, d/b/a Rockin' Jump Fort Lauderdale. We are in receipt of your letter dated July 31st, 2018 which contends that our client is not in compliance with the terms of its lease agreement dated November 23, 2015 (the "Lease") with MDG Powerline Holdings, LLC ("Landlord").  Our client not only categorically denies being in breach of the Lease, but also demands that the Landlord cease and desist from interfering with our client's business, use, and quiet enjoyment of the Property.

Restriction on Outside Food of Beverage

The Lease contains certain restrictions in connection with food and beverages, the first of which is Section 10 – Restrictions on Use, which in pertinent part reads as follows:

> "*Unless otherwise agreed to by Landlord and Tenant in writing, Tenant shall be prohibited from: A. **Selling** food and drink, subject to the terms of an operating agreement […]*" (emphasis added).

You have also made express reference in your letter to Section A(21) of Exhibit C of the Lease which contains the Rules & Regulations for the use of the leased space. Such provision states as follows:

> "*Tenant shall not **store, display, sell** or **distribute** any alcoholic beverage or any dangerous materials (including without limitation fireworks) unless specifically permitted in the lease*" (emphasis added).



Clearly, the specific activities that are prohibited by the Lease are: (i) the sale of food without Landlord's permission; and (ii) the storage, display, sale or distribution of alcoholic beverages. There are <u>no</u> other specific restrictions on outside food or beverage in the Lease.

As indicated in prior correspondence, our client has not engaged in the sale, storage, display or distribution of food or alcoholic beverages in the leased premises and, therefore, is not (and has never been) in breach of the Lease.

You have also made reference to Section 6.02(b) of the Lease which states that "*Tenant shall comply at all times with the Rules and Regulations […] as Landlord may from time to time reasonably adopt (and which Tenant has notice) for the safety, care and cleanliness of the Property or the preservation of good order therein*". The only existing rules and regulations pertaining to food and beverage are the ones described above. Should Landlord attempt to issue new rules and regulations in connection with outside food and beverage in the future, the same would be subject to (i) a standard of reasonableness (for instance, it would be unreasonable to prohibit guests from bringing food or beverages for children with special dietary needs) and (ii) be justified for the safety, care or cleanliness of the property (for instance, no consumption of food in common areas or a requirement that areas within the leased premises be immediately cleaned after consumption). Our client has complied with all applicable rules and regulations, and will continue to do so, including complying with reasonable future rule and regulation related to the safety, care and cleanliness of the Property.

Hours of Operation.

You have made reference in your letter to Section 6.01 of the Lease. That section reads in pertinent part as follows:

> "*Commencing on the Rental Commencement Date, Tenant shall continuously and uninterruptedly during the term operate its business **in one hundred percent (100%) of the Premises during all business hours established by Landlord as the hours of operation for the property**, provided Landlord shall not require that Tenant open for business before 12:00 p.m. or remain open after 9:00 p.m., except (i) for holiday, seasonal or other special sales or promotions, or (ii) when a majority of other tenants at the Property will be open.*" (emphasis added).

This clause solely imposes an obligation on our client to be open for business during the hours established by the Lease for the operation of the park and not as a restriction on using the leased space outside said hours. This is consistent with the fact that co-tenant Xtreme and other co-tenants regularly hold events outside of the Property's hours of operation without any complaints by the Landlord. Additionally Section 6.01 provides as follows: "*[…] Tenant failure to keep premises open for*



- 3 -                                                                                                      August 20th, 2018

*business during the required hours and days shall be conclusively deemed to be a violation of this Lease […]*". It is evident from this language that the intent of the clause is ensure that our client's business be open no later than 12:00pm during the times that the other tenants are also open for business, which has always been the case. Our client's facilities have always been open to the public not later than 12:00 pm and throughout the hours of operation set by Landlord. Not once have they been closed during the required hours. Consequently, our client is not (and has never been) in breach of the Lease.

Breaches by Landlord

Contrary to your allegations, it is Landlord, rather than our Client who has breached the Lease and continues to do so.

*Section 15 of the Basic Provisions of the Lease*

Section 15 of the Basic Provisions of the Lease, as amended, reads as follows:

> "*SIGNAGE: Tenant will be permitted to install the maximum amount of signage allowable by local code on both the east and west façade of the building **as well as signage in the interior of the Premises near the front of the building, subject to Landlord approval, which shall not be unreasonably withheld**. **Tenant shall also have rights to the pro-rata portion of or dedicated panel on any existing or future pylon or monument, signage for the Project**.*" (emphasis added).

In this regard, Landlord, in clear violation of the terms of the Lease, has either directed or allowed the removal of our client's existing and previously approved internal signage (specially the one near the sole access point in the park which was removed in April 2018 and which had been in place since 2016), thus negatively impacting our client's ability to do business and its right to quietly enjoy the leased premises for their intended purpose. Remarkably, not only was the signage improperly removed in violation of the Lease, but that it was actually misappropriated by Landlord and/or its agents and never returned to our Client. Our client has made numerous requests for the return of its signage which remain unanswered as of this date. These deliberate and illegal actions not only constitute a breach of the Lease but are also negatively impacting our client's ability to run its business in an adequate manner. Internal signage is critical for guests finding and accessing our client's facilities, and their removal has resulted in decreased visits and revenue.

Landlord, through its agent Xtreme, has even refused to fairly represent/display our client's facilities in the facility maps that are held available for each guest when entering the park. Once again, per



- 4 -                                                                                                          August 20th, 2018

Section 12.01 of the Lease, Landlord is the party exclusively controlling the access point to the park and consequently to our Client's facilities.

Faced with these clear breaches of the Lease, coupled with the fact that there is no information desk in the access point even though the Lease provides for one, on August 10th, 2018 our client asked one of its employees to be present near the Park's entrance to greet, provide directions and safety instructions to our client's guests arriving in the property. On that same date an employee of Landlord's agent, Xtreme, threatened our client's employee with banning her from the facility simply for being at the entrance area. In this regard, we would like to highlight that per Section 14.05(b) our client is being charged for a share of operating expenses associated with the access point (including the non-existing information desk) without getting any benefit out of it since its internal signage and mobile front desk were removed and its personnel is being banned for being there. This is a clear contractual breach and illegal interference with our client's business and we hereby demand that Landlord comply with the terms of the Lease and cease and desist from this behavior.

As indicated, under Section 15 of the Basic Provisions of the Lease our client has rights to the pro-rata portion of or dedicated panel on any existing or future pylon or monument, signage for the park. Notwithstanding the foregoing, Landlord and its agent unilaterally decided to drop our client from the marquee located on Powerline Road and which was installed in the Spring of 2018. Per the Lease, our client is entitled to be represented in said marquee. While the Lease does not indicate the basis for this pro-rata allocation, past arrangements indicate that our Client should be afforded 45% of the space in the marquee (that is the same percentage of cost that was allocated to our client in the past in connection with the remodeling of bathrooms in the property). We hereby demand that Landlord comply with the terms of the lease and allow our client to be appropriately represented in the marquee located on Powerline Road.

*Articles 7 and 14 of the Lease*

Under the terms of Section 7.01, Landlord is responsible for the maintenance and good repair of the property and its common areas. In this regard our Client has, since late 2016, communicated to Landlord that the roof has been leaking in at least 3-4 locations within the leased premises. In May of this year Landlord indicated that it started repairing the leaks. As of this date a new leak in the roof has appeared (see attached pictures). Both the amount of roof leaks and their frequency indicate that the roof's coating or maintenance thereof have not been properly performed by Landlord. Consequently, our client hereby demands that the roof be immediately inspected by a reputable roofing company and that Landlord undertake all necessary action so that these leaks be immediately repaired as required in the Lease.

During periods of rain, the property's parking lot gets so widely and deeply flooded that guests cannot access the building without having to walk in water reaching above their ankles, all of which



negatively impacts our client's ability to conduct its business. This has occurred at least three times during 2018. Consequently, our client hereby demands that Landlord comply with its contractual maintenance obligations and immediately repair the parking lot to prevent future flooding.

Under the terms of Section 14.05(c)(i) our client is responsible for contributing to the park's marketing expenses and is therefore entitled to be properly represented in the park's marketing campaigns. Since June of this year and in retaliation for our client's past claims, Landlord's agent eliminated all references and traces of our client from the park's website (our client had been represented in the website since November 2016) again in violation of the Lease, and negatively impacting our client's business. Based on the foregoing, our client hereby demands that Landlord compensate our client for the damages suffered, and together with its agent comply with its contractual obligations and restore the references to our client in the park's website to the form they were in prior to their deletion.

*Article 20 of the Lease*

Under Section 20.15(a) of the Lease our client is entitled to a 15% discount over Landlord's agent's published prices for food for events taking place in the leased premises. As evidenced in the attached sample invoice, the above-referenced discount has not been honored, which is yet another example of Landlord's breach of the Lease.  Further, contrary to Florida law, these invoices were not issued without taxes even though our client has provided a resale certificate. In the spirit of collaboration and good faith our client has agreed to pay the amount of $ 1,778.37, in connection with Xtreme's invoices for food sold for resale to our client from June to early July 2018. This amount represents the total value of the food less the contractual 15% discount and the corresponding sales taxes. Notwithstanding the foregoing, our client hereby demands that Landlord or its agent (i) promptly reimburse our Client for the excess 15% and the sales taxes that should not have been collected in past invoices (a separate invoice will be prepared and sent by our client in this regard) and (ii) honor the agreed contractual discount in all future invoices.

*Other breaches*

Landlord and its agent have also breached the Lease's covenant of quiet enjoyment (Section 20.21 of the Lease) by engaging in an intentional campaign of interference with our client's normal and reasonable operation of its business by, among others, unreasonably removing power to our client's satellite front desk and placing obstacles in front of it thus hindering its ability to sell tickets and provide directions to guests. In this regard note that even though your firm's letter of June 1st to our client clearly states that "*Tenant will be provided with a front desk space where your client may keep a POS and a cash box and can carry out all of its registration and waiver needs*", as of this date neither such space nor any reasonable accommodation has been afforded to our client thus



severely impacting its ability to conduct business. We understand that on August 15, 2018 our client reached an agreement with Landlord through David Goldfarb, that would restore access to a dedicated space in the front desk by August 18, 2018. Our client welcomes Landlord's agreement in this regard but notes that as of this date such access has not been restored. In this regard, our client has communicated with Landlord's agent to obtain specific commitments in furtherance of their agreement with respect to the following items: (i) confirm size and location of our client's new front desk; (ii) provide rendering of location of our client's new front desk space; (iii) ensure all necessary power and wiring (Cat 5 cables, power, etc.) is in place at new location; (iv) design/build partitions to allow for safe cash operations for both parties; and (v) install security cameras to monitor cash transactions for both parties. As I'm sure you'll appreciate, these are essential parts of the agreement reached with Landlord. If our client can't operate properly, its business will continue to be negatively impacted.

Additionally, Landlord has made modifications to common areas without affording reasonable accommodations to our client (for instance the placement of a ropes course and barricades in front of our client's facilities unnecessarily hindered visibility and access to our client's facilities for a period of 4-6 weeks negatively impacting its ability to conduct business). Also, as communicated in prior correspondence, Landlord or its agent have in the past prevented our client's guests (as well as other guests visiting the park) from entering our client's facilities during several lockout events during 2017, all of which resulted in decreased revenues and a negative financial impact for our client. We understand that the August 15, 2018 agreement with David Goldfarb includes compensation for the Warren Henry event.

For context, the attached spreadsheet shows our Client's losses and impact in revenue during June to August 2018 only. Obviously, the Landlord has been in breach of the Lease as described above since April 2018.

Other Outstanding Matters

*New Access System*

Under Section 20.21 of the Lease, our client is entitled to the quiet enjoyment of the leased premises. Such right to quiet enjoyment includes affording our client and its designees with proper access to the leased premises. In this regard, Landlord is in the process of installing a new entry system which, as currently envisioned, would unreasonably limit the ability of our client and its designees to access the leased premises. Firstly, the unreasonable restriction on the number of people that can access the lease premises is a direct violation of the right to quiet enjoyment contained in the lease. Secondly, the implementation of a system that only functions with smartphones and which does not offer



- 7 - August 20th, 2018

alternatives (such as a fob) for whenever our client or its designees don't have their smartphone with them is both unreasonable and imposes an undue burden on our client in violation of the Lease.

*Unnecessary Security Cameras*

Our client would like to point out that Landlord has, without its consent, installed security cameras within the leased premises which, under the Lease, are to be exclusively used and controlled by our Client. These cameras which have unfettered view of all of the leased premises, infringe upon our client and its guest's reasonable expectation of privacy. While our client does not object to security cameras being conspicuously placed in the property's common areas and exits, our client strongly objects to their current placement which infringes on their rights and their reasonable expectation of privacy, and demands their immediate removal.

*Outstanding Compensation*

We understand from our Client that Xtreme has agreed to compensate our client in the amount of $750 for the lockout event that took place on December 19, 2017. While this is by no means just compensation for the loss of revenue experienced by our client as a consequence of Landlord and its agent's actions, our Client in good faith is willing to accept this amount in satisfaction of the outstanding compensation for the December 2017 lockout event. Our client is also willing to agree to include its facilities in the lockout event planned by co-Tenant Xtreme on September 26 & 27, 2018 provided that (i) co-Tenant Xtreme agrees to the one-time price of $ 1,600, per day (up to a maximum of four (4) hrs/day) for this particular event and (iii) Landlord and Xtreme agree to restore our client's access to a space in the front desk located at the property's access point. Payment for the September 26 & 27, 2018 lockout events is due to our client on September 1, 2018 for reserving the exclusive space.  Note also that in line with the payment terms currently offered by Xtreme to our client for food sales (COD), all socks need to be prepaid before the event.

Be advised, however, that neither our client's acceptance of the agreed compensation for the December 2017 lockout event, nor the one-time pricing for the September 26 & 27 lockout events shall be deemed or interpreted as setting a precedent for future pricing for the use of our client's facilities. Pricing for such use during any lockout event will be determined in the future, on a case-by-case basis and will always be subject to the prior agreement of our client.



- 8 -									August 20th, 2018

Formal notice is given to Landlord to remediate all contractual breaches described above within thirty (30) days as required under Section 17.03 of the Lease.

As previously indicated, our client disputes all allegations of breach of the Lease by Landlord and is fully committed to vigorously defending itself, exercising its rights and to challenge any retaliatory or constructive eviction by Landlord. Our client's position throughout its tenancy has always been to find common ground for understanding and to work in harmony with Landlord, its agents and all co-tenants. That commitment remains unwavering. Accordingly, should your client wish to engage in constructive conversations or propose alternatives in order to resolve all outstanding issues in an amicable manner and move forward, our client will gladly consider it.

Should you have any questions or comments regarding the contents of this letter, please do not hesitate to contact me.

Very truly yours,

Thinkeen Legal, P.A.

By: _____
     Christian Perez Font, Esq.

.cc   Rockin Jump
      7901 Stoneridge Dr. Suite 503
      Pleasanton, CA 94588
      Attn: Joseph Freschi

.cc   Seven Stars on the Hudson Corp.
      d/b/a Rockin' Jump Fort Lauderdale
      2108 NE 63rd Street
      Fort Lauderdale, FL 33308
      Att: Jens Berding

**Attachment A**
**Rockin Jump Fort Lauderdale's Revenue Losses from June 2018 to Date**

|  | Avg Rev. Growth Since Dec. '16 | Avg. Rev. Growth since Dec. '16 Excl. April | | |
|---|---|---|---|---|
|  | 54% | 68% | | |
|  | Expected Rev. 54% YoY Growth | Expected Rev. 68% YoY Growth | Revenue Loss vs. 54% Growth | Revenue Loss vs. 68% Growth |
| June | $ 219,576.92 | $ 239,476.27 | $ (99,399.85) | $ (119,299.20) |
| July | $ 288,300.03 | $ 314,427.48 | $ (147,210.61) | $ (173,338.06) |
| MTD August | $ 120,464.24 | $ 131,381.42 | $ (61,864.29) | $ (72,781.47) |
|  |  |  | $ (308,474.75) | $ (365,418.74) |

Notes:
1) Not complete overview of all losses as revenue loss from removal of sign and switching-off of power for front desk have not been quantified yet.
2) April '18 saw a significantly slower YoY revenue growth due to missing Easter holiday and related school vacations in '18

**Attachment B**
**Roof Leak**



**Attachment C**
**Invoices without Contractual Discount**

